## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

BRAYDEN JOHNSON, LOGAN RHINES,    )
and KAYLA SAVAGE, individually, and on    )
behalf of all others similarly situated,    )
                                      )
            *Plaintiffs*,    )
                                        )
      v.    )  Case No. <u>5:24-cv-00495-PRW</u>
                                        )
THE UNIVERSITY OF OKLAHOMA,    )
ET AL.    )
                                        )
            *Defendants*.    )

## DEFENDANTS' BRIEF IN SUPPORT OF
## <u>THEIR MOTION TO DISMISS THE COMPLAINT</u>

Defendants the University of Oklahoma, Joseph Harroz, Jr., Jeff Blahnik, Courtney

Henderson, and Dorion Billups submit this brief in support of their Motion to Dismiss the

Complaint under Rule 12(b)(6) and Rule 12(b)(1).

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES..................................................................................................ii

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

STANDARD OF REVIEW ................................................................................................ 4

ARGUMENT.................................................................................................................... 5

      I.      The Complaint fails to state a plausible claim for relief under Rule 12(b)(6).
            .................................................................................................................... 5

            A.      The University is not subject to liability under 42 U.S.C. § 1983
                    (Count I), and the University Officials are not subject to liability un-
                    der Title VI (Count II). ....................................................................... 6

            B.      Plaintiffs do not plausibly allege that Defendants violated the Equal
                    Protection Clause or Title VI in awarding financial aid. .................. 8

                    1.      Plaintiffs fail to plausibly allege that the University treated
                            them differently from similarly situated students. .................. 9

                    2.      Plaintiffs do not plausibly allege that the University engaged
                            in intentional discrimination. ................................................ 15

      II.     The Court should dismiss the Complaint for lack of jurisdiction under Rule
            12(b)(1)................................................................................................... 18

CONCLUSION ............................................................................................................. 23

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alexander v. Sandoval,*
  532 U.S. 275 (2001) ................................................................................. 8, 15

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) .................................................................................. passim

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ................................................................................. 11

*Black Emergency Response Team v. Drummond,*
  2024 WL 3014659 (W.D. Okla. June 14, 2024) .......................................... 6

*Blackwell v. Strain,*
  496 F. App'x 836 (10th Cir. 2012) ........................................................... 15

*Brooks v. Mentor Worldwide LLC,*
  985 F.3d 1272 (10th Cir. 2021) ............................................................. 4, 5, 14

*Brown v. Montoya,*
  662 F.3d 1152 (10th Cir. 2011) .............................................................. 14

*Carpenter v. Boeing Co.,*
  456 F.3d 1183 (10th Cir. 2006) ............................................................. 13, 14

*City of Cleburne v. Cleburne Living Ctr.,*
  473 U.S. 432 (1985) ................................................................................. 8

*City of Cuyahoga Falls, Ohio v. Buckeye Cmty. Hope Found.,*
  538 U.S. 188 (2003) ................................................................................. 8

*Collins v. Daniels,*
  916 F.3d 1302 (10th Cir. 2019) ............................................................. 19, 22

*COPE v. Kan. State Bd. of Educ.,*
  821 F.3d 1215 (10th Cir. 2016) .............................................................. 19

*Davis v. Bruce*,
    129 F. App'x 406 (10th Cir. 2005)................................................................7

*Davis v. Fed. Election Comm'n*,
    554 U.S. 724 (2008)...................................................................................19

*Denver Homeless Out Loud v. City and Cty. Of Denver*,
    2022 WL 974294 (D. Colo. March 31, 2022)............................................22

*Ex parte Young*,
    209 U.S. 123 (1908)...................................................................................22

*Garrett v. Wells Fargo Bank, N.A.*,
    2024 WL 1011891 (D. Wyo. Feb. 7, 2024)...............................................22

*Gomillion v. Lightfoot*,
    364 U.S. 339 (1960).............................................................................16, 17

*Harter v. United States*,
    344 F. Supp. 3d 1269 (D. Kan. 2018) .........................................................5

*Hartman v. Kickapoo Tribe Gaming Comm'n*,
    319 F.3d 1230 (10th Cir. 2003)...................................................................6

*Hensel v. Off. of Chief Admin. Hearing Officer*,
    38 F.3d 505 (10th Cir. 1994).......................................................................6

*Hunt v. Lincoln Unified Sch. Dist.*,
    2016 WL 1734797 (E.D. Cal. May 2, 2016) ............................................17

*In re Gold Res. Corp. Sec. Litig.*,
    776 F.3d 1103 (10th Cir. 2015)...................................................................5

*In re Peeples*,
    880 F.3d 1207 (10th Cir. 2018)..............................................................5, 18

*Jordan v. Sosa*,
    654 F.3d 1012 (10th Cir. 2011).................................................................21

*Kan. Nat. Res. Coal. v. U.S. Dep't of Interior*,
    971 F.3d 1222 (10th Cir. 2020).................................................................19

*Khalik v. United Air Lines*,
   671 F.3d 1188 (10th Cir. 2012) ........................................................................ 4, 14

*Kitchen v. Herbert*,
   755 F.3d 1193 (10th Cir. 2014) ............................................................................... 8

*Lucas v. Turn Key Health Clinics, LLC*,
   58 F.4th 1127 (10th Cir. 2023) .......................................................................... 8, 15

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ......................................................................................... 19, 20

*McCleskey v. Kemp*,
   481 U.S. 279 (1987) .................................................................................... 15, 16, 17

*McLaughlin v. Bd. of Trs. of State Colleges of Colo.*,
   215 F.3d 1168 (10th Cir. 2000) ............................................................................... 6

*Moose Lodge No. 107 v. Irvis*,
   407 U.S. 163 (1972) ................................................................................................ 20

*Murguia v. Childers*,
   2021 WL 799876 (W.D. Ark. March 2, 2021) ...................................................... 7

*Pers. Adm'r of Mass. v. Feeney*,
   442 U.S. 256 (1979) ............................................................................................ 8, 15

*Requena v. Roberts*,
   893 F.3d 1195 (10th Cir. 2018) ......................................................................... 8, 14

*Reynolds v. Sch. Dist. No. 1, Denver, Colo.*,
   69 F.3d 1523 (10th Cir. 1995) .............................................................................. 15

*SECSYS, LLC v. Vigil*,
   666 F.3d 678 (10th Cir. 2012) .............................................................................. 16

*Seibert v. State of Okla., ex rel. Univ. of,Okla.*,
   867 F.2d 591 (10th Cir. 1989) ................................................................................. 6

*Sheppard v. Kent State Univ.*,
   2015 WL 4743893 (N.D. Ohio Aug. 11, 2015) .................................................... 17

*Shotz v. City of Plantation*,
344 F.3d 1161 (11th Cir. 2003) ................................................................. 7

*Soule v. Conn. Ass'n of Sch., Inc.*,
90 F.4th 34 (2d Cir. 2023) ...................................................................... 21

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ................................................................. 19, 20, 21

*Steel Co. v. Citizens for Better Env't*,
523 U.S. 83 (1998) ................................................................................. 20

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023) ............................................................................. 8, 9

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) ................................................................................. 5

*United States v. Calvillo-Diaz*,
2022 WL 1607525 (N.D. Ill. May 20, 2022) ......................................... 18

*United States v. Mesa-Roche*,
288 F. Supp. 2d 1172 (D. Kan. 2003) .................................................... 17

*United States v. Texas*,
599 U.S. 670 (2023) ............................................................................... 19

*United States v. Thurmond*,
7 F.3d 947 (10th Cir. 1993) ................................................................... 16

*Ute Indian Tribe of the Uintah & Ouray Indian Rsrv., v. Ure*,
2024 WL 3013377 (D. Utah June 14, 2024) ............................................ 7

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) ................................................................... 15, 16, 17

*Webb v. Swensen*,
663 F. App'x 609 (10th Cir. 2016) ........................................................... 7

*Yick Wo v. Hopkins*,
118 U.S. 356 (1886) ............................................................................... 16

**Statutes**

20 U.S.C. §§ 1070 ................................................................................................ 10

42 U.S.C. § 1983 .......................................................................................... 5, 6, 7

42 U.S.C. § 2000d ................................................................................................ 7

42 U.S.C. § 2000d-7(a) ........................................................................................ 7

Okla. Stat. tit. 70, §§ 2601 ................................................................................ 10

U.S. Const. amend. XIV, § 1 ............................................................................... 8

U.S. Const. art. III.............................................................................................. 18

**INTRODUCTION**

Plaintiffs boldly allege the University of Oklahoma intentionally awards more financial aid to Black students than to other students and that, *but for* this alleged racial preference, Plaintiffs would have received more financial aid.

For such a serious allegation, one would expect Plaintiffs to identify specific scholarships or other forms of financial aid that the University allegedly distributes based on race. But Plaintiffs do not do this. In fact, Plaintiffs do not even allege what specific scholarships or other forms of financial aid for which *they* applied, much less that those specific programs (albeit, entirely unidentified) used race as an eligible criterion, or otherwise had some fixed sum of money earmarked for Black students that would otherwise be made available to everyone else *but for* a racial preference.

The best Plaintiffs can muster is a supposed "sophisticated statistical analysis," shrouded in secrecy, which they claim shows that the *aggregate* financial aid over the last thirteen years has been disproportionally awarded to Black students. However, in higher education there are many different forms of financial aid, some of which are awarded based on federal or state formulas that the University does not control. Practices from thirteen years ago do not reflect practices today. Thus, an aggregate analysis does nothing to establish that the University intentionally discriminated against Plaintiffs, let alone can it establish that Plaintiffs were personally denied some form of aid they otherwise would have received *but for* a racial preference.

At best, an aggregate analysis of financial aid data *might* plead a disparate-impact theory of discrimination. However, disparate impact is not a cognizable theory under either the Equal Protection Clause or Title VI, the two laws under which Plaintiffs seek relief. Moreover, Plaintiffs do not even allege sufficient facts to raise a disparate-impact theory beyond the speculative level, because they admit their statistical analysis is based primarily

1

on old data that pre-dates the Supreme Court's decision in *Students for Fair Admission*, they do not describe the forms of financial aid they analyzed (as noted, many forms are awarded by the federal government, state government, or third-parties, all of which are outside the control of the University), and they admit they did not control for various non-discriminatory factors that may correlate with race.

Given these glaring deficiencies, it is no surprise that Plaintiffs do not disclose the results of their analysis, and instead characterize their analysis in only generalized and se-cretive terms. But "Trust us, it shows discrimination," does not satisfy the *Twombly/Iqbal* standard of pleading, *especially* where disparate impact is not a cognizable theory to begin with.

At bottom, there are simply no allegations sufficient to sustain a claim of intentional discrimination, as required by the Equal Protection Clause and Title VI. Without this basic information, Plaintiffs fail to state a claim for relief and to establish Article III standing. This Court should dismiss the Complaint in its entirety.

## BACKGROUND[1]

Plaintiffs Brayden Johnson, Logan Rhines, and Kayla Savage are students at the University, a constitutionally created state entity and public educational institution in Norman, Oklahoma. Compl. ¶¶ 11–14. Plaintiffs do not have the financial means to pay for college, so they applied for scholarships from the University. *Id.* ¶¶ 44, 49, 55. Which ones, they do not say.

---

[1] As they must at this stage, Defendants confine their Background to those facts set forth in Plaintiffs' Complaint and assume those facts (but not legal conclusions) to be true. While Defendants disagree with the accuracy of many of Plaintiffs' assertions, this motion is not predicated on those disagreements. Defendants reserve the right to challenge, and disprove, all of Plaintiffs' factual allegations should this case proceed forward.

When applying for financial aid, they "self-identified as white and non-Hispanic." *Id.* ¶¶ 45, 50, 56. Johnson "received a merit scholarship in the amount of $4,000 per semester and two smaller scholarships totaling $1,000 and $1,750 per year." *Id.* ¶ 46. Rhines "received a merit scholarship based on his ACT score and GPA in the amount of $1,000 per semester." *Id.* ¶ 51. And Savage received "no financial aid." *Id.* ¶ 57. Savage claims that an "official" from the University's "Office of Admissions" told her that "financial aid was generally not available to students like her but would have been if she were African-American." *Id.* ¶ 54. Savage does not provide the name of this purported official, what title he or she holds, or explain what authority, if any, this person has regarding financial aid.

If the University "did not engage in racial discrimination when awarding financial aid," however, Plaintiffs allege that they "would have received additional financial aid." *Id.* ¶¶ 47, 52, 58; *see also id.* ¶ 43.

Plaintiffs conclude the University "awards financial aid based on race," generically claiming that a "statistical analysis" of "the University of Oklahoma's published enrollment data and the financial aid data that it reported to the Department of Education from 2009 to 2022" shows that "black students receive more institutional grant aid from the University of Oklahoma than other students, even when controlling to the extent possible for factors such as family income." *Id.* ¶ 37. This "sophisticated statistical analysis"—without which the University's alleged "systematic racial discrimination" (Plaintiffs say) would have remained undetected—used data "at the university-year level regarding the net price of tuition at the institution, the proportion of students enrolled from a group that appears to receive beneficial treatment, and measures of the family income of enrolled students." *Id.*

¶¶ 38, 40. Plaintiffs thus conclude that "available evidence indicates that race plays a role in the University of Oklahoma's financial-aid awards." *Id.* ¶ 80.

Plaintiffs sued the University and four University employees in their official capacity: President Joseph Harroz, Jr.; Jeff Blahnik, Vice President for the Division of Enrollment Management and Chief Enrollment Officer; Courtney Henderson, Executive Director of Financial Aid Services; and Dorion Billups, Director of Connection and Student Engagement (collectively, the "University Officials"). *Id.* ¶¶ 15–18. On behalf of themselves and a class of former, current, and incoming University students, Plaintiffs assert two claims for violating the Equal Protection Clause of the Fourteenth Amendment (Count I) and Title VI of the Civil Rights Act of 1964 (Count II). *Id.* ¶¶ 59, 67–86; *see also id.* ¶ 60 (defining the class).

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (cleaned up).

Although the Court must accept well-pleaded facts as true, conclusory allegations are "not entitled to the assumption of truth." *Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012). A conclusory allegation is one in which an inference is asserted without "stating underlying facts" or including "any factual enhancement." *Brooks v.*

*Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021). The Court should "disregard conclusory statements and look to the remaining factual allegations to see whether Plaintiffs have stated a plausible claim." *Id.* In reviewing the Complaint, the Court "must consider the complaint in its entirety, as well as other sources," including "matters of which a court may take judicial notice." *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1108 (10th Cir. 2015) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)).

Article III standing is a predicate to subject matter jurisdiction, and therefore the absence of standing is a basis for dismissal under Rule 12(b)(1). *See In re Peeples*, 880 F.3d 1207, 1212 (10th Cir. 2018) ("Article III standing is jurisdictional."). However, when a deficiency in standing (here, the absence of an adequately pleaded injury-in-fact) overlaps with or is intertwined with a deficiency in pleading the elements of a claim, the Rule 12(b)(6) and Rule 12(b)(1) analysis effectively merges into a single Rule 12(b)(6) analysis. *See Harter v. United States*, 344 F. Supp. 3d 1269, 1274 (D. Kan. 2018). Therefore, Defendants present this motion as primarily resting on Rule 12(b)(6), although they also discuss the standing analysis specifically, to the extent the Court concludes the arguments are not intertwined.

## ARGUMENT

The Court should dismiss Plaintiffs' Complaint in its entirety because Plaintiffs fail to state a plausible claim for relief under Rule 12(b)(6), and they lack Article III standing, depriving the Court of subject matter jurisdiction.

## I.    The Complaint fails to state a plausible claim for relief under Rule 12(b)(6).

Plaintiffs fail to state a claim in three ways. *First*, Plaintiffs cannot sue the University for violation of the Equal Protection Clause under 42 U.S.C. § 1983 (Count I)

5

because it is not a "person" covered by § 1983. *Second*, Plaintiffs cannot sue the University Officials under Title VI (Count II) because the statute applies only to entities that receive federal funds. And *third*, Plaintiffs do not plausibly allege that Defendants violated the Equal Protection Clause or Title VI in awarding financial aid to students.

**A.   The University is not subject to liability under 42 U.S.C. § 1983 (Count I), and the University Officials are not subject to liability under Title VI (Count II).**

Count I fails to state a claim against the University in any respect because States and arms of the States cannot be held liable under § 1983. "A cause of action under section 1983 requires the deprivation of a civil right by a 'person' acting under color of state law." *McLaughlin v. Bd. of Trs. of State Colleges of Colo.*, 215 F.3d 1168, 1172 (10th Cir. 2000) (quoting 42 U.S.C. § 1983). "[A] governmental entity that is an arm of the state for Eleventh Amendment purposes is not a person for § 1983 purposes." *Id.* (cleaned up).

Under Oklahoma law, a suit against the University is a suit against the Oklahoma Board of Regents.[2] *See Hensel v. Off. of Chief Admin. Hearing Officer*, 38 F.3d 505, 508 (10th Cir. 1994). Moreover, the Board of Regents is an arm of the State and therefore not a "person" as defined by § 1983. *See, e.g.*, *Black Emergency Response Team v. Drummond*, 2024 WL 3014659, at *4 (W.D. Okla. June 14, 2024) (dismissing § 1983 claim against the University of Oklahoma Board of Regents because it is not a "person" covered by the statute); *accord Hartman v. Kickapoo Tribe Gaming Comm'n*, 319 F.3d 1230, 1234 (10th Cir. 2003) (affirming dismissal of § 1983 claim because "neither a state nor a state agency

---

[2] *Seibert v. State of Okla., ex rel. Univ. of Okla.*, 867 F.2d 591, 594 (10th Cir. 1989) ("Under Oklahoma's constitutional and statutory scheme, the Board of Regents, which supervises the University and in whose name all suits against the University must be brought, is an arm of the State.").

is a 'person' for purposes of § 1983"). Thus, Plaintiffs fail to state a viable § 1983 Equal Protection claim against the University.[3]

Count II, for violation of Title VI, fails to state a claim against the University Officials, in their official capacities. Title VI prohibits "discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. "Title VI forbids discrimination only by recipients of federal funding; therefore, individual employees of such entities are not liable under Title VI." *Webb v. Swensen*, 663 F. App'x 609, 613 (10th Cir. 2016); *accord Shotz v. City of Plantation*, 344 F.3d 1161, 1171 (11th Cir. 2003) ("It is beyond question . . . that individuals are not liable under Title VI."); *see, e.g.*, *Ute Indian Tribe of the Uintah & Ouray Indian Rsrv., v. Ure*, 2024 WL 3013377, at *17 (D. Utah June 14, 2024) (dismissing Title VI claim against individual employees). Further, Eleventh Amendment immunity does not shield the University from suit on a Title VI claim. *See* 42 U.S.C. § 2000d-7(a). Therefore, even assuming the merits are satisfied the University itself can be subjected to declaratory relief under Title VI. Thus, there is no need for the University Officials to be subject to declaratory relief under Title VI, based on *Ex parte Young*, which is a legal fiction created solely to obtain prospective relief where the Eleventh Amendment bars such relief directly against the State. *See Murguia v. Childers*, 2021 WL 799876, at *3 (W.D. Ark. March 2, 2021) (*Ex parte Young* is "not relevant" for a "Title VI" claim because equitable remedies are directly available against a state entity under Title VI). As a result, the University Officials are not proper defendants to a Title VI claim.

---

[3] Sometimes the courts conceptualize the ground for dismissal as arising from the Eleventh Amendment itself. In other words, because the University is an arm of the State and enjoys Eleventh Amendment immunity by default, and it was not included as a "person" under § 1983, then § 1983 did not abrogate Eleventh Amendment immunity. *See Davis v. Bruce*, 129 F. App'x 406, 408-09 (10th Cir. 2005). To the extent this distinction matters, the University also moves to dismiss the § 1983 claim based on Eleventh Amendment immunity.

**B.      Plaintiffs do not plausibly allege that Defendants violated the Equal Protection Clause or Title VI in awarding financial aid.**

For purposes of the alleged discrimination, this Court may evaluate the Equal Protection claim and the Title VI claim together. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 198 n.2 (2023) ("*SFFA*") (citation omitted) (evaluating Title VI claim "under the standards of the Equal Protection Clause itself"); *see also* Compl. ¶ 83 (alleging a Title VI violation "for the same reasons that the challenged conduct violates the Equal Protection Clause"). The Equal Protection Clause states that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This "is essentially a direction that all persons similarly situated should be treated alike." *Kitchen v. Herbert*, 755 F.3d 1193, 1222 (10th Cir. 2014) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).

To move forward on an Equal Protection claim, a plaintiff "must first make a threshold showing that they were treated differently" from "similarly situated" persons who are alike "in all relevant respects." *Requena v. Roberts*, 893 F.3d 1195, 1210 (10th Cir. 2018) (cleaned up). A plaintiff must then allege that this treatment resulted from "purposeful discrimination." *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1146 (10th Cir. 2023); *see also City of Cuyahoga Falls, Ohio v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 194 (2003) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection.") (cleaned up); *accord Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) ("Title VI itself directly reach[es] only instances of intentional discrimination.") (citations omitted). "[P]urposeful discrimination requires more than intent as volition or intent as awareness of consequences. It instead involves a decisionmaker's undertaking a course of action because of, not merely in spite of, [the action's] adverse effects upon an identifiable group." *Iqbal*, 556 U.S. at 676–77 (quoting

8

*Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)) (cleaned up). Under this rubric, Plaintiffs fail to state a plausible claim.

> ### 1. Plaintiffs fail to plausibly allege that the University treated them differently from similarly situated students.

Plaintiffs do not plead sufficient facts to allow the Court "to draw the reasonable inference" that the University intentionally treated Plaintiffs differently from Black students in awarding financial aid. *Id.* at 678.[4] Most notably, Plaintiffs do not disclose the specific scholarships or other forms of financial aid for which they applied, let alone what the criteria for awarding such scholarships and other forms of financial aid are, making it impossible to evaluate how any theory of discrimination is possible. This is unlike *SFFA*, where Harvard and North Carolina admittedly considered race as a "plus" factor in the undergraduate admissions process. Because in *SFFA* the admissions pools were fixed, and all applicants were competing for the same admission, the use of race to favor some

---

[4] A brief word is necessary about Plaintiffs' irrelevant allegations suggesting that the University wrongfully "place[s] a high value on racial diversity." Compl. ¶¶ 27–32. These allegations appear designed to poison the well rather than to state a claim. They have nothing to do with the University's financial aid practices, and Plaintiffs do not link the two. Further, there is nothing wrong with placing a high value on racial diversity. Nothing in *SFFA* prohibits an institution from "valuing" racial diversity, nor does it proscribe the type of permissible affinity programming Plaintiffs demean in their Complaint. Indeed, following *SFFA*, the Department of Justice and Department of Education issued guidance to colleges and universities explaining that nothing in *SFFA* prohibits institutions from attempting to recruit diverse student bodies through legally permissible means. *See* U.S. Dep'ts of Just. and Educ., *Questions and Answers Regarding the Supreme Court's Decision in Students for Fair Admissions, Inc. v. Harvard College and University of North Carolina* (Aug. 14, 2023), https://bit.ly/4ez6qAx. ("[N]othing in the *SFFA* decision prohibits institutions from continuing to seek the admission and graduation of diverse student bodies, including along the lines of race and ethnicity, through means that do not afford individual applicants a preference on the basis of race in admissions decisions."). *Id.* at 3. *see* Compl. ¶ 27 (criticizing the University for "monitoring the racial statistics of admitted students").

applicants was inherently detrimental to others. Such an inference is not possible here because of the threadbare nature of Plaintiffs' allegations.

Indeed, Plaintiffs do not even allege they were denied any particular scholarship or any particular form of financial aid based on a racial preference for Black students. Nor are there any allegations that any relevant specific scholarships or financial aid programs utilize race as a criterion. In other words, it is unclear that the hypothetical Black students who allegedly received a racial preference when considering financial aid in the *aggregate* were competing for the same scholarships and forms of financial aid as the Plaintiffs.

Plaintiffs try to resolve this deficiency through wordplay. They use terms like "aid," "grants," and "scholarships," haphazardly, interchangeably, and in a way that presupposes financial aid is uniform. But these terms are *not* interchangeable because there are a wide variety of programs constituting the universe of financial aid. The federal government awards need-based aid through grants, loans, and work-study programs that the University administers. *See* 20 U.S.C. §§ 1070 *et seq.* The State of Oklahoma also awards need-based scholarships under the Oklahoma Promise program. *See* Okla. Stat. tit. 70, §§ 2601 *et seq.* Students can also apply to obtain outside grants or scholarships from various third parties, such as Native American tribes, which then provide funds on a student's behalf to pay for University tuition and fees. And, of course, students can also apply for scholarships or "tuition waivers"[5] directly from the University itself. But it is only with respect to these latter forms of financial aid that the University sets eligibility criteria.

All three Plaintiffs generically allege that they applied for "scholarships" because they did not have the "financial means to pay for college." Compl. ¶¶ 44, 49, 55. They do not allege the "scholarship" programs to which they applied, much less the information

---

[5] A tuition waiver simply reduces the amount the University charges a recipient, unlike a scholarship which is applied to pay for tuition, fees, room and board, and other charges.

they submitted. Johnson received a "merit scholarship" and "two smaller scholarships," *id.* ¶ 46. But were these third-party scholarships or University-funded scholarships? The Complaint does not say. Rhines also received a "merit scholarship based on his ACT score and GPA," *id.* ¶ 51. But if the scholarship Rhines received was based on academic criteria, then what forms of aid did Rhines seek that were influenced by race? Again, the Complaint is silent. Savage received "no financial aid." *Id.* ¶ 57. But the Complaint fails to identify the forms of financial aid for which Savage applied. These distinctions matter because different forms of financial aid are funded by different entities, who set different eligibility criteria.

These threadbare and genericized allegations simply lack the "factual enhancement" needed to "nudge[] their claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558, 570 (2007).

Further, Plaintiffs plead no facts connecting the unidentified scholarships and financial aid that they applied for but did not receive, to the universe of "financial aid data" reported to the Department of Education, and the "institutional grant aid"—whatever that means—that Black students allegedly receive in greater amounts, according to Plaintiffs' secret statistical analysis. Compl. ¶¶ 37, 44, 49, 55; *see also id.* ¶ 38 (alleging discrimination in "university grants"). Did Black students receive a disproportionate amount of federal Pell grants? Did they receive a disproportionate amount of State grants? Did they receive a disproportionate amount of third-party funded scholarships that the University simply administered? Were any of these forms of aid included in the "financial aid data" reported to the Department of Education? Given that the University administers or itself awards millions of dollars across many financial aid categories every year, and large portions of that aid are awarded by federal or state formulas, or third-party decisions,

Plaintiffs need more than speculation and generalization to plausibly connect the alleged disproportionate statistics to intentional discrimination by the University.

That brings us to Plaintiffs' equally problematic "statistical analysis" itself. *Id.* ¶ 37. If Plaintiffs' true grievance is with certain institutional scholarships or other forms of financial aid the University itself awards, yet the data they use for the survey includes other forms of federal, state, and third-party aid simply administered by the University, and that causes the overall financial aid award to reflect a statistical disparity, the analysis is of no value.

Plaintiffs' deliberate choice to omit the particulars of their statistical analysis is inexplicable. If Plaintiffs uncovered a real statistical disparity showing that Black students received more financial aid than everyone else—communicable in numbers rather than vague, conclusory statements—why not disclose the results? Similarly, that Plaintiffs withhold the sources for the "published enrollment data" and "financial-aid data that [the University] reported to the Department of Education," *id.*—while they cite seven other irrelevant internet links, *see, e.g.*, *id.* ¶ 30 n.6–8—casts doubt on the analysis's plausibility. As Plaintiffs' only piece of evidence supporting the University's alleged "systemic racial discrimination" in awarding financial aid, *see id.* ¶ 40 ("In the absence of this sophisticated statistical analysis, the University of Oklahoma's systemic racial discrimination with respect to financial aid would not have become known."), they need more than the tepid, passive-voice statement that the analysis "indicates" that "race plays a role in the University's financial aid awards." *Id.* ¶ 80; *see also id.* ¶ 37.

Perhaps the most fundamental problem with Plaintiffs' statistical analysis is that the data do not reflect the University's *current* or even *recent* financial aid practices. *See, e.g.*, Prayer for Relief at (b) (seeking a prospective declaration that "Defendants' racially

discriminatory financial-aid practices violate the Equal Protection Clause and Title VI"). The most recent data that Plaintiffs could muster is from 2022—over two years ago. But data from 2022—and it goes without saying 2009 and on—says nothing about how the University administers financial aid in 2023 and 2024. Plaintiffs cannot plausibly allege that the University's current financial aid practices violate the Constitution by pointing to historic data, especially data that pre-date *SFFA* itself, which substantially changed the governing law regarding the extent to which race may be used to achieve the compelling interest of diversity.

In the same way, plausibly alleging, let alone proving, that the University treated Plaintiffs differently from similarly situated students using the proffered dataset is a statistical impossibility. Plaintiffs enrolled at the University no earlier than Fall 2022. *See* Compl. ¶¶ 44, 49, 53. Yet Plaintiffs' analysis incorporates *thirteen* years of data before Plaintiffs ever set foot on campus.[6] *See generally Carpenter v. Boeing Co.*, 456 F.3d 1183, 1196–97 (10th Cir. 2006) (to be reliable, statistical data must "relate to the proper population" and control for key variables). This, apples-to-oranges comparison is fatal to Plaintiffs' claims. By definition, students attending the University when Plaintiffs were in elementary school (and at a time when Supreme Court precedent was quite different from that now reflected in *SFFA*) are not similarly situated to them. Moreover, even if the dataset contained financial aid data for 2022, and thus overlapped minimally with Plaintiffs, the vast bulk of the data were from prior years. If any inference is to be drawn, it would be that a statistical aberration was likely the result of the data from the twelve years that predate 2022, rather than 2022 itself.

---

[6] If the "2022" data refers to the 2021–2022 academic year—and like Plaintiffs' other allegations, this is unclear—then the analysis's timeframe shares not even the slightest overlap with Plaintiffs' attendance at the University.

There is also the problem that Plaintiffs failed to control for non-discriminatory factors that might correlate with race and thus could be the cause of a statistical disparity, rather than intentional discrimination.

The Plaintiffs' analysis used "data at the university-year level regarding the net price of tuition at the institution, the proportion of students enrolled from a group that appears to receive beneficial treatment, and measures of the family income of enrolled students." *Id.* ¶ 38. For such a "sophisticated statistical analysis," this sounds markedly unsophisticated. *Id.* ¶ 40. Plaintiffs plead that they tried to "control[] *to the extent possible* for factors *such as* family income." *Id*. ¶ 37 (emphasis added); *see Carpenter*, 456 F.3d at 1196–97. But this suggests it was *not possible* to control for all such factors and, therefore, that Plaintiffs did not *actually* control for all factors that affect financial aid. In the absence of valid statistical controls, the Court cannot draw the reasonable inference that the University treated *anyone* "differently" from "similarly situated" students much less Plaintiffs. *Requena*, 893 F.3d at 1210.

Putting this all together, Plaintiffs' allegation that "[a] statistical analysis of publicly available data indicates that the University of Oklahoma considers race when awarding financial to its students" (Compl. ¶ 37) is a "naked assertion[]" not entitled to the presumption of truth. *Brooks*, 985 F.3d at 1281; *see Khalik*, 671 F.3d at 1193; *see generally Brown v. Montoya*, 662 F.3d 1152, 1173 (10th Cir. 2011) ("[I]n the context of a § 1983 claim, conclusory allegations are not sufficient to state a constitutional violation.") (cleaned up). Plaintiffs must offer "more than a sheer possibility that [the University] has acted unlawfully," *Iqbal*, 556 U.S. at 678, and the Complaint—brimming with glaring defects—does not.

14

## 2. Plaintiffs do not plausibly allege that the University engaged in intentional discrimination.

But even if Plaintiffs ran the perfect analysis—and actually disclosed what they found—Plaintiffs would still fail to state a plausible claim under the Equal Protection Clause and Title VI. On top of alleging the threshold requirement that the University treated them differently from similarly situated students, Plaintiffs must allege that the University acted with "purposeful discrimination." *Lucas*, 58 F.4th at 1146. Plaintiffs' alleged "statistics" cannot do this, *even if* they involved a valid dataset and valid methodology.

Disparate impact violates neither the Equal Protection Clause nor Title VI. *See Feeney*, 442 U.S. at 273–74 (Equal Protection Clause); *Alexander*, 532 U.S. at 285 (Title VI). Rather, "purposeful discrimination is the condition that offends the Constitution." *Feeney*, 442 U.S. at 274. It follows that statistical evidence showing disparate *impact* is not enough on its own to prove intentional discrimination. *See Reynolds v. Sch. Dist. No. 1, Denver, Colo.*, 69 F.3d 1523, 1535 (10th Cir. 1995) ("[S]tatistical evidence alone does not establish intentional discrimination."); *Blackwell v. Strain*, 496 F. App'x 836, 840 (10th Cir. 2012) ("Statistical evidence alone is rarely enough to show discriminatory purpose.").

Although the Supreme Court "has accepted statistics as proof of intent to discriminate in certain limited contexts," only in "rare cases [has] a statistical pattern of discriminatory impact demonstrated a constitutional violation." *McCleskey v. Kemp*, 481 U.S. 279, 293 & n.12 (1987); *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) ("Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action . . . . But such cases are rare."). Examples of those rare cases include *Gomillion v. Lightfoot*, 364 U.S. 339 (1960) and *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). *See McCleskey*, 481 U.S. at 293 n.12.

In *Gomillion*, the Supreme Court held that a state legislature violated the Fifteenth Amendment when it changed a city's boundaries "from a square to an uncouth twenty-eight-sided figure," in effect, excluding 395 of 400 Black voters without excluding a single white voter. 364 U.S. at 340–41. The Court held that "the conclusion would be irresistible, tantamount for all practical purposes to a mathematical demonstration" that the state acted with a discriminatory purpose. *Id.* at 341. And in *Yick Wo*, an ordinance required laundry operators to obtain a permit, and all but one of the white applicants received permits while more than two hundred Chinese applicants received no permits. 118 U.S. at 373–74. The Court determined that the statistical disparity "warrant[ed]" and "require[d] the conclusion" that the state acted with a discriminatory purpose. *Id.* "Absent a pattern as stark as that in *Gomillion* or *Yick Wo*," however, "impact alone is not determinative, and the Court must look to other evidence." *Vill. of Arlington Heights*, 429 U.S. at 266. At bottom, generalized statistics are rarely helpful because "to prevail under the Equal Protection Clause, [a plaintiff] must prove that the decisionmakers in *his* case acted with discriminatory purpose." *McCleskey*, 481 U.S. at 292 (emphasis in original).

Plaintiffs do not plausibly allege a "statistical pattern [that] is 'stark' enough to infer discriminatory purpose" because Plaintiffs do not share the results. *United States v. Thurmond*, 7 F.3d 947, 952 (10th Cir. 1993) (quoting *Arlington Heights*, 429 U.S. at 266); *see also accord SECSYS, LLC v. Vigil*, 666 F.3d 678, 686 (10th Cir. 2012) (opinion of Gorsuch, J.) (explaining that only a "starkly disparate impact—while not itself automatically or presumptively unlawful—may well inform a court's investigation into the law's underlying intent or purpose"). In other words, Plaintiffs do not quantify the degree of statistical disparity they claim exists, and they do not suggest it is anywhere nearly as significant as in *Gomillion* or *Yick Wo*.

But even if they did more than posture the alleged statistical disparity, it is doubtful that the disparity, if any, would make this one of the "rare" cases when disparate impact shows discriminatory intent by itself. *Arlington Heights*, 429 U.S. at 266; *see, e.g.*, *United States v. Mesa-Roche*, 288 F. Supp. 2d 1172, 1193 (D. Kan. 2003) (declining "to do that which higher courts have already refused to do"—"infer discriminatory intent from the statistical evidence"); *Hunt v. Lincoln Unified Sch. Dist.*, 2016 WL 1734797, at *5–*6 (E.D. Cal. May 2, 2016) (refusing to "extrapolate[]" from statistics that a school district "systematically turned down African American students for special education services at a much higher rate than other students" because "these allegations even if true do not state a viable claim" under Title VI). Without (a lot) more, Plaintiffs have not plausibly alleged that the "decisionmakers in [their] case[s] acted with discriminatory purpose." *McCleskey*, 481 U.S. at 292.

Savage's allegation that some unnamed admissions "official" told her that "financial aid was generally not available to students like her but would have been if she were African-American" does not save her claim either. Compl. ¶ 54. This single, stray comment, is insufficient to plausibly allege that the University acted with discriminatory intent to deny her financial aid *because* she is white (or not Black). For starters, key facts are missing. Savage does not allege this person's identity, whether the statement occurred before or after the University denied Savage financial aid, or whether this person had decision-making authority at the University to award financial aid. Indeed, in other equal protection contexts, one-off comments are not enough to support even the inference of discriminatory intent. *See, e.g.*, *Sheppard v. Kent State Univ.*, 2015 WL 4743893, at *3 (N.D. Ohio Aug. 11, 2015) (finding that statement "that he could not hire the Plaintiff because he just hired two black professors" was not "sufficient to support a reasonable

17

inference that [the University] acted with 'racially discriminatory intent or purpose' toward the Plaintiff as is required to make out an equal protection claim"); *United States v. Calvillo-Diaz*, 2022 WL 1607525, at *9 (N.D. Ill. May 20, 2022) ("The notion that one senator's stray remark can ascribe racist intent to a whole deliberative body has been rejected by the Supreme Court.").

More importantly, even if this interaction occurred, it would still be insufficient to plausibly allege intentional discrimination. To make out an Equal Protection violation, Savage must point to evidence that the University gave *her* financial aid to a Black student "because" she is white and "not merely in spite of" it. *Iqbal*, 556 U.S. at 677. Because neither Savage—nor Rhines or Johnson, for that matter—have done so, their claims "stop[] short of the line between possibility and plausibility of entitlement to relief." *Id.* at 678.

In the end, stripped of the conclusory, unsupported allegations, Plaintiffs' Complaint amounts to "an unadorned, the-defendant-unlawfully-harmed-me accusation" insufficient to support a plausible claim for relief. *Id*. The Complaint should be dismissed.

## II.   The Court should dismiss the Complaint for lack of jurisdiction under Rule 12(b)(1).

Alternatively, the Court should dismiss the Complaint for lack of jurisdiction under Rule 12(b)(1) because Plaintiffs cannot establish Article III standing to bring their claims. *See In re Peeples*, 880 F.3d 1207, 1212 (10th Cir. 2018) ("Article III standing is jurisdictional.").

Article III of the Constitution limits the federal judicial power to "Cases" and "Controversies." U.S. Const. art. III, § 2. "Under Article III, a case or controversy can exist only if a plaintiff has standing to sue." *United States v. Texas*, 599 U.S. 670, 675 (2023).

To satisfy Article III's standing requirements, Plaintiffs must "clearly allege facts" showing all three elements of constitutional standing: (1) an "injury in fact," (2) that is "fairly traceable" to the University's "challenged conduct," and (3) "that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (cleaned up). Plaintiffs "bear[] the burden of establishing these elements." *Id.*

"[S]tanding is not dispensed in gross." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (citation omitted). Quite the opposite: "[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Id.* (cleaned up). Here, Plaintiffs seek a declaratory judgment as a form of prospective relief, and damages as a retrospective remedy, so they must establish standing for both forms of relief. *See, e.g.*, Compl. ¶¶ 75, 85; *see Collins v. Daniels*, 916 F.3d 1302, 1314 (10th Cir. 2019) ("Plaintiffs have the burden to demonstrate standing for each form of relief sought.") (citation omitted).

"At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Kan. Nat. Res. Coal. v. U.S. Dep't of Interior*, 971 F.3d 1222, 1231 (10th Cir. 2020) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (quoting *COPE v. Kan. State Bd. of Educ.*, 821 F.3d 1215, 1221 (10th Cir. 2016)). In short, "plaintiffs must adequately allege a plausible claim of injury." *COPE*, 821 F.3d at 1221. Here, Plaintiffs do not plead a plausible, injury-in-fact with regard to *either* form of relief they seek.

An injury-in-fact is the "[f]irst and foremost" of standing's three elements. *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 103 (1998). It requires that the plaintiff suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (cleaned up). For an injury to be "concrete," "it must actually exist." *Spokeo*, 578 U.S. at 340. And "[f]or an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Id.* at 339 (cleaned up). A generalized interest in preventing discrimination is not enough: the plaintiff must allege that he or she sought a benefit and was denied it based on protected status. *See Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166 (1972).

Here, Plaintiffs do not allege the specific scholarships or other specific forms of financial aid for which they applied, much less that those specific scholarships and specific forms of aid are included in the data being evaluated in the statistical analysis that Plaintiffs claim shows discrimination through statistical disparity. *Spokeo*, 578 U.S. at 338. Further, even if Plaintiffs applied for some forms of financial aid (i.e., specific scholarships), that were included in the aggregate statistical analysis, Plaintiffs only alleged that financial aid, *in the aggregate*, was disproportionately awarded to Black students. However, this says nothing about whether the scholarships Plaintiffs sought were awarded in a discriminatory manner.

There is also the problem with the range of the data set. The statistical analysis that Plaintiffs rely on concerned financial aid awarded from 2009 to 2022. Compl. ¶ 40. The most that the Court can infer from the Complaint—and this is generous—is that the University's aggregate financial aid data shows an aggregate racial disparity in the years

before Plaintiffs applied for financial aid. Even if this were true, it does not help Plaintiffs allege that the University's actions affected them "in a personal and individual way" or that the University's current financial aid practices violate the Constitution. *Spokeo*, 578 U.S. at 339. Indeed, it is quite possible (and Plaintiffs provide no allegations to clarify, one way or the other) that the alleged statistical disparity results from disproportionate awards of certain forms of aid in the earlier years of this thirteen-year period.

Plaintiffs' reliance on this historical data is particularly problematic for their request for declaratory relief, because a plaintiff cannot obtain prospective relief based on allegations that are stuck in the past and do not substantiate an *ongoing* injury. *See Jordan v. Sosa*, 654 F.3d 1012, 1019 (10th Cir. 2011) ("Although a plaintiff may present evidence of a past injury to establish standing for retrospective relief, he must demonstrate a continuing injury to establish standing for prospective relief."); *accord Soule v. Conn. Ass'n of Sch., Inc.*, 90 F.4th 34, 84 (2d Cir. 2023) ("[I]n the absence of any plausible, non-speculative allegations of ongoing or future harm, Plaintiffs' remaining claims for injunctive relief are fundamentally retrospective . . . and therefore, if they have a meritorious claim, the proper remedy is damages."). Moreover, because Plaintiffs' supposed evidence of discrimination is *backward*-looking, and they do not indicate that they are currently attempting to secure more financial aid (e.g., they "would have received" more scholarships but for the alleged discrimination), they have not adequately pleaded the sort of ongoing violation of federal law that could support an *Ex parte Young* claim against

21

the University Officials they have sued in their official capacities.[7] *See Denver Homeless Out Loud v. City and Cty. Of Denver*, 2022 WL 974294, at *8 (D. Colo. March 31, 2022) ("Because Plaintiffs' Complaint does not establish that State Defendants are engaging in an ongoing violation of federal law, the Court finds that the *Ex parte Young* exception does not apply . . . .").

But to be clear, Plaintiffs also lack standing to seek damages under Title VI because, at a minimum, they have not plausibly alleged that they suffered even a historic injury-in-fact. Plaintiffs allege no facts to support the conclusory allegation that they "would have received additional financial aid" if the University "did not engage in racial discrimination." Compl. ¶¶ 47, 52, 58. They allege no facts detailing the scholarships for which they applied, the scholarships the University awarded using race-based criteria, and how *they* would have received those scholarships but-for the alleged discriminatory barrier. And without these facts, Plaintiffs have not plausibly alleged a concrete and particularized injury to confer standing to seek damages. *See, e.g.*, *Garrett v. Wells Fargo Bank, N.A.*, 2024 WL 1011891, at *6 (D. Wyo. Feb. 7, 2024) (finding that alleged damages pleaded in a "rather conclusory fashion" without "any supporting factual allegations" did not "plausibly allege" that the plaintiffs "suffered a concrete and particularized injury").

---

[7] Should Plaintiffs respond that they seek retrospective declaratory relief for past wrongs, then Plaintiffs' Equal Protection claim against the University Officials clearly cannot proceed under *Ex parte Young*, which "may not be used to obtain a declaration that a state officer has violated a plaintiff's federal rights in the past." *Collins*, 916 F.3d at 1316 (citation omitted); *see Ex parte Young*, 209 U.S. 123 (1908).

**CONCLUSION**

For all these reasons, the Court should dismiss Plaintiffs' Complaint and grant any other relief that the Court considers appropriate.

Date:  July 15, 2024

Respectfully submitted,

Armand Paliotta, OBA #15320
**UNIVERSITY OF OKLAHOMA**
Office of Legal Counsel
660 Parrington Oval, Suite 213
Norman, Oklahoma 73019
Telephone: (405) 325-4124
Facsimile: (405) 325-7681
apaliotta@ou.edu

*University General Counsel*

/s/ Michael Burrage
Michael Burrage, OBA No. 1350
Patricia A. Sawyer, OBA No. 30712
**WHITTEN BURRAGE LAW FIRM**
512 North Broadway Avenue, Ste 300
Oklahoma City, OK 73102
Telephone (405) 516-7800
Facsimile (405) 516-7859
mburrage@whittenburragelaw.com
psawyer@whittenburragelaw.com

23

Hayley E. Hanson, *pro hac vice pending*
Derek Teeter, *pro hac vice pending*
Michael T. Raupp, *pro hac vice pending*
**HUSCH BLACKWELL LLP**
4801 Main, Suite 1000
Kansas City, MO 64112
T (816) 983-8000
F (816) 983-8080
hayley.hanson@huschblackwell.com
derek.teeter@huschblackwell.com
michael.raupp@huschblackwell.com

Daniel G. Solomon, *pro hac vice pending*
**HUSCH BLACKWELL LLP**
1801 Penn. Ave, NW, Suite 1000
Washington, DC 20006
T (202) 378-2300
F (202) 378-2319
danny.solomon@huschblackwell.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that, on July 15, 2024, I filed a copy of the foregoing with the Court using the ECF system, which sent electronic notification to all counsel of record.

/s/ Michael Burrage
Michael Burrage, OBA No. 1350
*Attorney for Defendants*