# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| BRAYDEN JOHNSON, LOGAN RHINES, and KAYLA SAVAGE, individually, and on behalf of all others similarly situated, | CASE No. CIV-24-495-PRW |
| *Plaintiffs*, | **FIRST AMENDED COMPLAINT – CLASS ACTION** |
| vs. | |
| THE UNIVERSITY OF OKLAHOMA; JOSEPH HARROZ, JR., President; JEFF BLAHNIK, Vice President for Division of Enrollment Management & Chief Enrollment Officer; COURTNEY HENDERSON, Executive Director of Financial Aid Services; and DORION BILLUPS, Director of Connection and Student Engagement, | |
| *Defendants*. | |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Brayden Johnson, Logan Rhines, and Kayla Savage bring this action for declaratory relief and damages on behalf of themselves and a Class of others similarly situated against the following Defendants: (i) the University of Oklahoma; and the University's (ii) President; (iii) Vice President for the Division of Enrollment Management/Executive Director of the Office of Admissions & Recruitment; (iv) Executive Director of Financial Aid Services; and (v) Director of Connection and Student Engagement (collectively the "University of Oklahoma").

1

Defendants' practice of awarding financial aid to students on the basis of race violates Plaintiffs' and other Class members' rights under the Equal Protection Clause of the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964. For the reasons set forth in this Complaint, Plaintiffs and the proposed Class are entitled to declaratory relief and damages.

## **INTRODUCTION**

1.     "Eliminating racial discrimination means eliminating all of it." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023) ("*SFFA*").

2.     Yet racial preferences continue to exist at the University of Oklahoma. Rather than determining who to admit based on their race, the University of Oklahoma determines how much financial aid it gives to students based on their race. That is unlawful.

3.     Universities that discriminate on the basis of race when making financial-aid awards violate the same equal protection principles that apply in the admissions context and elsewhere.

4.     The Equal Protection Clause of the Fourteenth Amendment prohibits the government from considering race when providing public benefits—such as financial aid—except when the government can satisfy strict scrutiny. This is an exceedingly high standard. The government must show that racial preferences serve a compelling government interest and are narrowly tailored to that interest. No other showing will suffice.

5.     And Title VI requires, at minimum, that recipients of federal funding meet

this same exacting standard—strict scrutiny—when using racial classifications.

6.    Defendants' use of race to allocate financial-aid resources cannot survive strict scrutiny. Government actors may not "intentionally allocate preference to those 'who may have little in common with one another but the color of their skin.'" *Id*. at 220 (quoting *Shaw v. Reno*, 509 U.S. 630, 647 (1993)). And if Defendants had a cognizable interest in easing the financial burden on certain racial groups attending the University of Oklahoma, they could serve that interest by more narrowly tailored means, such as awarding need-based, but race-blind, financial aid.

7.    Defendants' race-based financial-aid practices thus violate the Equal Protection Clause of the Fourteenth Amendment. They also violate Title VI, which prohibits racial discrimination by all programs receiving federal financial assistance.

8.    Such violations entitle Plaintiffs and the Class to declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, and damages under Title VI, 42 U.S.C. § 2000d.

## JURISDICTION AND VENUE

9.    This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

10.    Venue is proper under 28 U.S.C. § 1391 because at least one Defendant is a resident of this District and all Defendants are residents of Oklahoma, and because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

11.    Plaintiff Brayden Johnson is a resident of Oklahoma and an undergraduate student in an accelerated master's degree program at the University of Oklahoma.

12.    Plaintiff Logan Rhines is a resident of Oklahoma and a junior at the University of Oklahoma.

13.    Plaintiff Kayla Savage is a resident of Oklahoma and a senior at the University of Oklahoma.

14.    Defendant the University of Oklahoma is a public educational institution based in Norman, Oklahoma. The University of Oklahoma accepts substantial financial assistance from the federal government. In fiscal year 2023, for example, the University of Oklahoma was awarded more than $150 million through federal programs. And in fiscal year 2022, it was awarded more than $70 million.[1] The University of Oklahoma also receives financial assistance from the federal government by enrolling students who pay tuition, at least in part, with federal financial aid.

15.    Defendant Joseph Harroz, Jr. is President of the University of Oklahoma. In that role, he serves as chief executive officer of the University and is ultimately responsible for the University's financial aid program. Defendant Harroz is sued in his official capacity.

16.    Defendant Jeff Blahnik is Vice President for the Division of Enrollment Management and Chief Enrollment Officer. In that role, he oversees the University of Oklahoma's financial aid department among other responsibilities. Defendant Blahnik is

---

[1]    *Recipient Profile, University of Oklahoma*, USASPENDING.GOV, https://bit.ly/3QsKoVX (last accessed May 1, 2024).

sued in his official capacity.

17.    Defendant Courtney Henderson is Executive Director of Financial Aid Services at the University of Oklahoma. In that role, she operates the University's financial aid program. Defendant Henderson is sued in her official capacity.

18.    Defendant Dorion Billups is Director of Connection and Student Engagement at the University of Oklahoma. He served as Director of Diversity Enrichment Programs at the University of Oklahoma until his position was renamed. In his role, Mr. Billups works within the Office of Admissions & Recruitment to promote racial diversity, including through race-conscious financial aid decisions. Defendant Billups is sued in his official capacity.

## **LEGAL FRAMEWORK**

19.    Equal protection prohibits government entities—including public universities—from distributing benefits or burdens based on race, unless the government identifies a compelling interest and shows that its policy is narrowly tailored to pursue that interest. Racial classifications usually fail under this standard, known as "strict scrutiny." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995). The Supreme Court has identified only limited "compelling interests that permit resort to race-based government action," namely "remediating specific, identified instances of past discrimination" and "avoiding imminent and serious risks to human safety in prisons, such as a race riot." *SFFA*, 600 U.S. at 207.

20.    In *Grutter v. Bollinger*, 539 U.S. 306 (2003), the Supreme Court held that the Equal Protection Clause also allowed limited consideration of race in higher-education

admissions. The Court required schools to use an admissions plan "flexible enough to ensure that each applicant is evaluated as an individual." *Id*. at 337. Thus, in a related case, the Court rejected an admissions program that "automatically" awarded points to minority applicants. *Gratz v. Bollinger*, 539 U.S. 244, 271 (2003). The Court further assumed that schools would continue to pursue race-neutral options and contemplated that "25 years from now, the use of racial preferences will no longer be necessary to further the interest approved today." *Grutter*, 539 U.S. at 343.

21.    The Court later returned to the issue of affirmative action in two cases, both named *Fisher v. University of Texas*. In *Fisher I*, the Court reminded lower courts that "strict scrutiny imposes on the university the ultimate burden of demonstrating, before turning to racial classifications, that available, workable race-neutral alternatives do not suffice." *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 312 (2013) ("*Fisher I*"). Because the trial court had failed to "perform this searching examination," the Supreme Court reversed. *Id.* at 312–13. In *Fisher II*, a seven-member Court upheld the University of Texas's consideration of race in admissions based on the unique facts of that case, but affirmed that strict scrutiny applies to all government classifications based on race—no exceptions. *See Fisher v. Univ. of Tex. at Austin*, 579 U.S. 365, 377–80 (2016) ("*Fisher II*").

22.    In 2023, the Supreme Court held that the use of race in admissions by Harvard College and the University of North Carolina ("UNC") violated equal-protection principles. In so doing, the Supreme Court eliminated the special dispensation it had provided for college admissions programs in earlier cases. *See SFFA*, 600 U.S. at 214–24.

23.    The Supreme Court reaffirmed its longstanding teaching that race-conscious "[u]niversity programs must comply with strict scrutiny." *Id.* at 213. And it emphasized that it had "time and again forcefully rejected the notion that government actors may intentionally allocate preference to those 'who may have little in common with one another but the color of their skin.'" *Id.* at 220 (quoting *Shaw*, 509 U.S. at 647).

24.    The Supreme Court has never held that race-based financial-aid decisions satisfy strict scrutiny.

25.    Racial discrimination in financial aid was illegal before the Supreme Court's decision in *SFFA*, and it remains illegal after the Supreme Court's decision in *SFFA*. That is because "[r]acial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." *Gratz*, 539 U.S. at 270 (citation omitted).

## FACTUAL ALLEGATIONS

### I.    Racial Considerations in Financial Aid at the University of Oklahoma

26.    The University of Oklahoma is prohibited from using affirmative action when making admissions decisions. *See* OKLA. CONST. art. II, § 2–36A (prohibiting preferential treatment based on race by state educational institutions).

27.    Still, the University of Oklahoma places a high value on racial diversity. The University monitors the racial statistics of admitted students. And one of the University's

express goals is to increase the number of Black students on campus.[2] The University has also undertaken intentional efforts to increase the number of Hispanics on campus.

### A.    The University of Oklahoma Operates Many Race-Based Programs

28.    In an effort to increase racial diversity, the University of Oklahoma operates and has operated a host of race conscious programs. These programs, which give race-based preferences to Black students and other preferred racial groups, begin before matriculation and continue through graduation.[3]

29.    Prior to student matriculation, certain Black admittees are invited to attend the "McLaurin & Lewis Leadership Conference."[4] This conference is a "college preview program for African American students" during which they "are introduced to current African American student leaders, faculty, staff, and alumni."[5] Selection for the conference is race-based.

30.    If Black students opt to attend the University of Oklahoma, the school then

---

[2]    *African American Students*, UNIV. OF OKLA., https://bit.ly/43qZ110 (last accessed March 21, 2024) (highlighting that the University "seeks to increase African American student . . . representation on campus").

[3]    Many of these programs appear, on their face, to be inconsistent with the Oklahoma Constitution's Bill of Rights. *See* OKLA. CONST. art. II, § 2–36A (prohibiting preferential treatment based on race in the operation of public education). The University's basis for operating these programs is unclear.

[4]    *African American Students*, *supra*, n.2.

[5]    *McLaurin Lewis Leadership Conference*, UNIV. OF OKLA., https://bit.ly/43wgjds (last accessed March 21, 2024) ("African American students that have been admitted to OU for Fall 2020 are invited to participate and are introduced to current African American student leaders, faculty, staff, and alumni. Our goals are not only to have these students attend OU but to become actively involved in the African American community at OU.").

invites them to what it has dubbed "Welcome Black Weekend."[6] According to university official Angelique Price, "Welcome Black Weekend is a three day orientation for incoming or transfer Black students."[7] The racially exclusionary nature of the program is not subtle. In 2022, an official university account advertised the event by declaring, "We're back and blacker than EVER!"[8]

31.    The University of Oklahoma continues to engage in racially discriminatory activities after students are admitted. For example, the University hosts race-based programming and activities, sponsored by the University's Office of African American Programs & Services.[9]  The University also hosted similar activities for Latino students, thought it appears to have deleted numerous webpages describing those activities.[10]

32.    And even at the end of Oklahoma students' time at the University, race continues to play a role: The University hosts an annual "Black Excellence Ceremony," which is designed to honor Black graduates only.[11] The University hosts a similar ceremony for Hispanic students, which the University dubbed its "Latinx Graduation and

---

[6]    *African American Students*, *supra* n.2.

[7]    Houston Williams, *Welcome Black Weekend Coming Aug. 26-28*, Okla. Inst. for Div. in Journalism, https://bit.ly/3IKyJgO (last accessed March 21, 2024).

[8]    @welcomeblack_ou, X (formerly known as Twitter) (June 29, 2022, 5:45 pm), https://bit.ly/4a35MIS.

[9]    *See generally Programs*, Univ. of Okla., https://bit.ly/4a1n9tz (last accessed March 21, 2024).

[10]    *See*, *e.g.*, *Latino Programs and Services*, Univ. of Okla., https://bit.ly/3WN2tkU (deleted as of Aug. 2, 2024). Based on information obtained from the Internet Archive, this webpage previously contained information on activities targeted toward Hispanics at the University of Oklahoma.

[11]    *Programs*, Univ. of Okla., https://bit.ly/4a1n9tz (last accessed March 21, 2024).

Achievement Banquet."[12]

33.     In an effort to obscure the extent to which it has engaged in race-based decision making, the University of Oklahoma has recently deleted many webpages with information about its diversity and race-based programs. It is therefore difficult to determine the full extent of the University's race-based programs.

34.     The University of Oklahoma continued to delete webpages pertaining to its diversity efforts after Plaintiffs filed their initial Complaint.

**B.     The University of Oklahoma Considers Race When Awarding Financial Aid**

35.     Given the extent to which race has infused the University of Oklahoma's decision-making processes, it is perhaps unsurprising that the University of Oklahoma also awards financial aid based on race.

36.     The University of Oklahoma advertises on its "Financial Aid" webpage that during the 2022–2023 academic year the average financial aid given to undergraduates was $15,747, and that nearly 71% of students received aid of some amount.[13] Based on the number of students at the University of Oklahoma, this amounts to more than $230 million in financial assistance.

---

[12]  @DrDavidSurratt, X (formerly known as Twitter), (May 8, 2022, 12:28 am), https://bit.ly/4dt3Ta0 (University's Vice President for Student Affairs & Dean of Students celebrating this event).

[13]  *Financial Aid*, UNIV. OF OKLA, https://bit.ly/3VtFPOn (last accessed March 21, 2024).

37.     Students are considered for financial aid and scholarships when they apply to the University of Oklahoma through the Common Application, OU Application, or Apply Coalition with Scoir. On each of these applications, students may indicate their race.

38.     The University of Oklahoma also considers data submitted through FAFSA.

39.     These general applications are the primary means by which the University of Oklahoma awards such aid to students.

40.     An official from the University of Oklahoma's Office of Admissions told Plaintiff Savage that financial aid was generally not available to students like her—but would have been if she were African American.

41.     A statistical analysis of publicly available data provides further evidence that the University of Oklahoma considers race when awarding aid to its students.

42.     Based on the University of Oklahoma's published enrollment data, and the financial-aid data that the University reported to the Department of Education for academic years 2002–2003 through 2021–2022, statistical regression analysis shows that as the number of Black/Hispanic students increases, the average net cost of attendance price decreases.[14] Conversely, as the number of White/Asian students increases, the average net cost of attendance price increases. These results are statistically significant. And they remain so when using available data to control for family financial resources.

43.     This statistical analysis is consistent with discrimination stemming from

---

[14]  Net cost of attendance includes the costs of attending a university (such as tuition, university fees, room and board, and books and supplies) minus institutional aid. It thus reflects the actual costs paid to attend a university, factoring in discounts like institutional grant aid.

affirmative action policies in university grants that benefit some favored racial groups (in this case, Black/Hispanic students) and harm other disfavored groups (in this case, non-Black/non-Hispanic students).

44.     The analysis uses data at the university-year level regarding the net price of tuition at the institution, the proportion of students enrolled from a group that appears to receive beneficial treatment, and measures of enrolled students receiving federal grant aid as a proxy for family financial resources. The analysis also controls for inflation.

45.     Plaintiffs are aware of no public statement from the University of Oklahoma disclosing that the school systematically discriminates on the basis of race when allocating financial aid.

46.     In the absence of this sophisticated statistical analysis, the University of Oklahoma's systematic racial discrimination with respect to financial aid would not have become known.

47.     Plaintiffs and the Class could not have learned about the University of Oklahoma's systematic racial discrimination at an earlier date through the exercise of reasonable diligence.

48.     The University of Oklahoma's racial discrimination with respect to financial aid is consistent with recent peer-reviewed econometric research showing that American

colleges and universities have, in the recent past, provided racial discounts when awarding financial aid.[15]

## II.    Effect of the University of Oklahoma's Racial Discrimination on Plaintiffs

49.    The University of Oklahoma has a limited pool of money from which to award all forms of financial aid.

50.    Because of Defendants' race-based financial aid decision making, Plaintiffs received less financial aid from the University of Oklahoma than they would have if the University of Oklahoma did not discriminate on the basis of race when awarding financial aid.

### A.    Plaintiff Brayden Johnson

51.    Plaintiff Brayden Johnson is an undergraduate student in an accelerated master's degree program at the University of Oklahoma. Because Plaintiff Johnson does not have the financial means to pay for college, he applied for scholarships from the University of Oklahoma.

52.    Plaintiff Johnson self-identified as White and non-Hispanic when applying for financial aid from the University of Oklahoma.

53.    Plaintiff Johnson received a merit scholarship in the amount of $4,000 per year and two smaller scholarships totaling $1,000 and $1,750 per year, respectively.

---

[15] Ian Fillmore, *Price Discrimination and Public Policy in the US College Market*, 90 (3) THE REV. OF ECON. STUD., 1228, 1240 & tbl. 2 (2023) (finding a statistically significant relationship between Black and Hispanic students and tuition discounts using a robust 2007–2008 data set).

Plaintiff Johnson did not receive any other scholarships or financial aid from the University of Oklahoma.

54.    Plaintiff Johnson would have received additional financial aid from the University of Oklahoma if the Defendants did not engage in racial discrimination when awarding financial aid.

55.    To support himself while at the University of Oklahoma, Plaintiff Johnson works at Home Depot three days a week. He previously worked as a cashier at a bagel shop for the same reason.

### B.    Plaintiff Logan Rhines

56.    Plaintiff Logan Rhines is a junior at the University of Oklahoma. He is a first-generation college student. Because Plaintiff Rhines does not have the financial means to pay for college, he applied for scholarships from the University of Oklahoma.

57.    Plaintiff Rhines identified himself as White and non-Hispanic when applying for financial aid from the University of Oklahoma.

58.    Plaintiff Rhines received a merit scholarship based on his ACT score and GPA in the amount of $1,000 per semester. Plaintiff Rhines did not receive any other scholarships or financial aid from the University of Oklahoma.

59.    Plaintiff Rhines would have received additional financial aid from the University of Oklahoma if the Defendants did not engage in racial discrimination when awarding financial aid.

### C.    Plaintiff Kayla Savage

60.    Plaintiff Kayla Savage is a senior at the University of Oklahoma. Plaintiff

Savage transferred to the University of Oklahoma after attending community college.

61.    An official from the University of Oklahoma's Office of Admissions told Plaintiff Savage that financial aid was generally not available to students like her—but would have been if she were African American.

62.    Because Plaintiff Savage did not have the financial means to pay for college, she nonetheless applied for scholarships from the University of Oklahoma.

63.    Plaintiff Savage self-identified as White and non-Hispanic when applying for financial aid from the University of Oklahoma.

64.    Plaintiff Savage received no financial aid from the University of Oklahoma.

65.    Plaintiff Savage would have received additional financial aid from the University of Oklahoma if the Defendants did not engage in racial discrimination when awarding financial aid.

## <u>CLASS ALLEGATIONS</u>

66.    Plaintiffs bring this action on behalf of themselves and other current, former, and incoming University of Oklahoma students similarly entitled to damages and declaratory relief.

67.    The Class consists of all current, future, and former undergraduate students of the University of Oklahoma who were enrolled at any time from the date that the University of Oklahoma began systematically discriminating in favor of Black/Hispanic students when awarding financial aid to the date of class certification, who did not receive financial aid covering all costs of attendance, who were U.S. citizens or permanent residents, who applied for financial aid, and who are not identified in the school's financial

aid or admissions database as Black, African American, Hispanic, Latino or any substantively similar label. These Class members are seeking damages from Defendant the University of Oklahoma under Title VI, and a declaratory judgment declaring that their rights were violated under both Title VI and the Equal Protection Clause of the Fourteenth Amendment.

68.    The Class shall exclude any judicial officers presiding over this action, as well as members of their immediate families and members of their judicial staffs. The Class shall also exclude any attorney appearing in this action and any juror assigned to this action, as well as members of their immediate families.

69.    The proposed Class is so numerous that joinder of all members is impracticable. *See* FED. R. CIV. P. 23(a)(1). The exact number of Class members is unknown at this time and can be ascertained only through appropriate discovery. But given the number of students who attend and apply for financial aid from the University of Oklahoma every year, there are at least thousands of members of the proposed Class.

70.    Common questions of law and fact exist with respect to the Class. *See* FED. R. CIV. P. 23(a)(2). Those questions include:

  a.  Whether Defendants denied financial aid to the Class members on the basis of their race (both Counts);

  b.  Whether Defendants' challenged conduct violates the Equal Protection Clause (Count I); and

  c.  Whether the University of Oklahoma's challenged conduct violates Title VI (Count II).

71.    Plaintiffs' claims are typical of those of the other Class members. *See* FED. R. CIV. P. 23(a)(3). All members of the Class currently attend, have attended, or will attend the University of Oklahoma and are being denied, were denied, or will be denied financial aid on the basis of race. They were thus similarly affected by the wrongful conduct complained of herein.

72.    Plaintiffs will fairly and adequately protect the interests of all Class members. *See* FED. R. CIV. P. 23(a)(4). Plaintiffs' counsel is competent and experienced in class and civil rights litigation, and Plaintiffs have no interests adverse or antagonistic to the Class.

73.    The Class is certifiable under Federal Rule of Civil Procedure 23(b)(3). The common questions of law and fact listed above predominate over any questions affecting only individual members of the Class. All Class members are entitled to similarly race-blind consideration for financial aid. A class action is also superior to other available methods for the fair and efficient adjudication of this controversy. The membership of the class can be readily ascertained from records in the possession of Defendants. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment of this case as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many class members who otherwise could not bear the expense and burden of seeking redress on an individual basis for the conduct alleged herein.

## CLAIMS FOR RELIEF

### COUNT I
**Asserted Against Defendants Harroz Jr., Blahnik, Henderson, and Billups**
**Violation of the Equal Protection Clause**
**(42 U.S.C. § 1983)**

74.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

75.    The Equal Protection Clause of the Fourteenth Amendment provides: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1.

76.    The Equal Protection Clause applies to state educational institutions and their officers and employees. *See, e.g.*, *Fisher I*, 570 U.S. at 307.

77.    Racial discrimination is "invidious in all contexts." *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 619 (1991). So government actors, such as state universities and their officers and employees, may not provide a benefit on the basis of race without satisfying strict scrutiny.

78.    The Court must first determine whether the racial classification "further[s] compelling governmental interests." *Grutter*, 539 U.S. at 326. "Classifying and assigning" students based on their race "requires more than . . . an amorphous end to justify it." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 735 (2007). A "generalized assertion" of "past discrimination" is insufficient, because it "provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 498 (1989).

79.    If a racial classification somehow serves a compelling interest, the Court must then determine whether it is "narrowly tailored"—meaning "necessary"—to that interest. *Fisher I*, 570 U.S. at 311–12. In this context, Defendants must not only show "how assigning students to these racial categories and making [financial-aid] decisions based on them furthers the educational benefits that the universities claim to pursue," but also that the classification has a "logical end point." *SFFA*, 600 U.S. at 216, 221 (internal quotation marks omitted).

80.    The University of Oklahoma's race-based financial-aid practices fail strict scrutiny under the Equal Protection Clause. These practices share all the failings of the race-based admissions practices deemed unlawful in *SFFA*: they rely on imprecise and irrational categories; they assume that members of each racial group are uniform in their need for financial aid and that such aid will have the same effect on each member of the group; and they rest on the demeaning stereotype that Black/Hispanic students need financial aid more than non-Black/non-Hispanic students. For all these reasons, Defendants cannot assert a compelling interest in considering "race for race's sake." *Id*. at 220.

81.    Defendants also lack a compelling interest in considering race when awarding aid because Oklahoma's Constitution prohibits the University of Oklahoma from engaging in such practices.  *See* OKLA. CONST. art. II, § 2–36A.

82.    Moreover, less-restrictive means for easing financial burdens on Black/Hispanic students are readily available. Simply providing adequate need-based financial aid to all students, regardless of race, would ensure that Black/Hispanic students who have been admitted to the University of Oklahoma are not dissuaded from attending

by the cost of doing so. There is no legitimate basis for privileging the financial needs of students of one race over the financial needs of students of other races. This is true in all contexts.

83.     Defendants' wrongful use of race in financial-aid determinations deprives Plaintiffs and other Class members of their equal-protection rights. Plaintiffs and other Class members are thus entitled to a declaratory judgment.

84.     Plaintiffs are also entitled to attorneys' fees and costs under 42 U.S.C. § 1988.

**COUNT II**
**Asserted Against the University of Oklahoma**
**Violation of Title VI**
**(42 U.S.C. § 2000d)**

85.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

86.     Title VI of the Civil Rights Act of 1964 prohibits discrimination on the basis of race by programs and activities receiving federal funds. Specifically, Section 601 provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

87.     This provision is privately enforceable. *See*, *e.g.*, *Alexander v. Sandoval*, 532 U.S. 275, 279–80 (2001).

88.     A recipient of federal funds violates Title VI when it intentionally discriminates on the basis of race. *See*, *e.g.*, *Yu v. Idaho State Univ.*, 15 F.4th 1236, 1242

(9th Cir. 2021); *Khan v. Midwestern Univ.*, 147 F. Supp. 3d 718, 720 (N.D. Ill. 2015).

89.    The University of Oklahoma violated Title VI by considering students' race when awarding financial aid.

90.    Intentional discrimination can also take the form of facially neutral policies, specifically where "the relevant decisionmaker . . . adopted the policy at issue 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.'" *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 562 (3rd Cir. 2002) (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)). To the extent Defendants apply facially neutral policies that adversely affect non-Black/non-Hispanic applicants, those policies are subject to Title VI as well.

91.    Intentional racial discrimination alone violates Title VI. *See SFFA*, 600 U.S. at 309 (Gorsuch, J., concurring). But even if the Court were to apply an interest-balancing framework—i.e., strict scrutiny—the University of Oklahoma would bear the burden of showing that its discriminatory financial-aid practices survive strict scrutiny. *See*, *e.g.*, *Shaw*, 509 U.S. at 643.

92.    "[D]iscrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI." *SFFA*, 600 U.S. at 198 n.2 (internal quotation marks omitted). So for the same reasons that the challenged conduct violates the Equal Protection Clause, it also violates Title VI.

93.    Plaintiffs and the other Class members have suffered damages as a direct and proximate result of Defendant the University of Oklahoma's violations of Title VI.

Plaintiffs are therefore entitled to compensatory damages, to be measured at trial, for any and all financial aid that they have been wrongfully deprived of because of their race.

94.    The University of Oklahoma's wrongful conduct also deprives Plaintiffs and other Class members of their right to equal treatment, which is protected by Title VI. Plaintiffs and other Class members are entitled to a declaratory judgment to prevent the University of Oklahoma from continuing any such deprivation.

95.    Plaintiffs are further entitled to attorneys' fees and costs under 42 U.S.C. § 1988.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

a.    Certify that this action is a proper class action under Federal Rule of Civil Procedure 23(a) and (b) on behalf of the Class defined herein;

b.    Declare that Defendants' racially discriminatory financial-aid practices violate the Equal Protection Clause and Title VI;

c.    Award Plaintiffs and the Class members compensatory damages for Defendant the University of Oklahoma's violation of Title VI, in an amount to be proven at trial, including interest thereon;

d.    Award Plaintiffs attorneys' fees and costs under 42 U.S.C. § 1988; and

e.    Order such further relief as the Court may deem just and proper.

Respectfully submitted,                    Dated: August 5, 2024


*/s/ Ryan Haynie*
Ryan Haynie, OBA No. 32796              David H. Thompson, *pro hac vice*
OKLAHOMA COUNCIL OF PUBLIC              Peter A. Patterson, *pro hac vice*
AFFAIRS                                 Samuel D. Adkisson, *pro hac vice*
1401 N. Lincoln Blvd.                   COOPER & KIRK, PLLC
Oklahoma City, OK, 73104               1523 New Hampshire Ave., N.W.
Telephone: (405) 590-6070             Washington, D.C., 20036
Email: ryan@ocpathink.org             Telephone: (202) 220-9600
                                       Facsimile: (202) 220-9601
                                       Email: dthompson@cooperkirk.com


                        *Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 5, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will cause a copy of the document to be served electronically on all parties or their counsel.

Dated: August 5, 2024                            /s/ Ryan Haynie
                                                 Ryan Haynie

                                                 *Attorney for Plaintiffs*