# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

BRAYDEN JOHNSON, LOGAN RHINES,  )
and KAYLA SAVAGE, individually, and on  )
behalf of all others similarly situated,  )
                                )
              *Plaintiffs*,  )
                                )
    v.  ) Case No. <u>5:24-cv-00495-PRW</u>
                                )
THE UNIVERSITY OF OKLAHOMA,  )
ET AL.  )
                                )
              *Defendants*.  )

## DEFENDANTS' BRIEF IN SUPPORT OF
## <u>THEIR MOTION TO DISMISS THE FIRST AMENDED COMPLAINT</u>

Defendants the University of Oklahoma, Joseph Harroz, Jr., Jeff Blahnik, Courtney Henderson, and Dorion Billups (collectively, "the University") submit this brief in support of their Motion to Dismiss the First Amended Complaint ("FAC") [Doc. 42] under Rule 12(b)(6) and Rule 12(b)(1).

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................ ii

INTRODUCTION ............................................................................. 1

BACKGROUND ............................................................................... 3

STANDARD OF REVIEW ................................................................ 5

ARGUMENT ................................................................................... 6

I.  **The FAC fails to state a plausible claim for relief under Rule 12(b)(6)**........... 6

    A.  Plaintiffs fail to plausibly allege that the University treated them differently than similarly situated students. .................................................. 7

        1.  The FAC lacks any facts from which this Court could begin to compare Plaintiffs to similarly situated students. .............................. 7

        2.  Plaintiffs plead no facts to plausibly allege that the University treated them differently than any students, much less similarly situated ones. .................................................................... 11

    B.  Plaintiffs do not plausibly allege that the University engaged in intentional discrimination. ............................................................................ 16

II.  **The Court should dismiss the FAC for lack of jurisdiction due to the lack of standing.** ............................................................................... 21

    A.  Plaintiffs lack Article III standing to bring their claims. ........................... 21

    B.  The Eleventh Amendment bars Plaintiffs' Equal Protection Clause claim (Count I) against the University Officials. .................................................. 24

CONCLUSION ................................................................................ 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alexander v. Sandoval,*
532 U.S. 275 (2001) ................................................................... 7, 17

*Apsley v. Boeing Co.,*
722 F. Supp. 2d 1218 (D. Kan. 2010) ............................................ 10

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ............................................................ passim

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ..................................................................... 9

*Blackwell v. Strain,*
496 F. App'x 836 (10th Cir. 2012) ................................................ 17

*Brnovich v. Democratic Nat'l Comm.,*
594 U.S. 647 (2021) ..................................................................... 10

*Brooks v. Mentor Worldwide LLC,*
985 F.3d 1272 (10th Cir. 2021) ................................................. 5, 15

*Brown v. Montoya,*
662 F.3d 1152 (10th Cir. 2011) ...................................................... 15

*Carpenter v. Boeing Co.,*
456 F.3d 1183 (10th Cir. 2006) ................................. 11, 12, 15, 17

*Chilcoat v. San Juan Cnty.,*
41 F.4th 1196 (10th Cir. 2022) ..................................................... 25

*City of Cleburne v. Cleburne Living Ctr.,*
473 U.S. 432 (1985) ....................................................................... 6

*City of Cuyahoga Falls, Ohio v. Buckeye Cmty. Hope Found.,*
538 U.S. 188 (2003) ....................................................................... 6

*Collins v. Daniels,*
   916 F.3d 1302 (10th Cir. 2019) ............................................................. 22, 25

*COPE v. Kan. State Bd. of Educ.,*
   821 F.3d 1215 (10th Cir. 2016) ................................................................. 22

*Davis v. Fed. Election Comm'n,*
   554 U.S. 724 (2008) .................................................................................. 21

*Denver Homeless Out Loud v. City and Cty. Of Denver,*
   2022 WL 974284 (D. Colo. March 31, 2022) ......................................... 25

*Dias v. City and Cnty. of Denver,*
   567 F.3d 1169 (10th Cir. 2009) ................................................................. 23

*Ex parte Young,*
   209 U.S. 123 (1908) .................................................................................. 25

*Garrett v. Wells Fargo Bank, N.A.,*
   2024 WL 1011891 (D. Wyo. Feb. 7, 2024) ............................................. 24

*Gomillion v. Lightfoot,*
   364 U.S. 339 (1960) ............................................................................ 17, 18

*Grutter v. Bollinger,*
   539 U.S. 306 (2003) .................................................................................. 12

*Hunt v. Lincoln Unified Sch. Dist.,*
   2016 WL 1734797 (E.D. Cal. May 2, 2016) ........................................... 18

*Hwang v. Kansas State Univ.,*
   753 F.3d 1159 (10th Cir. 2014) ................................................................... 8

*In re Cessna 208 Series Aircraft Prod. Liab. Litig.,*
   2009 WL 2912611 (D. Kan. Sept. 9, 2009) ............................................. 15

*In re Peeples,*
   880 F.3d 1207 (10th Cir. 2018) ................................................................. 21

*Jordan v. Sosa,*
   654 F.3d 1012 (10th Cir. 2011) ................................................................. 24

*Kan. Nat. Res. Coal. v. U.S. Dep't of Interior,*
   971 F.3d 1222 (10th Cir. 2020)..................................................................... 22

*Khalik v. United Air Lines,*
   671 F.3d 1188 (10th Cir. 2012).................................................................. 5, 15

*Kitchen v. Herbert,*
   755 F.3d 1193 (10th Cir. 2014)..................................................................... 6

*Lucas v. Turn Key Health Clinics, LLC,*
   58 F.4th 1127 (10th Cir. 2023).................................................................. 6, 16

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ..................................................................................... 22

*McCleskey v. Kemp,*
   481 U.S. 279 (1987) .................................................................... 17, 18, 19, 20

*Moose Lodge No. 107 v. Irvis,*
   407 U.S. 163 (1972) ..................................................................................... 22

*Murphy v. United States,*
   2020 WL 6939716 (D.N.M. Nov. 25, 2020) ................................................. 6

*Ortega v. Safeway Stores, Inc.,*
   943 F.2d 1230 (10th Cir. 1991).................................................................... 13

*Pers. Adm'r of Mass. v. Feeney,*
   442 U.S. 256 (1979) .................................................................................. 7, 17

*Requena v. Roberts,*
   893 F.3d 1195 (10th Cir. 2018)..................................................................... 6

*Reynolds v. Sch. Dist. No. 1, Denver, Colo.,*
   69 F.3d 1523 (10th Cir. 1995)...................................................................... 17

*Ruiz v. McDonnell,*
   299 F.3d 1173 (10th Cir. 2002).................................................................... 21

*SECSYS, LLC v. Vigil,*
   666 F.3d 678 (10th Cir. 2012)...................................................................... 18

*Sheppard v. Kent State Univ.*,
  2015 WL 4743893 (N.D. Ohio Aug. 11, 2015) ........................................................... 20

*Soule v. Conn. Ass'n of Sch., Inc.*,
  90 F.4th 34 (2d Cir. 2023) ...................................................................................... 24

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ...................................................................................... 21, 22, 23

*Steel Co. v. Citizens for Better Env't*,
  523 U.S. 83 (1998) ................................................................................................... 22

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  600 U.S. 181 (2023) ...................................................................................... 6, 12, 16

*Tabor v. Hilti, Inc.*,
  703 F.3d 1206 (10th Cir. 2013) ............................................................................... 10

*United States v. Calvillo-Diaz*,
  2022 WL 1607525 (N.D. Ill. May 20, 2022) ............................................................ 20

*United States v. Coleman*,
  483 F. App'x 419 (10th Cir. 2012) ........................................................................... 19

*United States v. Mesa-Roche*,
  288 F. Supp. 2d 1172 (D. Kan. 2003) ...................................................................... 18

*United States v. Texas*,
  599 U.S. 670 (2023) ................................................................................................. 21

*United States v. Thurmond*,
  7 F.3d 947 (10th Cir. 1993) ..................................................................................... 18

*Verizon Md. Inc. v. Pub. Serv. Comm'n*,
  535 U.S. 635 (2002) ................................................................................................. 25

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) .......................................................................................... 17, 18

*Williams v. Utah Dep't of Corr.*,
  928 F.3d 1209 (10th Cir. 2019) ............................................................................... 25

*Yick Wo v. Hopkins*,
   118 U.S. 356 (1886) ................................................................................. 17, 18

**Statutes**

20 U.S.C. §1087kk ....................................................................................... 13, 15

20 U.S.C. §§ 1070 ............................................................................................. 8

Okla. Stat. tit. 70, §§ 2601 ................................................................................ 8

U.S. Const. amend. XIV, § 1 .............................................................................. 6

U.S. Const. art. III ............................................................................................ 21

**Other Authorities**

Reference Manual on Scientific Evidence 252 ................................................. 11

## INTRODUCTION

Plaintiffs boldly allege that the University of Oklahoma intentionally awards more financial aid to Black and Hispanic students than to White and Asian students and that, but for this alleged racial preference, Plaintiffs would have received more financial aid than they ultimately received.

For such a serious allegation, one would expect Plaintiffs to identify specific scholarships or other financial aid the University allegedly distributes based on race. But not here. In fact, Plaintiffs do not even allege which specific scholarships or other forms of financial aid they *applied for*, much less that those specific (unidentified) programs used race as an eligibility criterion or otherwise had some fixed sum of money earmarked for Black or Hispanic students that would have been awarded to Plaintiffs *but for* a racial preference.

The best Plaintiffs can muster is a self-proclaimed "sophisticated statistical analysis" allegedly showing that, considered in the aggregate, Black and Hispanic students had a lower net cost of attendance than White and Asian students. Yet this analysis cannot plausibly allege the University treated *Plaintiffs* differently than similarly situated students, because it has nothing to do with them: It relies on aggregate financial aid data from the twenty years *before* Plaintiffs enrolled at the University. In other words, even if the data at issue reflected the University gave a racial preference to Black and Hispanic students over White and Asian students (it does not), Plaintiffs were not one of those White students. The problems only begin there.

Many forms of financial aid exist in higher education. Besides financial aid that the University awards using its own criteria, the University administers financial aid on behalf of the federal government, the State of Oklahoma, and third parties using federal and state formulas or criteria that the University does not control. Treating all financial aid as

equal—no matter the source—Plaintiffs plead no facts identifying which forms of financial aid were analyzed in their analysis much less whether this aid was the same type of aid they otherwise would have received but for a racial preference by the University. On top of this, Plaintiffs admit that they have no way to control for the key variable in need-based aid—a student's degree of financial need.

The analysis also fails to plausibly allege that the University *intentionally* discriminated against Plaintiffs as required to state a claim under the Equal Protection Clause of the United States Constitution and Title VI of the Civil Rights Act. An intentional discrimination claim requires showing that the decisionmakers acted with discriminatory purpose in *Plaintiffs'* cases. But except in the rarest of cases, an aggregate analysis—even one using a proper dataset—is sufficient *only* to plead a disparate-impact theory of discrimination, which is not cognizable under the Equal Protection Clause or Title VI.

Given these glaring deficiencies, it is no surprise that Plaintiffs do not disclose the results of their analysis, insisting only that the results are "statistically significant." But statistical significance sheds no light on the statistical *disparity* uncovered, and "trust us, the data shows discrimination" does not satisfy the plausibility standard.

These defects are fatal to Plaintiffs' claims. The University already moved to dismiss Plaintiff's original Complaint and identified these very problems. If Plaintiffs could have fixed them in the First Amended Complaint, they would have. At bottom, because Plaintiffs do not plausibly allege intentional discrimination, they fail to state a claim for relief and to establish Article III standing. This Court should dismiss the First Amended Complaint.

## BACKGROUND[1]

Plaintiffs Brayden Johnson, Logan Rhines, and Kayla Savage are students at the University, a constitutionally created state entity and public educational institution in Norman, Oklahoma. FAC ¶¶ 11–14. Plaintiffs do not have the financial means to pay for college, so they applied for "scholarships" from the University. *Id.* ¶¶ 51, 56, 62. Which ones, they do not say.

When applying for financial aid, Plaintiffs "self-identified as white and non-Hispanic." *Id.* ¶¶ 52, 57, 63. Johnson "received a merit scholarship in the amount of $4,000 per year and two smaller scholarships totaling $1,000 and $1,750 per year." *Id.* ¶ 53. Rhines "received a merit scholarship based on his ACT score and GPA in the amount of $1,000 per semester." *Id.* ¶ 58. Savage received "no financial aid." *Id.* ¶ 64. Savage claims that an unnamed "official" from the University's "Office of Admissions" told her that "financial aid was generally not available to students like her—but would have been if she were African American." *Id.* ¶ 61. If the University "did not engage in racial discrimination when awarding financial aid," Plaintiffs conclude that they "would have received additional financial aid." *Id.* ¶¶ 54, 59, 65; *see also id.* ¶ 50.

Plaintiffs claim that a "statistical regression analysis" using "the University of Oklahoma's published enrollment data, and the financial-aid data that the University reported to the Department of Education for academic years 2002–2003 through 2021–2022" shows that "as the number of Black/Hispanic students increases, the average net cost of attendance price decreases" and "as the number of White/Asian students increases, the

---

[1] As required at this stage, the University confines the Background to the facts alleged in Plaintiffs' FAC and assumes those facts (but not legal conclusions) to be true. Although the University disagrees with the accuracy of Plaintiffs' assertions, this motion is not based on those disagreements. The University reserves the right to challenge—and disprove—Plaintiffs' factual allegations should this case proceed forward.

average net cost of attendance price increases." *Id.* ¶ 42. Plaintiffs' analysis used data "at the university-year level regarding the net price of tuition at the institution, the proportion of students enrolled from a group that appears to receive beneficial treatment, and measures of the family income of enrolled students receiving federal grant aid as a proxy for family financial resources." *Id.* ¶ 44. Plaintiffs allege that the "results are statistically significant," concluding that the University "awards financial aid based on race." *Id.* ¶¶ 35, 42. Plaintiffs believe that without this "sophisticated statistical analysis," the University's alleged "systematic racial discrimination" would have remained undetected. *Id.* ¶ 46.

Plaintiffs sued the University and four University employees in their official capacity: President Joseph Harroz, Jr.; Jeff Blahnik, Vice President for the Division of Enrollment Management and Chief Enrollment Officer; Courtney Henderson, Executive Director of Financial Aid Services; and Dorion Billups, Director of Connection and Student Engagement (collectively, the "University Officials"). *Id.* ¶¶ 15–18. On behalf of themselves and a class of former, current, and incoming University students, Plaintiffs assert two claims for violating the Equal Protection Clause of the Fourteenth Amendment (Count I) and Title VI of the Civil Rights Act of 1964 (Count II). *Id.* ¶¶ 66, 74–95; *see also id.* ¶ 67 (defining the class).

Plaintiffs filed an original Complaint, and the University moved to dismiss. *See* Docs. 20, 42. In the original Complaint, Plaintiffs asserted Counts I and II against both the University and the University Officials. *See* Compl. [Doc. 1] ¶¶ 67–86. The original Motion to Dismiss pointed out, among other things, that Plaintiffs cannot bring an Equal Protection claim against the University and cannot bring a Title VI claim against the University Officials. Doc. 20 at 6–7. The FAC appears to have fixed these improperly pleaded claims.

*See* FAC ¶¶ 74–95. Because the FAC did not, however, fix all the other problems, this motion follows.

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (cleaned up).

Although the Court must accept well-pleaded facts as true, conclusory allegations are "not entitled to the assumption of truth." *Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012). A conclusory allegation is one in which an inference is asserted without "stating underlying facts" or including "any factual enhancement." *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021). The Court should "disregard conclusory statements and look to the remaining factual allegations to see whether Plaintiffs have stated a plausible claim." *Id.*

In addition to failing to state a claim under the elements of each cause of action, Plaintiffs' deficient allegations also illustrate the absence of an injury in fact. Accordingly, Plaintiffs also lack standing, and this Court lacks subject matter jurisdiction. When, as here, a facial jurisdictional challenge (traditionally performed under Rule 12(b)(1)) is intertwined with the merits of the claims, this Court should adjudicate the motion as one

under Rule 12(b)(6). *See, e.g., Murphy v. United States*, 2020 WL 6939716, at *2–*4 (D.N.M. Nov. 25, 2020), *modified*, 2020 WL 7342671 (D.N.M. Dec. 14, 2020).

## ARGUMENT

The Court should dismiss Plaintiffs' FAC because Plaintiffs fail to state a plausible claim for relief under Rule 12(b)(6), and they lack Article III standing, depriving the Court of subject matter jurisdiction.

## I.    The FAC fails to state a plausible claim for relief under Rule 12(b)(6).

Plaintiffs fail to state a claim because they do not plausibly allege that the University violated the Equal Protection Clause or Title VI in awarding financial aid to students. The Equal Protection Clause states that no State shall "deny to any person within its jurisdiction the equal protection of the laws."[2] U.S. Const. amend. XIV, § 1. This "is essentially a direction that all persons similarly situated should be treated alike." *Kitchen v. Herbert*, 755 F.3d 1193, 1222 (10th Cir. 2014) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). To move forward on an Equal Protection claim, a plaintiff "must first make a threshold showing that they were treated differently" from "similarly situated" persons who are alike "in all relevant respects." *Requena v. Roberts*, 893 F.3d 1195, 1210 (10th Cir. 2018) (cleaned up). A plaintiff must then allege that this treatment resulted from "purposeful discrimination." *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1146 (10th Cir. 2023); *see also City of Cuyahoga Falls, Ohio v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 194 (2003) ("Proof of racially discriminatory intent or purpose

---

[2] For purposes of the alleged discrimination, this Court may evaluate the Equal Protection claim and the Title VI claim together. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 198 n.2 (2023) ("*SFFA*") (citation omitted) (evaluating Title VI claim "under the standards of the Equal Protection Clause itself"); *see also* FAC ¶ 92 (alleging a Title VI violation "for the same reasons that the challenged conduct violates the Equal Protection Clause").

is required to show a violation of the Equal Protection.") (cleaned up); *accord Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) ("Title VI itself directly reach[es] only instances of intentional discrimination.") (citations omitted). "[P]urposeful discrimination requires more than intent as volition or intent as awareness of consequences. It instead involves a decisionmaker's undertaking a course of action because of, not merely in spite of, [the action's] adverse effects upon an identifiable group." *Iqbal*, 556 U.S. at 676–77 (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)) (cleaned up).

Plaintiffs' second try at stating a claim fares no better than their first. The University moved to dismiss Plaintiffs' original Complaint, highlighting all the ways Plaintiffs failed to state a plausible claim. Rather than fix these problems, Plaintiffs doubled down and made them worse. Plaintiffs clarified that they have no facts to plausibly allege that the University treated them differently than similarly situated students, and confirmed that their claims rest on an inactionable disparate-impact theory rather than intentional discrimination. Because the FAC represents the best Plaintiffs can do, yet still fails at every turn, the Court should dismiss the FAC.

**A.    Plaintiffs fail to plausibly allege that the University treated them differently than similarly situated students.**

**1.    The FAC lacks any facts from which this Court could begin to compare Plaintiffs to similarly situated students.**

At every step, Plaintiffs fail to plead sufficient facts to allow the Court "to draw the reasonable inference" that the University treated Plaintiffs differently than Black and Hispanic students in awarding financial aid. *Iqbal*, 556 U.S. at 678. Plaintiffs do not plead sufficient facts about the types of financial aid available to students generally. They do not plead sufficient facts about the types of financial aid for which they specifically applied but did not receive. And they do not plead sufficient facts connecting the latter to the data

used in their statistical analysis. In short, Plaintiffs fail to "allege some set of facts that taken together plausibly suggest differential treatment of similarly situated" students. *Hwang v. Kansas State Univ.*, 753 F.3d 1159, 1164–65 (10th Cir. 2014).

Without context, Plaintiffs use terms like "financial aid," "grants," and "scholarships," haphazardly, interchangeably, and in a way that presupposes financial aid is uniform. *See, e.g.,* FAC ¶¶ 37, 43, 56–58. But these terms are *not* interchangeable because many programs make up the universe of financial aid. The federal government awards need-based aid through grants, loans, and work-study programs that the University administers. *See* 20 U.S.C. §§ 1070 *et seq.* The State of Oklahoma also awards need-based scholarships under the Oklahoma Promise program. *See* Okla. Stat. tit. 70, §§ 2601 *et seq.* Students can apply for grants or scholarships from various third parties, such as Native American tribes, which then provide funds on a student's behalf to pay for University tuition and fees. And students can apply for scholarships or "tuition waivers"[3] directly from the University. Of course, the University sets eligibility criteria only for the financial aid that it awards directly, yet Plaintiffs' vague allegations do not identify the types of aid Plaintiffs believe are discriminatory or that any statistical difference is caused by awards from the University rather than another federal, state, or third-party program.

Plaintiffs' factual allegations concerning their individual circumstances are equally deficient. All three Plaintiffs generically allege that they applied for "scholarships" because they did not have the "financial means to pay for college." FAC ¶¶ 51, 56, 62. Johnson received a "merit scholarship" and "two smaller scholarships," *id.* ¶ 53; Rhines received a "merit scholarship based on his ACT score and GPA," *id.* ¶ 58; and Savage received "no

---

[3] A tuition waiver reduces the amount of tuition that the University charges a student, whereas a scholarship can be used to pay for tuition, fees, room and board, and other charges.

financial aid," *id.* ¶ 64. Had the University not engaged in "racial discrimination when awarding financial aid," Plaintiffs allege that they "would have received additional financial aid." *Id.* ¶¶ 54, 59, 65.

Missing from these threadbare allegations is the "factual enhancement" needed to "nudge[] their claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558, 570 (2007). Plaintiffs plead no facts alleging which scholarships they applied for and when, what information they submitted as part of the applications, which scholarships or financial aid programs use race criterion, and most importantly, which scholarships the University would have awarded them if not for the University's alleged racial discrimination. These facts matter because different entities fund different forms of financial aid that use different eligibility criteria. Without this information, the Court cannot even begin to infer that Plaintiffs were competing for the same scholarships or financial aid as anyone else, much less the hypothetical Black and Hispanic students who allegedly received financial aid directly from the University that Plaintiffs' claim would have otherwise been awarded to them.

That brings us to Plaintiffs' "statistical regression analysis"—the only basis for their supposed racial-discrimination theory. *See* FAC ¶ 46 ("In the absence of this sophisticated statistical analysis, the University of Oklahoma's systematic racial discrimination with respect to financial aid would not have become known."). Much like Plaintiffs' other allegations, problems plague the analysis up and down. The result is that the statistical analysis does not plausibly support what Plaintiffs claim.

Plaintiffs allege that a "statistical regression analysis" using the University's "published enrollment data" and "financial-aid data that the University reported to the

Department of Education"[4] shows that "as the number of Black/Hispanic students increases, the average net cost of attendance price decreases" and "as the number of White/Asian students increases, the average net cost of attendance price increases." FAC ¶ 42. Plaintiffs define "[n]et cost of attendance" as "includ[ing] the costs of attending a university (such as tuition, university fees, room and board, and books and supplies) minus institutional aid." *Id.* ¶ 42 n.14. In other words, net cost of attendance "reflects the actual costs paid to attend a university, factoring in discounts like institutional grant aid." *Id.*

First, Plaintiffs' deliberate choice to omit the results of their statistical analysis is inexplicable. After the University called out Plaintiffs for doing the same thing in the original Complaint, Plaintiffs added their unsupported belief that the "results are statistically significant" as if that solved the problem. FAC ¶ 42. Not so. "Statistical significance measures the likelihood that the disparity between groups is random, i.e., solely the result of chance." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1223 (10th Cir. 2013). But statistical significance says nothing about the size of the disparity itself. *See generally id.* at 1222 (explaining that "the size of the disparity" and "the statistical significance of the disparity" are two separate "issues" in a disparate impact claim). In other words, "[s]tatistical significance does not tell us whether the disparity we are observing is meaningful in a practical sense nor what may have caused the disparity." *Apsley v. Boeing Co.*, 722 F. Supp. 2d 1218, 1247 (D. Kan. 2010), *aff'd*, 691 F.3d 1184 (10th Cir. 2012); *see also Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 677 n.17 (2021) ("[S]ignificant differences are not evidence that what is at work is legally or practically important. Statisticians distinguish between statistical and practical significance to make the point. When practical significance is lacking—when the size of a disparity is

---

[4] That Plaintiffs withhold the sources for this data—while citing seven other irrelevant internet links, *see, e.g., id.* ¶ 30 n.6–8—casts doubt on the analysis's plausibility.

negligible—there is no reason to worry about statistical significance." (quoting Federal Judicial Center, Reference Manual on Scientific Evidence 252 (3d ed. 2011)) (cleaned up).

As applied here, Plaintiffs "misapprehend[] the statistical evidence by confusing the magnitude of the disparities with their level of statistical significance." *Carpenter v. Boeing Co.*, 456 F.3d 1183, 1201 (10th Cir. 2006). Alleging that the results are "statistically significant" says nothing about whether the observed disparity is meaningful. FAC ¶ 42. The disparity could be $1,000 or $6.87—but who knows? The Court should not assume that the disparity is great just because Plaintiffs call the results statistically significant: "[W]hen, as here, there is a great deal of data"—twenty years of financial aid data on hundreds of thousands of students—"even a relatively small difference may be highly statistically significant (that is, unlikely to be random)." *Carpenter*, 456 F.3d at 1202. At its core, if Plaintiffs uncovered a meaningful statistical disparity showing that Black and Hispanic students have a lower net cost of attendance than White and Asian students— communicable in numbers rather than conclusory statements, Plaintiffs would have disclosed the results.

> **2.** **Plaintiffs plead no facts to plausibly allege that the University treated them differently than any students, much less similarly situated ones.**

Even if Plaintiffs had disclosed the results, the analysis would still not plausibly allege that the University treated Plaintiffs differently than similarly situated students, because Plaintiffs do not plead sufficient facts connecting their individual circumstances to the data used in the analysis.

First, it is statistically impossible for Plaintiffs to use the proffered dataset to allege, much less prove, that the University treated *Plaintiffs* differently than similarly situated students. Plaintiffs enrolled at the University no earlier than academic year 2022–2023. *See*

FAC ¶¶ 51, 56, 62. Yet the statistical analysis used data from "academic years 2002–2003 through 2021–2022"—*twenty* academic years before Plaintiffs ever set foot on campus. *Id.* ¶ 42. *See generally Carpenter*, 456 F.3d at 1196–97 (to be reliable, statistical data must "relate to the proper population" and control for key variables). This apples-to-oranges comparison is fatal to Plaintiffs' claims. By definition, students attending the University when Plaintiffs were not even in grade school are not similarly situated to them.

Along the same lines, the dataset is irrelevant to Plaintiffs' claims because it does not reflect the University's *current* financial aid practices. *See, e.g.*, Prayer for Relief at (b) (seeking a prospective declaration that "Defendants' racially discriminatory financial-aid practices violate the Equal Protection Clause and Title VI"). Data from 2021–2022—and it goes without saying 2002 and on—says nothing about how the University awarded financial aid in 2023 and 2024. Plaintiffs cannot plausibly allege that the University's current financial aid practices violate the Constitution by pointing to aggregate historical data pre-dating *SFFA*, which substantially changed the governing law on the role of race in achieving the compelling interest of academic diversity. *See Grutter v. Bollinger*, 539 U.S. 306, 335–36 (2003) (allowing universities to consider race to be a "plus" factor to "attain[] a critical mass of underrepresented minority students" or "a diverse student body"); *see SFFA*, 600 U.S. at 287 (Thomas, J., concurring) ("The Court's opinion rightly makes clear that [*Grutter v. Bollinger*, 539 U.S. 306 (2003)] is, for all intents and purposes, overruled."); *id.* at 307 (Gorsuch, J., concurring) (explaining that *SFFA* "ends university exceptionalism and returns this Court to the traditional rule that the Equal Protection Clause forbids the use of race in distinguishing between persons unless strict scrutiny's demanding standards can be met").

Next, Plaintiffs identified as White when applying for financial aid from the University. FAC ¶¶ 52, 57, 63. Yet Plaintiffs clarified that the "other students" compared to Black (and now Hispanic) students in their analysis include White *and* Asian students. *Compare* Compl. ¶ 37, *with* FAC ¶ 42. So even if Plaintiffs were part of the group of White students considered in the analysis—they are not, which is clear from timing alone—the Court cannot infer that White students alone received less financial aid. Perhaps the data reflects a disparity only when isolating Asian students, but this was not tested (or at least not revealed).

Not only does the analysis use data that lacks any temporal relevance to Plaintiffs and muddies the results with irrelevant comparables, *see Ortega v. Safeway Stores, Inc.*, 943 F.2d 1230, 1243 (10th Cir. 1991) ("[A]ny statistical analysis must involve the appropriate comparables."), but Plaintiffs plead no facts connecting the unknown scholarships and financial aid for which they applied but did not receive to the "financial-aid data" reported to the Department of Education or the "institutional grant aid" used to measure the net cost of attendance.[5] FAC ¶ 42 & n.14. Nor do they identify the other "discounts" that were "factor[ed] in" to their analysis. *Id.* ¶ 42 n.14.

This basic information is crucial to the plausibility of Plaintiffs' claims. The University awards millions of dollars in scholarships every year based on criteria that the University sets. The University also administers financial aid based on federal and state need-based formulas or third-party criteria beyond the University's control.[6] *See, e.g.*, 20 U.S.C. §1087kk (setting out needs-based formula for federal financial aid). If Plaintiffs'

---

[5] It is also unclear whether "institutional grant aid" is the same thing as the "institutional aid" in the previous sentence. FAC ¶ 42 n.14.

[6] Plaintiffs' allegation that "[t]he University of Oklahoma has a limited pool of money from which to award *all* forms of financial aid" is false. FAC ¶ 49 (emphasis added). Students are not competing against each other for University-administered *federal* financial aid.

true grievance is with certain University scholarship programs or other forms of financial aid that the University awards, yet the regression analysis includes data on financial aid that the University merely administers on behalf of the federal government, the State of Oklahoma, or third parties, the data does not reflect how the *University* treated anyone differently, much less Plaintiffs. Put another way, if Plaintiffs found a statistical disparity in how much Black and Hispanic students received in federal Pell grants and loans compared to White and Asian students, they can take it up with the federal government. Plaintiffs need more than speculation and generalization to plausibly connect the financial aid for which they applied but did not receive with the "financial-aid data" used in their analysis. FAC ¶ 42.

Finally, Plaintiffs admit they fail to account for family financial resources, further undermining the plausibility of any connection to their claims. In its first motion to dismiss, the University pointed out that Plaintiffs did not allege that they adequately controlled for nondiscriminatory factors that might correlate with race and could thus cause a statistical disparity. Given the chance to fix this, the FAC instead confirms that Plaintiffs did not and cannot do so. Plaintiffs claim that the results remain statistically significant "when using data to control for family financial resources." *Id.* But just two paragraphs later, Plaintiffs admit that they used "measures of enrolled students receiving federal grant aid *as a proxy* for family financial resources." FAC ¶ 44 (emphasis added). A proxy is "[a] measurable variable that is used in place of a variable that cannot be measured." Graham Upton & Ian Cook, A Dictionary of Statistics 315 (2d ed. 2008). In other words, Plaintiffs have no way to control for family financial resources but claim they tried to do the best they could.

Plaintiffs' best, however, is not sufficient because "measures of enrolled students receiving federal grant aid" is *not* a viable proxy for "family financial resources." *Id.*; *see*

*generally Carpenter*, 456 F.3d at 1197 (noting that when proxies are used, they must be "reliable"); *In re Cessna 208 Series Aircraft Prod. Liab. Litig.*, 2009 WL 2912611, at *5 (D. Kan. Sept. 9, 2009) (criticizing proxy data for not being "closely correlated"). To illustrate, the "measure[] of enrolled students receiving federal grant aid" answers a binary question for each student: Did Student X receive federal grant aid or not? FAC ¶ 44. But this "yes" or "no" answer tells us nothing about Student X's *degree* of poverty—measured as "expected family contribution"—which directly controls the amount of federal aid that he or she receives and, in turn, the student's net cost of attendance. *See* 20 U.S.C. §1087kk. Plaintiffs' supposed proxy thus does not account for whether the poor Black and Hispanic students were *more* impoverished than the poor White and Asian students—each student's true "family financial resources." FAC ¶ 44. Put slightly differently, if the poor Black and Hispanic students in the aggregate were poorer than the poor White and Asian students, the average net cost of attendance *would* decrease as the number of Black and Hispanic increases. We do not know, though, because Plaintiffs did not control for family financial resources. In sum, Plaintiffs' proxy is an unreliable substitute for an immeasurable variable, and the analysis cannot support Plaintiffs' claims.[7]

In the end, Plaintiffs' allegation that "[a] statistical analysis of publicly available data provides further evidence that the University of Oklahoma considers race when awarding aid to its students" (FAC ¶ 41) is a "naked assertion[]" not entitled to the presumption of truth. *Brooks*, 985 F.3d at 1281; *see Khalik*, 671 F.3d at 1193; *see generally Brown v. Montoya*, 662 F.3d 1152, 1173 (10th Cir. 2011) ("[I]n the context of a § 1983 claim, conclusory allegations are not sufficient to state a constitutional violation.") (cleaned

---

[7] Plaintiffs' assurance that they controlled for inflation makes no sense. FAC ¶ 44. The amount of financial aid that a Black or Hispanic student received in 2002 is irrelevant to whether the University treated Plaintiffs differently than Black and Hispanic students in *their* financial aid cycle.

up). Plaintiffs must offer "more than a sheer possibility that [the University] has acted unlawfully," *Iqbal*, 556 U.S. at 678, and the FAC—brimming with defects—does not.

**B.    Plaintiffs do not plausibly allege that the University engaged in intentional discrimination.**

Even if Plaintiffs ran the perfect analysis with a valid dataset and sound methodology—and revealed what they found—Plaintiffs would do not state a plausible claim under the Equal Protection Clause and Title VI. On top of alleging the threshold requirement that the University treated them differently than similarly situated students, Plaintiffs must also plausibly allege that the University acted with "purposeful discrimination." *Lucas*, 58 F.4th at 1146. Plaintiffs do not plead discriminatory intent.

To begin, this case is nothing like *SFFA*, in which Harvard and the University of North Carolina admittedly considered race to be a "plus" factor in the undergraduate admissions process.[8] 600 U.S. at 294. Plaintiffs have no evidence that the University intentionally discriminates based on race when awarding financial aid and admit as much.

---

[8] Plaintiffs' allegations suggesting that the University wrongfully "place[s] a high value on racial diversity" are irrelevant. FAC ¶¶ 27–32. These allegations appear designed to poison the well rather than to state a claim. They have nothing to do with the University's financial aid practices, and Plaintiffs do not link the two. Nothing in *SFFA* prohibits an institution from "valuing" racial diversity, nor does it proscribe the type of permissible affinity programming that Plaintiffs demean in their FAC. Indeed, following *SFFA*, the Departments of Justice and Education issued guidance to colleges and universities explaining that "nothing in the *SFFA* decision prohibits institutions from continuing to seek the admission and graduation of diverse student bodies, including along the lines of race and ethnicity, through means that do not afford individual applicants a preference on the basis of race in admissions decisions." U.S. Dep'ts of Just. and Educ., *Questions and Answers Regarding the Supreme Court's Decision in Students for Fair Admissions, Inc. v. Harvard College and University of North Carolina* at 3 (Aug. 14, 2023), https://bit.ly/4ez6qAx. Institutions are also not prohibited from collecting "demographic information" that "provide institutions with critical information related to their programs and objectives" so long as the "demographic data related to the race of student applicants do not influence admissions decisions." *Id.* at 5; *but see* FAC ¶ 27 (criticizing the University for "monitoring the racial statistics of admitted students").

*See* FAC ¶¶ 45–47. To skirt this inconvenient fact, Plaintiffs rely on the alleged disparity discovered in their "sophisticated" regression analysis. FAC ¶ 46. Although "[s]tatistical evidence is an acceptable, and common, means of proving disparate impact," *Carpenter*, 456 F.3d at 1196, disparate impact violates neither the Equal Protection Clause nor Title VI. *See Feeney*, 442 U.S. at 273–74 (Equal Protection Clause); *Alexander*, 532 U.S. at 285 (Title VI). Rather, "purposeful discrimination is the condition that offends the Constitution." *Feeney*, 442 U.S. at 274. It follows that statistical evidence showing disparate *impact* is not enough to prove intentional discrimination. *See Reynolds v. Sch. Dist. No. 1, Denver, Colo.*, 69 F.3d 1523, 1535 (10th Cir. 1995) ("[S]tatistical evidence alone does not establish intentional discrimination."); *Blackwell v. Strain*, 496 F. App'x 836, 840 (10th Cir. 2012) ("Statistical evidence alone is rarely enough to show discriminatory purpose.").

Although the Supreme Court "has accepted statistics as proof of intent to discriminate in certain limited contexts," only in "rare cases [have] a statistical pattern of discriminatory impact demonstrated a constitutional violation." *McCleskey v. Kemp*, 481 U.S. 279, 293 & n.12 (1987); *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) ("Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action . . . . But such cases are rare."). Examples of these rare cases include *Gomillion v. Lightfoot*, 364 U.S. 339 (1960) and *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). *See McCleskey*, 481 U.S. at 293 n.12.

In *Gomillion*, the Supreme Court held that a state legislature violated the Fifteenth Amendment when it changed a city's boundaries "from a square to an uncouth twenty-eight-sided figure," in effect, excluding 395 of 400 Black voters without excluding a single White voter. 364 U.S. at 340–41. The Court held that "the conclusion would be irresistible,

17

tantamount for all practical purposes to a mathematical demonstration" that the state acted with a discriminatory purpose. *Id.* at 341. In *Yick Wo*, an ordinance required laundry operators to obtain a permit, and all but one of the White applicants received permits while over two hundred Chinese applicants received no permits. 118 U.S. at 373–74. The Court determined that the statistical disparity "warrant[ed]" and "require[d] the conclusion" that the state acted with a discriminatory purpose. *Id.* "Absent a pattern as stark as that in *Gomillion* or *Yick Wo*," however, "impact alone is not determinative, and the Court must look to other evidence." *Vill. of Arlington Heights*, 429 U.S. at 266. At bottom, generalized statistics are rarely helpful because "to prevail under the Equal Protection Clause, [a plaintiff] must prove that the decisionmakers in *his* case acted with discriminatory purpose." *McCleskey*, 481 U.S. at 292 (emphasis in original).

Plaintiffs do not plausibly allege a "statistical pattern [that] is 'stark' enough to infer discriminatory purpose" because Plaintiffs do not share the results. *United States v. Thurmond*, 7 F.3d 947, 952 (10th Cir. 1993) (quoting *Arlington Heights*, 429 U.S. at 266); *see also accord SECSYS, LLC v. Vigil*, 666 F.3d 678, 686 (10th Cir. 2012) (opinion of Gorsuch, J.) (explaining that only a "starkly disparate impact—while not itself automatically or presumptively unlawful—may well inform a court's investigation into the law's underlying intent or purpose"). Even if Plaintiffs disclosed the degree of statistical disparity, it is doubtful that it would make this case like *Gomillion* or *Yick Wo*—one of the "rare" cases when disparate impact showed discriminatory intent by itself. *Arlington Heights*, 429 U.S. at 266; *see, e.g., United States v. Mesa-Roche*, 288 F. Supp. 2d 1172, 1193 (D. Kan. 2003) (declining "to do that which higher courts have already refused to do"—"infer discriminatory intent from the statistical evidence"); *Hunt v. Lincoln Unified Sch. Dist.*, 2016 WL 1734797, at *5–*6 (E.D. Cal. May 2, 2016) (refusing to

"extrapolate[]" from statistics that a school district "systematically turned down African American students for special education services at a much higher rate than other students" because "these allegations even if true do not state a viable claim" under Title VI).

In one of the most critical revisions from the original Complaint, Plaintiffs acknowledge these shortcomings of the statistical analysis. In the original Complaint, Plaintiffs told the Court that their "statistical analysis provides evidence of the extent of discrimination stemming from affirmative action policies in university grants." Compl. ¶ 38. But now, on further thought, Plaintiff cannot even muster that degree of confidence, claiming only that the "statistical analysis is *consistent with* discrimination stemming from affirmative action policies in university grants." FAC ¶ 43 (emphasis added). Time and again, the Supreme Court has confirmed that this is insufficient. *See, e.g.*, *Iqbal*, 556 U.S. at 678 (explaining that it does not suffice to plead facts that are "merely consistent with" intentional discrimination) (citation omitted). Put simply, *Plaintiffs' own amended allegation* confirms that the "statistical analysis" does not even provide evidence of discrimination, but is merely "consistent with" that theory.[9] FAC ¶ 43.

Finally, Savage's allegation that some unnamed admissions "official" told her that "financial aid was generally not available to students like her but would have been if she were African American" does not save her claim. FAC ¶¶ 40, 61. This single, stray

---

[9] Moreover, the alleged discrimination has no connection to Plaintiffs whatsoever. *See* FAC ¶ 43 (alleging that the University's data is consistent with discrimination in unidentified "university grants"); *id.* ¶ 48 n. 15 (citing economic analysis of data from 2007–08). And at any rate, statistical evidence, which characterizes the whole class of cases, "is clearly insufficient to support an inference that any of the decisionmakers in [an individual] case acted with discriminatory purpose." *McCleskey*, 481 U.S. at 297; *see, e.g.*, *United States v. Coleman*, 483 F. App'x 419, 420 (10th Cir. 2012) (Gorsuch. J.) (generalized statistics regarding aggregated law enforcement data for law enforcement contacts for all officers in an area does not help prove an Equal Protection claim because plaintiff "must prove that the decisionmakers in his case acted with discriminatory purpose") (citation omitted).

comment is insufficient to plausibly allege that the University acted with discriminatory intent to deny her financial aid *because* she is White (or not Black/Hispanic). For starters, key facts are missing. Savage does not allege the speaker's identity, whether the statement occurred before or after the University denied Savage financial aid, or whether this person had decision-making authority at the University to award financial aid. Indeed, in other equal protection contexts, one-off comments are not enough to support even the inference of discriminatory intent. *See, e.g.*, *Sheppard v. Kent State Univ.*, 2015 WL 4743893, at *3 (N.D. Ohio Aug. 11, 2015) (finding the statement "that he could not hire the Plaintiff because he just hired two black professors" was not "sufficient to support a reasonable inference that [the University] acted with 'racially discriminatory intent or purpose' toward the Plaintiff as is required to make out an equal protection claim"); *United States v. Calvillo-Diaz*, 2022 WL 1607525, at *9 (N.D. Ill. May 20, 2022) ("The notion that one senator's stray remark can ascribe racist intent to a whole deliberative body has been rejected by the Supreme Court.").

More importantly, even if this interaction occurred, it would still be insufficient to plausibly allege intentional discrimination. To plausibly allege an Equal Protection violation, Savage must point to evidence that the University gave *her* financial aid to a Black or Hispanic student "because" she is White and "not merely in spite of" it. *Iqbal*, 556 U.S. at 677. Because neither Savage—nor Rhines or Johnson—have pointed to such evidence, their claims "stop[] short of the line between possibility and plausibility of entitlement to relief." *Id.* at 678.

Without (a lot) more, Plaintiffs have not plausibly alleged that the "decisionmakers in [their] case[s] acted with discriminatory purpose." *McCleskey*, 481 U.S. at 292. Stripped of the conclusory, unsupported allegations, Plaintiffs' FAC amounts to "an unadorned, the-

defendant-unlawfully-harmed-me accusation" insufficient to support a plausible claim for relief. *Iqbal*, 556 U.S. at 678. The Court should dismiss the FAC.

**II.    The Court should dismiss the FAC for lack of jurisdiction due to the lack of standing.**

Alternatively, the Court should dismiss the FAC for lack of jurisdiction because Plaintiffs lack Article III standing, a predicate to subject matter jurisdiction, and the Eleventh Amendment bars Plaintiffs' Equal Protection claim against the University Officials. *See In re Peeples*, 880 F.3d 1207, 1212 (10th Cir. 2018) ("Article III standing is jurisdictional."); *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002) ("[A]n assertion of Eleventh Amendment immunity concerns the subject matter jurisdiction of the district court.").

**A.    Plaintiffs lack Article III standing to bring their claims.**

Article III of the Constitution limits the federal judicial power to "Cases" and "Controversies." U.S. Const. art. III, § 2. "Under Article III, a case or controversy can exist only if a plaintiff has standing to sue." *United States v. Texas*, 599 U.S. 670, 675 (2023). To satisfy Article III's standing requirements, Plaintiffs must "clearly allege facts" showing all three elements of constitutional standing: (1) an "injury in fact," (2) that is "fairly traceable" to the University's "challenged conduct," and (3) "that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (cleaned up). Plaintiffs "bear[] the burden of establishing these elements." *Id.*

"[S]tanding is not dispensed in gross." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (citation omitted). Quite the opposite: "[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Id.* (cleaned up). Here, Plaintiffs seek a declaratory judgment as a form of prospective relief, and damages as a retrospective remedy, so they must establish standing for both forms of

relief. *See, e.g.*, FAC ¶¶ 83, 94; *see Collins v. Daniels*, 916 F.3d 1302, 1314 (10th Cir. 2019) ("Plaintiffs have the burden to demonstrate standing for each form of relief sought.") (citation omitted).

"At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Kan. Nat. Res. Coal. v. U.S. Dep't of Interior*, 971 F.3d 1222, 1231 (10th Cir. 2020) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (quoting *COPE v. Kan. State Bd. of Educ.*, 821 F.3d 1215, 1221 (10th Cir. 2016)). In short, "plaintiffs must adequately allege a plausible claim of injury." *COPE*, 821 F.3d at 1221. Plaintiffs do not plead a plausible injury-in-fact for *either* form of relief they seek.

At a minimum, Plaintiffs fail to plead an injury-in-fact—the "[f]irst and foremost" of standing's three elements. *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 103 (1998). Injury-in-fact requires that the plaintiff suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (cleaned up). For an injury to be "concrete," "it must actually exist." *Spokeo*, 578 U.S. at 340. And "[f]or an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Id.* at 339 (cleaned up). A generalized interest in preventing discrimination is not enough: The plaintiff must allege that he or she sought a benefit and was denied it based on protected status. *See Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166 (1972) (holding that African American lacked standing to challenge lodge's refusal to let African Americans become members when he never applied for membership).

*First*, Plaintiffs lack standing to seek damages under Title VI. For retrospective relief like compensatory damages, standing is based on past injuries, *see Dias v. City and Cnty. of Denver*, 567 F.3d 1169, 1176 (10th Cir. 2009), so Plaintiffs must plausibly allege that they would have obtained more financial aid but for the discriminatory barrier. To this end, they do not plead a single non-conclusory fact to support the allegation that they "would have received additional financial aid" if the University "did not engage in racial discrimination." FAC ¶¶ 54, 59, 65. Plaintiffs plead no facts detailing for which scholarships or forms of financial aid they applied, the scholarships the University awarded using race-based criteria, and how *they* would have received those scholarships but for the University's alleged racial discrimination. Plaintiffs plead no facts connecting their individual circumstances to the "financial-aid data" used in the statistical analysis that allegedly shows a disparate impact. *Id.* ¶ 42. And even if Plaintiffs applied for some forms of financial aid analyzed in the statistical analysis, Plaintiffs allege only that historical *aggregate* financial aid was disproportionately awarded to Black and Hispanic students over White and Asian students. This, however, says nothing about whether the University awarded the specific scholarships Plaintiffs sought in a discriminatory way.

In fact, Plaintiffs' statistical analysis cannot show that Plaintiffs suffered a concrete, particularized injury at all. The analysis used data from "academic years 2002–2003 through 2021–2022," yet Plaintiffs enrolled at the University no earlier than academic year 2022–2023. *See* FAC ¶¶ 54, 59, 65. Even if the University's aggregate financial aid data showed an aggregate racial disparity in the years before Plaintiffs applied for financial aid—a generous assumption—it does not help Plaintiffs "clearly allege" that the University's actions affected *them* "in a personal and individual way." *Spokeo*, 578 U.S. at 338–39.

The bottom line is that Plaintiffs do not connect their individual circumstances with the University's alleged "systematic racial discrimination" in financial aid from academic years 2002–2003 to 2021–2022. FAC ¶ 46. Without these facts, Plaintiffs have not plausibly alleged a concrete and particularized injury to confer standing to seek damages. *See, e.g.*, *Garrett v. Wells Fargo Bank, N.A.*, 2024 WL 1011891, at *6 (D. Wyo. Feb. 7, 2024) (finding that alleged damages pleaded in a "rather conclusory fashion" without "any supporting factual allegations" did not "plausibly allege" that the plaintiffs "suffered a concrete and particularized injury").

*Second*, Plaintiffs also lack standing to seek declaratory relief. "[T]o establish standing for prospective relief," a plaintiff "must demonstrate a continuing injury." *Jordan v. Sosa*, 654 F.3d 1012, 1019 (10th Cir. 2011); *accord Soule v. Conn. Ass'n of Sch., Inc.*, 90 F.4th 34, 84 (2d Cir. 2023) ("[I]n the absence of any plausible, non-speculative allegations of ongoing or future harm, Plaintiffs' remaining claims for injunctive relief are fundamentally retrospective . . . and therefore, if they have a meritorious claim, the proper remedy is damages."). Yet Plaintiffs plead no facts alleging that the University's current financial aid practices are unconstitutional. Again, the most that the Court can infer from the FAC is that the University's aggregate financial aid data—pre-dating *SFFA*—shows a statistical disparity in awarding financial aid to Blacks and Hispanic students no later than academic year 2021–2022. But this evidence cannot substantiate an *ongoing* injury in academic year 2023–2024 and on.

**B.    The Eleventh Amendment bars Plaintiffs' Equal Protection Clause claim (Count I) against the University Officials.**

Because the University's alleged discrimination is backward-looking, the Eleventh Amendment bars their Equal Protection claim against the University Officials. "Eleventh Amendment sovereign immunity bars suits for money damages against states, state

agencies, and state officers in their official capacities." *Chilcoat v. San Juan Cnty.*, 41 F.4th 1196, 1213 (10th Cir. 2022). The *Ex parte Young* doctrine provides an exception for suits against state officers for plaintiffs who (1) allege "an ongoing violation of federal law" and (2) "seek[] relief properly characterized as prospective." *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1214 (10th Cir. 2019) (quoting *Verizon Md. Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002)). Plaintiffs Equal Protection claim does not satisfy the *Ex parte Young* exception because they have not alleged an ongoing violation of federal law. Plaintiffs allege only that they "would have received" more scholarships but for the alleged discrimination, but they do not allege future discrimination if they tried to secure more financial aid.[10] *See* FAC ¶¶ 54, 59, 65; *see, e.g., Denver Homeless Out Loud v. City and Cty. Of Denver*, 2022 WL 974284, at *8 (D. Colo. March 31, 2022) ("Because Plaintiffs' Complaint does not establish that State Defendants are engaging in an ongoing violation of federal law, the Court finds that the *Ex parte Young* exception does not apply . . . ."). Plaintiffs' Equal Protection claim against the University Officials is therefore barred by the Eleventh Amendment.

## CONCLUSION

For all these reasons, the Court should dismiss Plaintiffs' FAC and grant any other relief that the Court considers appropriate.

---

[10] Should Plaintiffs respond that they seek retrospective declaratory relief for past wrongs, then Plaintiffs' Equal Protection claim (Count I) must be dismissed because *Ex parte Young* cannot "be used to obtain a declaration that a state officer has violated a plaintiff's federal rights in the past." *Collins*, 916 F.3d at 1316 (citation omitted); *see Ex parte Young*, 209 U.S. 123 (1908).

Date: August 19, 2024

Respectfully submitted,

Armand Paliotta, OBA #15320
**UNIVERSITY OF OKLAHOMA**
Office of Legal Counsel
660 Parrington Oval, Suite 213
Norman, Oklahoma 73019
Telephone: (405) 325-4124
Facsimile: (405) 325-7681
apaliotta@ou.edu

*University General Counsel*

/s/ *Michael Burrage*
Michael Burrage, OBA No. 1350
Patricia A. Sawyer, OBA No. 30712
**WHITTEN BURRAGE LAW FIRM**
512 North Broadway Avenue, Ste 300
Oklahoma City, OK 73102
Telephone (405) 516-7800
Facsimile (405) 516-7859
mburrage@whittenburragelaw.com
psawyer@whittenburragelaw.com

Hayley E. Hanson, *admitted PHV*
Derek Teeter, *admitted PHV*
Michael T. Raupp, *admitted PHV*
**HUSCH BLACKWELL LLP**
4801 Main, Suite 1000
Kansas City, MO 64112
T (816) 983-8000
F (816) 983-8080
hayley.hanson@huschblackwell.com
derek.teeter@huschblackwell.com
michael.raupp@huschblackwell.com

Daniel G. Solomon, *admitted PHV*
**HUSCH BLACKWELL LLP**
1801 Penn. Ave, NW, Suite 1000
Washington, DC 20006
T (202) 378-2300
danny.solomon@huschblackwell.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that, on August 19, 2024, I filed a copy of the foregoing with the

Court using the ECF system, which sent electronic notification to all counsel of record.

/s/ *Michael Burrage*
Michael Burrage, OBA No. 1350
*Attorney for Defendants*