## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

BRAYDEN JOHNSON, LOGAN RHINES, and KAYLA SAVAGE, individually, and on behalf of all others similarly situated,

    *Plaintiffs*,

    v.

THE UNIVERSITY OF OKLAHOMA, ET AL.,

    *Defendants*.

Case No. 5:24-CV-00495-PRW

---

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 2

STANDARD OF REVIEW ..................................................................................... 6

ARGUMENT .......................................................................................................... 7

I.    The Court Has Jurisdiction Over Plaintiffs' Equal Protection and Title VI Claims. ................................................................................................. 8

    A.    Plaintiffs Have Standing Because They Have Suffered Pocketbook and Equal-Treatment Injuries and Remain Subject to the University's Discriminatory Financial Aid System. ....................................................... 8

    B.    Plaintiffs' Claim for Prospective Relief Against the University Officials Is Not Barred by the Eleventh Amendment. .............................................. 12

II.    The Complaint Plausibly Alleges Violations of the Equal Protection Clause and Title VI. ................................................................................................. 14

    A.    The Complaint Plausibly Alleges that Defendants Engage in Unlawful Racial Discrimination When Awarding Financial Aid. ............................. 16

    B.    The Complaint Appropriately Relies upon Statistical Evidence. ................ 20

    C.    The Complaint Plausibly Alleges Differential Treatment and Intent. ......... 23

CONCLUSION ....................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Alvarado v. KOB-TV, LLC,*
    493 F.3d 1210 (10th Cir. 2007) ..................................................................7, 12,14

*Apsley v. Boeing Co.,*
    691 F.3d 1184 (10th Cir. 2012) ........................................................................ 23

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ...............................................................................7, 16, 24

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ....................................................................................... 6, 7

*Brown v. Board of Education,*
    347 U.S. 483 (1954) ...................................................................................2, 19, 20

*Chilcoat v. San Juan Cnty.,*
    41 F.4th 1196 (10th Cir. 2022) .....................................................................12, 13

*City of Cleburne v. Cleburne Living Ctr.,*
    473 U.S. 432 (1985) ......................................................................................23, 24

*City of Mesquite v. Aladdin's Castle, Inc.,*
    455 U.S. 283 (1982) ........................................................................................ 14

*Concrete Works of Colo., Inc. v. City & Cnty. of Denver,*
    36 F.3d 1513 (10th Cir. 1994) ........................................................................... 9

*Consumer Data Indus. Ass'n v. King,*
    678 F.3d 898 (10th Cir. 2012) ......................................................................... 10

*Czyzewski v. Jevic Holding Corp.,*
    580 U.S. 451 (2017) ......................................................................................... 9

*Daubert v. Merrell Dow Pharms., Inc.,*
    509 U.S. 579 (1993) ........................................................................................ 22

*Ex parte Young,*
    209 U.S. 123 (1908) ........................................................................................ 12

*Herron v. Watson's of Okla. City Inc.,*
    2020 WL 3086256 (W.D. Okla. 2020) .............................................................. 7

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010) ............................................................................................ 11

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ........................................................................................ 11

*Miller v. Johnson*,
    515 U.S. 900 (1995)................................................................14, 17, 25

*Ne. Fla. Chapter, Associated Gen. Contractors of Am. v. Jacksonville*,
    508 U.S. 656 (1993)................................................................... 9

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007).................................................................. 9

*Pers. Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979)................................................................15, 17, 25

*Rice v. Cayetano*,
    528 U.S. 495 (2000)................................................................. 14

*Robbins v. Oklahoma*,
    519 F.3d 1242 (10th Cir. 2008)........................................................ 7

*SECSYS, LLC v. Vigil*,
    666 F.3d 678 (10th Cir. 2012)......................................................... 18

*Sheppard* v. *Kent State Univ.*,
    2015 WL 4743893 (N.D. Ohio 2015).................................................... 17

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)................................................................. 9

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998).................................................................. 8

*Stone v. Autoliv ASP, Inc.*,
    210 F.3d 1132 (10th Cir. 2000)........................................................ 16

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
    600 U.S. 181 (2023)................................1, 4, 14, 15, 16, 17, 19, 24, 25

*Tabor v. Hilti, Inc.*,
    703 F.3d 1206 (10th Cir. 2013)........................................................ 22

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021).............................................................. 8, 9

*United States v. Calvillo-Diaz*,
    2022 WL 1607525 (N.D. Ill. 2022)..................................................... 17

*Uzuegbunam v. Preczewski*,
    592 U.S. 279 (2021)................................................................. 10

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*,
    535 U.S. 635 (2002)................................................................. 12

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977)...........................................................18, 19, 20

*Vitolo v. Guzman*,
 999 F.3d 353 (6th Cir. 2021) ................................................................... 9

*Washington v. Davis*,
 426 U.S. 229 (1976) ....................................................................... 18, 20

## Constitutions and Statutes

U.S. CONST. amend. XI ........................................................................ 2, 7, 12,

U.S. CONST. amend. XIV, § 1 ................................................................ 17

U.S. CONST. art. III ........................................................................ 7, 8, 9, 10

42 U.S.C. § 2000d ................................................................................ 15

OKLA. CONST. art. II, § 2–36A ......................................................... 15, 25

## Other Authorities

Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of
 Powers*, 17 SUFFOLK U. L. REV. 881 (1983) ........................................ 8

*Costs*, UNIV. OF OKLA., https://bit.ly/3Zk7inK (last accessed Sept. 2, 2024) ................... 3

Ian Fillmore, *Price Discrimination and Public Policy in the US College Market*,
 90 REV. OF ECON. STUD. (2023) ............................................................ 5

U.S. DEP'T OF EDUC., 2024-2025 FEDERAL STUDENT AID HANDBOOK (2024),
 https://bit.ly/3B6lI0n .......................................................................... 22

## INTRODUCTION

"Eliminating racial discrimination means eliminating all of it." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023) ("*SFFA*"). Yet the University of Oklahoma continues to discriminate on the basis of race when awarding financial aid. That is unlawful.

Three University of Oklahoma students filed this class-action lawsuit to challenge the University's race-based financial aid system. In support of their allegations, Plaintiffs marshal considerable evidence. Most incriminating, a University of Oklahoma official *told* one of the Plaintiffs that she was not eligible for institutional financial aid, "but would have been if she were African American." Statistical analysis shows that Black and Hispanic students paid less to attend the University of Oklahoma than did White and Asian students. This was because of the University's financial aid grants. Around the same time, the University admitted that it wanted to increase the presence of certain racial groups on campus, and it took intentional steps to do so. And all of this happened while the University was operating a host of race-based programs that openly discriminated against non-Black and non-Hispanic students. Plaintiffs' allegation of race-based financial aid discrimination is not just plausible, it is likely.

Despite this overwhelming evidence, Defendants ask the Court to dismiss the case. They advance three main arguments. First, they claim the Court lacks jurisdiction because Plaintiffs have not adequately alleged an injury in fact. Not so. The First Amended Complaint (hereafter, "Complaint") alleges that each Plaintiff has suffered (and continues to suffer) a pocketbook injury, and that each Plaintiff has been (and is) being denied equal

treatment. These injuries are middle-of-the-fairway stuff when it comes to standing.

Second, the individual Defendants claim that they are immune from prospective declaratory relief under the Eleventh Amendment. They say that the Complaint does not allege ongoing, as opposed to past, discrimination. But that again is not right. The Complaint squarely alleges that the University of Oklahoma currently discriminates on the basis of race when awarding financial aid. Each Plaintiff remains a student at the University of Oklahoma, and each continues to receive reduced aid because of the University's discrimination.

Third, Defendants argue that the Complaint fails to plausibly allege that the University intentionally discriminates on the basis of race when awarding financial aid. The facts previewed above show this is not the case. Indeed, the Motion to Dismiss can only make such a claim by failing to credit the allegations set forth in the Complaint, and by asking the Court to construe virtually every allegation *against* the Plaintiffs. But that is not the law.

Racial discrimination was wrong when the Fourteenth Amendment was ratified. It was wrong when the Supreme Court decided *Brown v. Board of Education*, 347 U.S. 453 (1954). And it is wrong when practiced by the University of Oklahoma today. The Court should deny Defendants' Motion to Dismiss and allow this case to proceed to discovery.

## BACKGROUND

The University of Oklahoma is the State's flagship institution of higher education. It is based in Norman and enrolls tens of thousands of students each year. *See* ECF No. 42, First Amended Complaint ("FAC") ¶ 14. The University and its officials are bound by the

Equal Protection Clause because they are state actors. FAC ¶¶ 4–6, 14. The University is also bound by Title VI because it accepts federal funding. FAC ¶¶ 7, 14.

Attending the University of Oklahoma is expensive. *See Costs*, UNIV. OF OKLA., https://bit.ly/3Zk7inK (last accessed Sept. 9, 2024) (noting that the current cost of attendance is $37,823 for in-state students, and $55,403 for out-of-state students). So the University operates an extensive financial aid program. During the 2022–2023 academic year, for example, the average financial aid given to undergraduates was $15,747. FAC ¶ 36. And nearly 71% of students received at least some financial aid. *Id.* In total, the University "awards millions of dollars in scholarships every year based on criteria that [it] sets." ECF No. 50, Defs' Br. in Supp. of Mot. to Dismiss at 13 ("Mot."). But the University's resources are finite: It has a limited pool of money from which to award financial aid. FAC ¶ 49.

When awarding its limited financial aid dollars, the University of Oklahoma discriminates on the basis of race. FAC ¶¶ 2, 35–48. The University solicits racial data when students submit their admission and financial aid applications. FAC ¶ 37. It closely "monitors the racial statistics of admitted students." FAC ¶ 27. And it considers race when making financial aid decisions—intentionally directing aid to students from preferred racial groups. FAC ¶¶ 2, 35–48.

When Plaintiff Kayla Savage was considering whether to attend the University of Oklahoma, she spoke with an official from the University's Office of Admissions. That official told her that "financial aid was generally not available to students like her—but would have been if she were African American." FAC ¶ 40, *see also* FAC ¶¶ 60–61. The

University's admission of racial discrimination is as overt as it is jarring. Yet it is perhaps unsurprising. The University "places a high value on racial diversity." FAC ¶ 27. That is, it values "race for race's sake." *SFFA*, 600 U.S. at 220. Accordingly, the University has taken intentional steps to increase the number of Black and Hispanic students on campus. FAC ¶ 27. Indeed, until recently the University highlighted that one of its express goals was to "increase African American student . . . representation on campus." FAC ¶ 27 & n.2. The University of Oklahoma recently deleted the webpage containing this statement, and many other webpages pertaining to its diversity efforts. *See* FAC ¶¶ 33–34. It has done so "to obscure the extent to which it has engaged in race-based decision making." FAC ¶ 33.

The University's admission that it discriminates on the basis of race when awarding financial aid is corroborated by statistical regression analysis. *See* FAC ¶¶ 41–44. This analysis is based on a data set that includes the University's published enrollment data, and the publicly available financial aid data that the University reported to the federal government for academic years 2002–2003 through 2021–2022. FAC ¶ 42. The analysis shows that Black and Hispanic students pay less than White and Asian students to attend the University of Oklahoma. *Id.* That is because "institutional [financial] aid" decreases the net cost of attendance more for the preferred racial groups than for the non-preferred racial groups. FAC ¶ 42 & n.14. The results of this analysis are statistically significant. FAC ¶ 42. And they remain so when controlling for "family financial resources" and "inflation." FAC ¶¶ 42, 44. What's more, the analysis tracks recent peer-reviewed econometric research showing that American colleges and universities have, in the recent

past, provided racial discounts when awarding financial aid. FAC ¶ 48 & n.15. *See* Ian Fillmore, *Price Discrimination and Public Policy in the US College Market*, 90 REV. OF ECON. STUD. 1228, 1240 & tbl. 2 (2023) (finding a statistically significant relationship between Black and Hispanic students and tuition discounts using a robust 2007–2008 data set).

The University's race-based financial aid decisions come against the backdrop of many other University of Oklahoma programs that openly discriminate against non-Black and non-Hispanic students. *See* FAC ¶¶ 28–33. Prior to matriculation, for example, the University of Oklahoma hosts prospective students at its invitation-only "McLaurin & Lewis Leadership Conference." FAC ¶ 29. This conference and college preview day is open only to Black students; White and Asian students are not invited. *Id.* If Black students opt to attend the University of Oklahoma, the school then invites them to a three-day, race-based orientation program called "Welcome Black Weekend." FAC ¶ 30. A student's ability to attend this University event again depends on race: Black students are invited; White and Asian students are not. *Id.* The University also hosts race-based programming and activities for Black and Hispanic students throughout the school year. FAC ¶ 31. And at the end of each academic year, the University hosts a "Black Excellence Ceremony" and "Latinx Graduation and Achievement Banquet"—programs designed to honor graduates from preferred racial and ethnic groups only. FAC ¶ 32.

Plaintiffs Brayden Johnson, Logan Rhines, and Kayla Savage attend the University of Oklahoma. FAC ¶¶ 51, 56, 60. Each sought financial aid from the University. FAC ¶¶ 52, 57, 63. Each identified as White and non-Hispanic when doing so. *Id.* And each

would have received additional financial aid but for Defendants' unlawful consideration of race. FAC ¶¶ 54, 59, 65.

Plaintiffs filed this suit against the University of Oklahoma and four University Officials. FAC ¶¶ 15–18. The University Officials named as Defendants are the University's (i) President, Joseph Harroz, Jr.; (ii) Vice President for the Division of Enrollment Management/Executive Director of the Office of Admissions & Recruitment, Jeff Blahnik; (iii) Executive Director of Financial Aid Services, Courtney Henderson; and (iv) Director of Connection and Student Engagement, Dorion Billups. FAC ¶¶ 15–18. Each is sued in his or her official capacity. *Id.* Plaintiffs' claims are on behalf of a putative class of current, former, and future University of Oklahoma undergraduates. FAC ¶¶ 66–68. The Complaint asserts two claims in connection with Defendants' race-based financial aid decision making. First, that the University of Oklahoma violated Plaintiffs' rights under Title VI of the Civil Rights Act of 1964. *See* FAC ¶¶ 85–95. And second, that the University Officials violated Plaintiffs' rights under the Equal Protection Clause. *See* FAC ¶¶ 74–84.

Defendants have filed a Motion to Dismiss under Rules 12(b)(1) and 12(b)(6). The Court should deny this motion and allow the case to proceed to discovery.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 8(a) requires "a short and plain statement of the grounds for the court's jurisdiction," and "a short and plain statement of the claim showing that the pleader is entitled to relief." Such pleadings must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 555 (2007).

Defendants have moved to dismiss the Complaint. A complaint will survive a motion to dismiss when it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This is not akin to a "probability requirement." *Id.* Instead, the facts pleaded in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

It is a "bedrock principle" of American law "that a judge ruling on a motion to dismiss must accept all allegations as true and may not dismiss on the ground that it appears unlikely the allegations can be proven." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). As the Supreme Court has emphasized, "when there are well-pleaded factual allegations, a court should assume their veracity." *Iqbal*, 556 U.S. at 679. And after assuming the facts' veracity, a court must then view the facts "in the light most favorable to the plaintiff." *Herron v. Watson's of Okla. City Inc.*, 2020 WL 3086256, at *1 (W.D. Okla. 2020) (quoting *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007)).

## ARGUMENT

The Court should deny Defendants' Motion to Dismiss and allow this case to proceed to discovery. First, Defendant's jurisdictional arguments are unavailing. This Court has jurisdiction under Article III, and the University Officials are not immune under the Eleventh Amendment. Second, the Complaint plausibly alleges that Defendants

intentionally discriminate on the basis of race when awarding financial aid. Such conduct

violates both the Equal Protection Clause and Title VI.

## I.     The Court Has Jurisdiction Over Plaintiffs' Equal Protection and Title VI Claims.

Jurisdiction is a "threshold matter." *Steel Co. v. Citizens for a Better Env't*, 523 U.S.

83, 94–95 (1998). A court must ensure it has jurisdiction in every case before proceeding

to the merits. Here, Defendants raise two jurisdictional challenges. Both lack merit, so this

Court has jurisdiction to decide the case.

### A.     Plaintiffs Have Standing Because They Have Suffered Pocketbook and Equal-Treatment Injuries and Remain Subject to the University's Discriminatory Financial Aid System.

Article III of the Constitution limits courts to adjudicating "Cases" and

"Controversies." A case or controversy exists when the plaintiff has "a personal stake in

the case"—that is, "standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)

(quotation marks omitted). To have standing, a plaintiff must adequately answer the

question "What's it to you?" *Id.* (quoting Antonin Scalia, *The Doctrine of Standing as an

Essential Element of the Separation of Powers*, 17 SUFFOLK U. L. REV. 881, 882 (1983)).

In practice, this means a plaintiff must show (i) an "injury in fact," (ii) that was "likely

caused by the defendant," and (iii) that "would likely be redressed by judicial relief." *Id.*

Article III standing is straightforward in this case. Each Plaintiff suffered an injury

in fact when he or she applied for financial aid and received less money because of his or

her race. FAC ¶¶ 51–65. And each Plaintiff is still enrolled at the University of Oklahoma.

FAC ¶¶ 51, 56, 60. So each sustains ongoing injuries from reduced—or non-existent—

financial aid awards each "semester" or "year" because of their race. FAC ¶¶ 53–54, 58–59, 61–65. "Monetary harms"—like those suffered by Plaintiffs—are paradigmatic injuries under Article III. *TransUnion LLC*, 594 U.S. at 425; *see also Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'").

Each Plaintiff also suffered, and continues to suffer, an injury in fact from "the denial of equal treatment." *Ne. Fla. Chapter, Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666 (1993). Such an injury results "from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id.* Thus, a Plaintiff challenging racial preferences "need not allege that he would have obtained the benefit but for the barrier in order to establish standing." *Id.* The denial of equal treatment is itself the injury. This principle is well-established. *See, e.g.*, *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) ("[O]ne form of injury under the Equal Protection Clause is being forced to compete in a race-based system that may prejudice the plaintiff."); *Vitolo v. Guzman*, 999 F.3d 353, 358–59 (6th Cir. 2021) (Thapar, J.) (finding standing on this basis); *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (same). Yet it goes entirely unaddressed in Defendants' Motion to Dismiss.

Next, Plaintiffs' injuries are not just "fairly traceable" to Defendants' challenged conduct—racial discrimination when awarding financial aid—they are the direct result of it. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Plaintiffs receive reduced financial aid awards because they belong to a disfavored racial group. FAC ¶¶ 35, 40–43, 49–65, 80,

83, 93. And they are subjected to unequal treatment because they must seek aid through this same racially discriminatory process. FAC ¶¶ 83, 94.

Finally, these injuries would be redressed by a favorable judicial decision. First, an award of compensatory damages under Title VI would redress Plaintiffs' pocketbook injuries. Indeed, even the prospect of nominal damages is enough to satisfy Article III's redressability requirement. *See Uzuegbunam v. Preczewski*, 592 U.S. 279 (2021). Second, declaratory relief would redress Plaintiffs' ongoing injuries by prohibiting the Defendant's from continuing to distribute financial aid in a race-based manner. *See Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 906 (10th Cir. 2012) (declaratory relief redresses threat from government action affecting a plaintiff).

Defendants contest neither causation nor redressability. Instead, they claim Plaintiffs have failed to allege an injury in fact. *See* Mot. at 22–23. This argument is unpersuasive given the clear economic and equal-treatment injuries alleged in the Complaint.

First, Defendants claim the Complaint is faulty because it does not detail the "specific scholarships or forms of financial aid" each Plaintiff sought, or explain how the Defendants used "race-based criteria" in each specific program. *Id.* But this argument fails to accept the pleadings on their face. The Complaint is premised on "systematic racial discrimination" in the University's financial aid program. FAC ¶¶ 2, 35, 46–47, 50; *see also infra* II.A. It is not premised on one-off discrimination in a particular sub-program. The Complaint explains that each Plaintiff applied for the University's general "financial aid" and "scholarship" offerings, and that each Plaintiff is receiving less aid than he or she

otherwise would because of the University's race-based decision making. FAC ¶¶ 49–50, 52–53, 57–58, 62–64. That is enough to show pocketbook and equal-treatment injuries. Defendants seem to hint that only certain "specific" scholarship programs may have engaged in racial discrimination. But the University has a "limited" pool of money from which to award financial aid. FAC ¶ 49. And "money is fungible." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 31 (2010). So even in such a scenario, Plaintiffs would have suffered a pocketbook injury traceable to Defendants' conduct.

Second, Defendants argue that "Plaintiffs' statistical analysis cannot show that Plaintiffs suffered a concrete, particularized injury at all." Mot. at 23. But this again misses the mark. The Complaint directly alleges such injuries. *See*, *e.g.*, FAC ¶¶ 49–50, 83, 94. And the Supreme Court has held that "at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (cleaned up). But here the Complaint offers much more than that: There is a direct statement, racially discriminatory admissions goals, and background evidence of racial discrimination at the University. *See* FAC ¶¶ 26–40. These allegations bolster the plausibility of the injuries alleged in the Complaint. And the statistical analysis—evidencing racial discrimination in the years immediately preceding Plaintiffs' enrollment—makes the injuries more plausible still.

Third, Defendants argue that even if the Plaintiffs suffered an injury in the past, they lack standing to seek prospective relief. Why? Because Plaintiffs have supposedly failed to allege "that the University's *current* financial aid practices are unconstitutional." Mot.

at 24 (emphasis added). But that is not right. The Complaint repeatedly contends that the University is engaged in ongoing racial discrimination when making financial aid decisions. *See*, *e.g.*, FAC ¶¶ 2–3, 35, 46, 50; *see also infra* I.B. And Plaintiffs continue to receive diminished financial aid awards each "semester" or "year" because of the University's racial discrimination—if they receive any aid at all. FAC ¶¶ 53–54, 58–59, 64–65. Defendants' argument is premised on a reading of the Complaint that is both inaccurate and incompatible with the principle that allegations must be construed "in the light most favorable to the plaintiff." *Alvarado*, 493 F.3d at 1215.[*] The Court should reject Defendants' arguments and hold that Plaintiffs have standing to proceed.

## B.   Plaintiffs' Claim for Prospective Relief Against the University Officials Is Not Barred by the Eleventh Amendment.

The Eleventh Amendment gives state actors immunity from suit in certain circumstances. It bars, for example, "suits for money damages against states, state agencies, and state officers in their official capacities." *Chilcoat v. San Juan Cnty.*, 41 F.4th 1196, 1213 (10th Cir. 2022). But the Eleventh Amendment has its limits. And the doctrine set forth in *Ex parte Young*, 209 U.S. 123 (1908), is one of them. Under that doctrine, a state official lacks immunity if a complaint (1) "alleges an ongoing violation of federal law" and (2) "seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002). This is a "straightforward inquiry into . . . the complaint." *Id.* (cleaned up).

---

[*] Defendants' argument about prospective relief is wrong. But even if accepted, it would do nothing to undermine Count II's request for retrospective compensatory damages.

Here, such an inquiry confirms this Court's jurisdiction. Plaintiffs have sued four state officers tasked with overseeing, managing, and coordinating the University's financial aid program. *See* FAC ¶¶ 15–18. The Complaint alleges that these University Officials are engaged in ongoing racial discrimination in violation of the Equal Protection Clause. That is why allegations in the Complaint are framed in the present tense. *See*, *e.g.*, FAC ¶ 2 (The University "*determines* how much financial aid it *gives* to students based on their race."); FAC ¶ 7 ("Defendants' race-based financial-aid practices thus *violate* the Equal Protection Clause of the Fourteenth Amendment."); FAC ¶ 35 ("[T]he University of Oklahoma . . . *awards* financial aid based on race."); FAC ¶ 83 ("Defendants' wrongful *use* of race in financial-aid determinations *deprives* Plaintiffs and other Class members of their equal-protection rights.") (emphases added). And that is why the Plaintiffs seek to represent a class that includes those who "*are* being denied" and "*will be* denied financial aid on the basis of race." FAC ¶ 71 (emphases added). What is more, Plaintiffs remain students at the University of Oklahoma. FAC ¶¶ 51, 56, 60. Two continue to receive modest grant aid—each "semester" and "year"—that is less than it would be but for Defendants' unlawful discrimination. FAC ¶¶ 53–54, 58–59. The third Plaintiff continues to receive no aid, after University officials told her that "financial aid was generally not available to students like her" because she was not "African American." FAC ¶ 61. Finally, the Complaint seeks only prospective relief against the University Officials, in the form of a declaratory judgment. *See Chilcoat*, 41 F.4th at 1214 (recognizing that declaratory relief is prospective).

The University Officials insist that Plaintiffs' Equal Protection claim (Count I) is

barred. They again argue that the pleadings allege only past violations of federal law. *See* Mot. at 25. But for the reasons just explained, the pleadings do allege that the University is currently discriminating on the basis of race when awarding financial aid. And Defendants never claim to have abandoned the practice. *Cf. City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) (discussing voluntary cessation). Finally, were there any ambiguity—and there is none—the allegations would have to be construed in Plaintiffs' favor. *Alvarado*, 493 F.3d at 1215.

## II.    The Complaint Plausibly Alleges Violations of the Equal Protection Clause and Title VI.

The Supreme Court has held that "race-based admissions" programs are unlawful under both the Equal Protection Clause and Title VI. *SFFA*, 600 U.S. at 214. Race-based financial aid programs like the University of Oklahoma's are unlawful too.

The Equal Protection Clause provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It thus prohibits state actors from intentionally treating individuals differently because of their race. *SFFA*, 600 U.S. at 220; *see also Miller v. Johnson*, 515 U.S. 900, 912 (1995). Race-based distinctions "are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Rice v. Cayetano*, 528 U.S. 495, 517 (2000). Such distinctions are "invidious in all contexts." *SFFA*, 600 U.S. at 214 (cleaned up). So "no State has any authority under the equal-protection clause of the Fourteenth Amendment to use race as a factor in affording educational opportunities among its citizens." *Id.* at 204 (citation omitted).

All racial classifications are "presumptively invalid." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979). Indeed the only time the government may take race-based action is when such action passes muster under strict scrutiny. Strict scrutiny is a "daunting" standard. *SFFA*, 600 U.S. at 206–07. It asks whether the government's use of race is "narrowly tailored" to further "compelling governmental interests." *Id*. The Supreme Court has recognized "only two compelling interests that permit resort to race-based government action." *Id.* at 207. The first is "remediating specific, identified instances of past discrimination." *Id.* And the second is "avoiding imminent and serious risks to human safety in prisons, such as a race riot." *Id.* Neither applies here, so the Defendants lack a compelling interest in making race-based financial aid decisions. *See* FAC ¶¶ 78–82. Defendants' Motion to Dismiss does not challenge these contentions. And for good reason: Oklahoma's Constitution expressly prohibits race-based preferences in public education. FAC ¶ 81; Okla. Const. art. II, § 2–36A. Since the Equal Protection Clause's interest-balancing framework is not at issue, what matters is whether the Complaint plausibly alleges that Defendants consider race when awarding financial aid. The Complaint does, so the Court should permit Plaintiffs' Equal Protection Clause claim to proceed. *See infra* II.A.

As for Title VI, it provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. All "discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts

15

federal funds also constitutes a violation of Title VI." *SFFA*, 600 U.S. at 198 n.2. It is undisputed that the University accepts federal funding. FAC ¶ 14. So because Plaintiffs have plausibly alleged a violation of the Equal Protection Clause, they have also plausibly alleged a violation of Title VI.

A. **The Complaint Plausibly Alleges that Defendants Engage in Unlawful Racial Discrimination When Awarding Financial Aid.**

The University of Oklahoma discriminates on the basis of race when awarding financial aid. FAC ¶¶ 2–3, 35, 50, 80, 89. This allegation of racial discrimination is supported by a host of facts—including a direct statement from a University official that such discrimination occurs, statistical analysis, race-based monitoring and race-based admissions goals, other race-based preferences and programs at the University of Oklahoma, and the University's recent efforts to hide these programs. Such "factual content" makes the Complaint's allegation of racial discrimination not just "conceivable," but "plausible"—and more still. *See Iqbal*, 556 U.S. at 678, 680.

Start with one of the most glaring facts in this case: "An official from the University of Oklahoma's Office of Admissions told Plaintiff [Kayla] Savage that financial aid was generally not available to students like her—but would have been if she were African American." FAC ¶ 61. She then applied for aid, self-identified as White, and received no aid. FAC ¶¶ 61–64. This is thus the rare case where there is direct evidence of Defendants' discrimination: A university official admitted the University had "an existing policy which itself constitutes discrimination." *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000). This admitted use of racial classifications in awarding financial aid is, on its

own, sufficient to demonstrate a discriminatory intent under the Equal Protection Clause. *See SFFA*, 600 U.S. at 206–07; *Miller*, 515 U.S. at 904; *Feeney*, 442 U.S. at 272.

The Defendants ignore this statement until the back end of their brief, and then try to shoo it away as much ado about nothing. *See* Mot. at 19–20. They suggest that the Complaint should have included even more details about the interaction. But at this stage in the proceedings, the facts must be construed in the light most favorable to the Plaintiffs, not against them. Defendants also complain that the pleadings do not reveal whether the interaction "happened before or after the University denied Savage financial aid." *Id.* at 20. But that is not right. The Complaint recounts the University official's statement, and then says that Plaintiff Kayla Savage "nonetheless" sought aid and did not receive it. FAC ¶¶ 61–64. The temporal relationship is clear. Finally, Defendants cite two unpublished, out-of-circuit district court cases. Both are inapposite. One concerns how federal courts are to assess legislative motive. *See United States v. Calvillo-Diaz*, 2022 WL 1607525, at *9 (N.D. Ill. 2022). The other concerns a pro se litigant's allegations of racial and sexual harassment after she submitted 79 employment applications to a university, solicited a meeting with a faculty member, and then claimed that the faculty member made a variety of racist comments and "inappropriately touched her feet." *Sheppard* v. *Kent State Univ.*, 2015 WL 4743893, at *1–4 (N.D. Ohio 2015). In the context of that particular case, it is unsurprising that the court granted a motion to dismiss. It is also unsurprising that, according to Westlaw, courts have cited the case just three times in nine years—and never for the proposition that a government official's statements about the existence of a discriminatory policy lack plausibility. The weakness of these cases highlights the strength

of the pleadings.

Plaintiffs' direct evidence of racial discrimination is bolstered by statistical analysis. *See* FAC ¶¶ 41–44. This statistical evidence shows that over the years immediately preceding Plaintiffs' enrollment, Black and Hispanic students systematically paid less to attend the University of Oklahoma in comparison to White and Asian students—after factoring in the University's institutional financial aid grants (that is, scholarships), and controlling for factors like inflation and family financial resources. FAC ¶¶ 42–44 & n.14. Additionally, these results are statistically significant. FAC ¶ 42. Such statistical analysis would "provide an important starting point" even in the absence of the University's statement that it discriminates on the basis of race when awarding financial aid. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977); *see also Washington v. Davis*, 426 U.S. 229, 242 (1976) ("Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another."). But coupled with Plaintiffs' direct evidence, the allegation that the University considers race when awarding financial aid far exceeds the plausibility threshold.

And still there is more. The Complaint also contains important "historical background" facts and "circumstantial evidence" that further strengthen the plausibility of Plaintiffs' allegations. *Arlington Heights*, 429 U.S. at 267; *SECSYS, LLC v. Vigil*, 666 F.3d 678, 686 (10th Cir. 2012) (op. of Gorsuch, J.). To begin, the University of Oklahoma "places a high value on racial diversity." FAC ¶ 27. It closely "monitors the racial statistics of admitted students." *Id.* And not for race-neutral purposes. One of the University's

express goals is to "increase the number of Black students on campus." *Id.* The University has also "undertaken intentional efforts to increase the number of Hispanics on campus." *Id.* Defendants do not distance themselves from any of this. Instead, they *defend* it, while simultaneously claiming the allegations were included in the Complaint only to "poison the well." Mot. at 16 n.8. But Defendants miss the point: Their commitment to increasing the number of Black and Hispanic students on campus—necessarily at the expense of other racial groups, *see SFFA*, 600 U.S. at 218–19—makes it more likely that the University used race-based financial aid practices to accomplish such goals.

In addition to the race-based goals and practices just discussed, race-based programs are pervasive at the University of Oklahoma. This evidence is "particularly" powerful because "it reveals a series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267. Take three examples. First, prior to matriculation the University invites certain Black admittees to its "McLaurin & Lewis Leadership Conference." FAC ¶ 29. The conference is a college preview program. *Id.* Yet selection is race-based: Prospective Black students are eligible for invitations; prospective White and Asian students are not. *Id.* Second, the University invites all freshmen and transfer students who are Black to a three-day orientation program called "Welcome Black Weekend." FAC ¶ 30. Selection is once again race-based: Black students are eligible for invitations; students of other races are not. Third, at the end of each academic year the University hosts race-based graduation and award ceremonies for Black and Hispanic students. FAC ¶ 32. That the University of Oklahoma continues to operate numerous educational programs that discriminate along racial lines—seventy years after the Supreme Court's decision in *Brown*

*v. Board of Education*, 347 U.S. 483 (1954)—enhances the plausibility of Plaintiffs'
allegation that the University also discriminates when awarding financial aid. Indeed, it is
telling that "the University of Oklahoma has recently deleted many webpages with
information about its diversity and race-based programs" as part of a coordinated "effort
to obscure the extent to which it has engaged in race-based decision making." FAC ¶ 33.
These efforts continued after Plaintiffs filed their initial complaint. FAC ¶ 34.

Given "the totality of the relevant facts," the Complaint plausibly alleges that
Defendants consider race when awarding financial aid. *Davis*, 426 U.S. at 242. And since
Defendants do not claim to have a compelling interest in doing so, their use of race in
distributing aid is actionable under the Equal Protection Clause and Title VI.

### B.  The Complaint Appropriately Relies upon Statistical Evidence.

Defendants dedicate the bulk of their Motion to Dismiss to attacking the statistical
evidence in the Complaint. *See* Mot. at 1–2, 9–15, 17–19, 23. They pretend that Plaintiffs
have pleaded a mere "disparate impact" theory, *id.* at 7, and then argue that the statistical
evidence is inadequate to support such a theory, *id.* at 9–15, 17–19.

As discussed above, statistical evidence *is* relevant in intentional discrimination
cases. *Davis*, 426 U.S. at 242. If a policy "bears more heavily on one race than another," it
is more likely that the government acted with discriminatory intent. *Id.* Statistical evidence
alone will not establish invidious discrimination (except in the most extreme
circumstances). *See Arlington Heights*, 429 U.S. at 266. But statistical evidence is "an
important starting point" in race-discrimination cases. *Id.* So courts consider statistical
evidence as part of the "totality of the relevant facts." *Davis*, 426 U.S. at 242.

Here, Plaintiffs' statistical analysis is used in precisely this way—as part of the "totality" of facts supporting a plausible inference of intentional discrimination in the University's financial aid system. These facts include: (i) a direct admission from a University official that such discrimination occurs; (ii) the statistical evidence; (iii) the University's race-based diversity goals, practices, and monitoring; (iv) the University's express racial discrimination in a series of contemporaneous programs; and (v) the University's recent efforts to hide its race-based conduct. *See supra* II.A (discussing this evidence in greater detail). Accordingly, Defendants miss the mark by suggesting that this is a disparate impact case and claiming that statistical analysis is "the only basis for [Plaintiffs'] supposed racial-discrimination theory." Mot. at 9. Even so, the statistical evidence is relevant. And Defendants' attacks upon it are unavailing.

Defendants' specific critiques of the statistical evidence range from the inaccurate to the odd. For example, Defendants claim that Plaintiffs "omit the results of their statistical analysis." *Id*. at 10. But Paragraphs 42 through 44 of the Complaint set forth the findings of the analysis. And Defendants quote much of this material in the background section of their brief. *See id*. at 3–4. Along similar lines, the Defendants' claim that Plaintiffs "withhold the sources" for their data, thereby "cast[ing] doubt on the analysis's plausibility." *Id.* at 10 n.4. But the Complaint expressly identifies the "Department of Education" and the "University of Oklahoma" as its sources. FAC ¶ 42. Defendants also say it "makes no sense" that Plaintiffs' analysis "controlled for inflation." Mot. at 15 n.7. But the regression analysis incorporates data from "academic years 2002–2003 through

2021–2022." FAC ¶ 42. Failing to account for inflation in a data series that spans such a time period would be unsound.

Other of Defendants' critiques are the stuff of *Daubert* hearings and Rule 702. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). They are not proper bases for discounting evidence on a motion to dismiss. For instance, the Complaint explains that Plaintiffs' statistical analysis "control for family financial resources." FAC ¶ 42. It does so by using "measures of enrolled students receiving federal grant aid as a proxy for family financial resources." FAC ¶ 44. This approach is sound because a student's eligibility for aid is closely linked to his family's financial resources. *See* U.S. DEP'T OF EDUC., Ch. 3: *Student Aid Index (SAI) and Pell Grant Eligibility*, 2024-2025 FEDERAL STUDENT AID HANDBOOK (2024), https://bit.ly/3B6lI0n (explaining grant requirements). Defendants claim it is not. They say the variable is neither "viable" nor "reliable" as a proxy. Mot. at 14–15 (citation omitted). But this is based on nothing more than Defendants' say so. Such arguments might be proper in a *Daubert* hearing. But they lack merit at the motion-to-dismiss stage, where the Court must view the facts in the light most favorable to Plaintiffs.

So too with statistical significance. The Complaint explains that the results of the analysis "are statistically significant." FAC ¶ 42. "Statistical significance measures the likelihood that the disparity between groups is random, i.e., solely the result of chance." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1223 (10th Cir. 2013). It is thus an important metric for statistical analysis. As the Tenth Circuit has explained, "It is not enough for a plaintiff to present data showing a disparity between groups. To be reliable, the result also must be statistically significant." *Id.* And so it is here. Defendants do not grapple with this important

finding. Instead, they attack the analysis for not also measuring "the size of the disparity itself" vis-à-vis a statistical concept called "practical significance." Mot. at 10–11. But "practical significance" is not a requirement that the Tenth Circuit has adopted for the use of statistical evidence. *See Apsley v. Boeing Co.*, 691 F.3d 1184, 1199–1200 (10th Cir. 2012). To the contrary, the Circuit has cautioned against overreliance on the concept. *Id.* Defendants may have pointed to a future line of inquiry for experts. But they have said nothing that undermines the Complaint's allegation of statistically significant race-based differences. *See* FAC ¶¶ 42–44.

Finally, Defendants ask the Court to ignore the statistical analysis entirely. They say the analysis is a "naked assertion" and so is "not entitled to the presumption of truth." Mot. at 15. But the amount of time that Defendants spend wrestling with the statistical analysis in the evidentiary muck gives the lie to this claim. So do the pleadings themselves, which contain ample explanation regarding the analysis. *See* FAC ¶¶ 40–44. The Court should reject Defendants' invitation to engage in premature expert analysis and accept Plaintiffs' well-pleaded statistical allegations.

## C.    The Complaint Plausibly Alleges Differential Treatment and Intent.

Defendants argue that the Complaint fails to allege that the University treated Plaintiffs differently because of their race or engaged in intentional discrimination. That is not right. As Section II.A of this brief explains, *supra*, the Complaint plausibly alleges just that. Still, a few more words are merited about each specific objection.

Begin with differential treatment. The Equal Protection Clause requires that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living*

*Ctr.*, 473 U.S. 432, 439 (1985). Race is not a relevant criterion when the government allocates benefits like college admission or financial aid. *SFFA*, 600 U.S. at 206–08. Plaintiffs are thus similarly situated to all others seeking aid from the University of Oklahoma. The Complaint plausibly alleges that the University considers race when awarding aid. *See supra* II.A–B. So Plaintiffs have plausibly alleged differential treatment.

Defendants claim the Equal Protection Clause requires more. They say the Complaint should have identified each specific scholarship or form of financial aid sought by Plaintiffs; explained how each specific program considered race; and then identified the precise aid each Plaintiff would have received over "hypothetical Black and Hispanic students." Mot. at 9. Yet Defendants cite no authority supporting their crabbed view of equal-protection pleadings. And Defendants' arguments again fail to accept the Complaint's theory of the case—"systematic racial discrimination" in the University's financial aid program. FAC ¶¶ 2, 35, 46–47, 50; *see also supra* I.A. Each Plaintiff applied for the University's general "financial aid" and "scholarship" offerings, and each received less aid because of his or her race. FAC ¶¶ 37–40, 49–53; 57–58, 62–64. That establishes differential treatment. So too does the University's statement that financial aid was not available to one Plaintiff, "but would have been if she were African American." FAC ¶ 40.

Defendants also contend that the statistical evidence is not relevant to differential treatment. Defendants first argue that the data is irrelevant because it ends in 2022. Mot. at 11–12. But this period immediately precedes Plaintiffs' enrollment and so is quite probative. *See* FAC ¶¶ 51, 56. Next, Defendants argue that the data is irrelevant because it "pre-dat[es] *SFFA*, which substantially changed the governing law." Mot. at 12. But this

does nothing to undermine the statistical evidence: The Supreme Court has *never* blessed racial preferences in financial aid, and Oklahoma's Constitution forbids them. OKLA. CONST. art. II, § 2–36A. The University's suggestion that it may have considered race when awarding aid prior to *SFFA* is a red flag and further supports Plaintiffs' allegations.

As for intent, the issue turns entirely on whether the University considers race when making financial aid decisions. Racial classifications are "presumptively invalid." *Feeney*, 442 U.S. at 272. So the use of race in a decision-making process is all that is required to show intent. *See SFFA*, 600 U.S. at 206–08; *Miller*, 515 U.S. at 904; *Feeney*, 442 U.S. at 272; *Concrete Works of Colo.*, 36 F.3d at 1519. For the reasons already explained in this brief, Plaintiffs have plausibly alleged that the University considered their race when awarding financial aid. *See supra* II.A–B. This means Plaintiffs have plausibly alleged intent.

Finally, Defendants make the puzzling claim that to allege intentional discrimination, a Plaintiff "must point to evidence that the University gave *her* financial aid to a Black or Hispanic student." Mot. at 20 (emphasis in original). That would be akin to requiring the plaintiff in an admission case to allege that her particular spot on campus went to some particular person. But that is not the law. *See generally SFFA*, 600 U.S. 181 (requiring nothing of the sort). The relevant legal question is whether the University takes an action with respect to Plaintiffs "on account of race." *Iqbal*, 556 U.S. at 677. The University does: It considers race when awarding financial aid. And that is unlawful.

## CONCLUSION

The Court should deny Defendants' Motion to Dismiss.

25

Respectfully submitted,

Date: September 9, 2024

/s/ Ryan Haynie
Ryan Haynie, OBA No. 32796
OKLAHOMA COUNCIL OF PUBLIC
AFFAIRS
1401 N. Lincoln Blvd.
Oklahoma City, OK, 73104
Telephone: (405) 590-6070
Email: ryan@ocpathink.org

David H. Thompson, *pro hac vice*
Peter A. Patterson, *pro hac vice*
Samuel D. Adkisson, *pro hac vice*
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C., 20036
Telephone: (202) 220-9600
Email: dthompson@cooperkirk.com
ppatterson@cooperkirk.com
sadkisson@cooperkirk.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that, on September 9, 2024, I filed a copy of the foregoing with the

Court using the ECF system, which sent electronic notification to all counsel of record.

*/s/ Ryan Haynie*
Ryan Haynie, OBA No. 32796