# EXHIBIT 2

**Richard LOWERY, Plaintiff,**

v.

**TEXAS A&M UNIVERSITY, et al., Defendants.**

**Civil Action No. 4:22-cv-03091**

United States District Court, S.D. Texas, Houston Division.

Signed September 29, 2023

**Background:** White male professor who was a prospective job applicant brought an action under Title VI, Title IX, § 1981, and § 1983 against state university and members of its administration, seeking a declaratory judgment that university engaged in unlawful discriminatory hiring practices which disadvantaged white and Asian men. Defendants moved to dismiss, and professor moved for leave to amend his complaint.

**Holdings:** The District Court, Charles Eskridge, J., held that:

(1) professor's alleged injury of a lost opportunity to compete with other applicants for professorships on an equal basis was not an imminent injury-in-fact sufficient to establish Article III standing;

(2) professor's action was moot and unripe; and

(3) professor's proposed amendments to his complaint were futile.

Plaintiff's motion denied; defendants' motion granted.

**1. Federal Courts** ⚖️**2015, 2073**

Subject-matter jurisdiction is inherently a threshold matter; this is because federal courts are ones of limited jurisdiction.

**2. Federal Courts** ⚖️**2086**

Dismissal for lack of subject matter-jurisdiction is appropriate when court lacks statutory or constitutional power to adjudicate claim. Fed. R. Civ. P. 12(b)(1).

**3. Federal Courts** ⚖️**2082**

On a motion to dismiss for lack of subject-matter jurisdiction, the burden is on party asserting jurisdiction to establish by a preponderance of evidence that it is proper. Fed. R. Civ. P. 12(b)(1).

**4. Federal Courts** ⚖️**2081**

A presumption against subject-matter jurisdiction exists that must be rebutted by the party bringing the action to federal court. Fed. R. Civ. P. 12(b)(1).

**5. Federal Civil Procedure** ⚖️**103.2, 103.3**

The burden is squarely upon the party asserting a claim in federal court to establish Article III standing by showing that he has suffered an injury in fact, the injury is fairly traceable to the challenged conduct, and the injury is likely be redressed by a favorable decision. U.S. Const. art. 3, § 2, cl. 1.

**6. Federal Civil Procedure** ⚖️**103.2**

As to the requirement of injury in fact, standing requires a claim of injury that is concrete, particularized, and actual or imminent; that means a claimed injury must be real, it must actually exist, and it must not be too speculative for Article III purposes. U.S. Const. art. 3, § 2, cl. 1.

**7. Federal Courts** ⚖️**2078**

In a facial challenge to subject-matter jurisdiction, the defendant argues simply that the allegations in the complaint are insufficient to support jurisdiction; the court on such motion must then look only at the operative complaint, with all allegations presumed to be true. Fed. R. Civ. P. 12(b)(1).

**LOWERY v. TEXAS A&M UNIVERSITY** 273
Cite as 696 F.Supp.3d 272 (S.D.Tex. 2023)

8. **Federal Courts** ⟶2080

In a factual challenge to subject-matter jurisdiction, the defendant submits evidence together with the argument contesting jurisdiction; the court then is not limited to the facts pleaded in the complaint, but instead has discretion to consider any evidence submitted by the parties, such as affidavits, testimony, and documents. Fed. R. Civ. P. 12(b)(1).

9. **Federal Courts** ⟶2082

In a factual challenge to subject-matter jurisdiction, the court has discretion to weigh any competing evidence based on credibility assessments. Fed. R. Civ. P. 12(b)(1).

10. **Civil Rights** ⟶1333(5)

White male professor's alleged injury of lost opportunity to compete on equal basis with other applicants for professorships at state university's business school was not concrete and imminent injury-in-fact sufficient to establish Article III standing for § 1983 claim alleging equal-protection violation and for claims under Title VI, which barred racial discrimination in programs receiving federal assistance, Title IX, and § 1981, where professor never applied for position at school and disavowed any present intention to apply, school did not participate in preferential-treatment program for underrepresented minorities, memorandum describing potential hiring line set aside for underrepresented minorities involved only future possibilities, and faculty senate resolution supporting diversity was not indicative of actions at school. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 14; Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681 et seq.; 42 U.S.C.A. §§ 1981(a), 1983; Civil Rights Act of 1964 § 601, 42 U.S.C.A. § 2000d et seq.

11. **Federal Courts** ⟶2113

"Mootness" pertains to situations where a set of circumstances eliminates actual controversy after the commencement of a lawsuit; in this vein, mootness is often referred to as "the doctrine of standing in a time frame."

See publication Words and Phrases for other judicial constructions and definitions.

12. **Federal Civil Procedure** ⟶103.2
    **Federal Courts** ⟶2113, 2206

The requisite personal interest that must exist at the commencement of litigation, i.e. standing, must continue throughout its existence, i.e. mootness; where mootness is evident, the court must dismiss the suit.

13. **Federal Courts** ⟶2119

"Ripeness" pertains to situations where disputes may be premature or speculative.

See publication Words and Phrases for other judicial constructions and definitions.

14. **Federal Courts** ⟶2121

A case is "ripe" when it would not benefit from any further factual development and when the court would be in no better position to adjudicate the issues in the future than it is now.

See publication Words and Phrases for other judicial constructions and definitions.

15. **Federal Courts** ⟶2206

Where a controversy is not ripe, the court must dismiss.

16. **Declaratory Judgment** ⟶210

White male prospective applicant's action seeking a declaration that state university was violating Title VI and Title IX by acts of discrimination favoring women and non-Asian racial minorities was moot, where state legislation enacted after appli-

**274**                 **696 FEDERAL SUPPLEMENT, 3d SERIES**

cant brought his action prohibited the university from engaging in preferential treatment in hiring on the basis of race, sex, color, ethnicity, or national origin. 20 U.S.C.A. § 1681 et seq.; Civil Rights Act of 1964 § 601, 42 U.S.C.A. § 2000d; Tex. Educ. Code Ann. § 51.3525(b)(1)(D).

**17. Federal Courts ⚖︎2120**

Ripeness entails balancing the fitness of issues for judicial resolution with the potential hardship to the parties caused by declining court consideration.

**18. Federal Courts ⚖︎2121**

A case is generally ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required.

**19. Civil Rights ⚖︎1455, 1561**

White male professor's action seeking to permanently enjoin state university from allegedly violating Title VI and Title IX by acts of discrimination favoring women and non-Asian racial minorities was unripe, where professor's purported future injury as a potential job applicant depended on future events that may or may not occur, and university was entitled to a presumption of good faith that it would comply with subsequently-enacted state legislation prohibiting it from engaging in preferential treatment in hiring on the basis of race, sex, color, ethnicity, or national origin. 20 U.S.C.A. § 1681 et seq.; Civil Rights Act of 1964 § 601, 42 U.S.C.A. § 2000d; Tex. Educ. Code Ann. § 51.3525(b)(1)(D).

**20. Public Employment ⚖︎1001**

Government actors in their sovereign capacity and in the exercise of their official duties are accorded a presumption of good faith because they are public servants, not self-interested private parties.

**21. Federal Courts ⚖︎2384**

For purposes of sovereign immunity, a suit against an agency of the state is construed as a suit against state officials.

**22. Federal Courts ⚖︎2377, 2384**

The doctrine of *Ex parte Young* permits an official-capacity equitable claim to proceed against state officers so long as it seeks injunctive relief for an ongoing violation of federal law and the officer bears a sufficiently close connection to the unlawful conduct such that it can be redressed by an injunction directed at the official.

**23. Federal Civil Procedure ⚖︎851**

White male professor's proposed amendments to his complaint alleging that state university was violating Title VI and Title IX by acts of discrimination favoring women and non-Asian racial minorities were futile, where professor's amendments did nothing to overcome professor's lack of an injury-in-fact and the complaint's mootness and unripeness given subsequently-enacted legislation prohibiting university from engaging in preferential treatment in hiring on the basis of race, sex, color, ethnicity, or national origin. U.S. Const. art. 3, § 2, cl. 1; 20 U.S.C.A. § 1681 et seq.; Civil Rights Act of 1964 § 601, 42 U.S.C.A. § 2000d; Tex. Educ. Code Ann. § 51.3525(b)(1)(D).

**24. Federal Civil Procedure ⚖︎828.1, 851**

Whether to grant leave to amend a complaint is in the discretion of the court, and denial is appropriate when the amendment would be futile.

---

Gene Patrick Hamilton, America First Legal Foundation, Washington, DC, Jonathan Franklin Mitchell, Mitchell Law PLLC, Austin, TX, for Plaintiff.

Jesika Jasmine Silva Blanco, Layne Edwin Kruse, Michael Carter Crow, Norton Rose Fulbright U.S. LLP, Houston, TX, Paul Denton Trahan, Fulbright Jaworski LLP, Austin, TX, Ryan Eric Meltzer, Norton Rose Fulbright U.S. LLP, Austin, TX, for Defendants Annie S. McGowan, N.K. Anand.

Ryan Eric Meltzer, Norton Rose Fulbright U.S. LLP, Austin, TX, for Defendants M. Katherine Banks, Alan Sams.

Michael Carter Crow, Norton Rose Fulbright U.S. LLP, Houston, TX, Ryan Eric Meltzer, Norton Rose Fulbright U.S. LLP, Austin, TX, for Defendant Texas A&M University.

### OPINION AND ORDER GRANTING MOTION TO DISMISS

Charles Eskridge, United States District Judge

The motion to dismiss by Defendants Texas A&M University, *et al*, is granted. Dkt 22.

The motion by Plaintiff Richard Lowery for leave to file a second amended complaint is denied. Dkt 37.

#### 1. Background

Plaintiff Richard Lowery, a white male, is a professor of finance at the University of Texas. In this putative class action, he sues on behalf of all white and Asian men who, like him, stand "able and ready" to apply for faculty appointments at Texas A&M. Dkt 19 at ¶ 47.

##### a. Allegations

Lowery alleges himself as an exceptionally strong candidate for a faculty appointment at Texas A&M, given his current status as a tenured professor at the University of Texas. He also claims that the finance department within the Mays Business School at Texas A&M "has shown interest in his research by inviting him to present [a] brown-bag lunch talk" in April of 2022. Id at ¶ 44. He says that he's interested in leaving the University of Texas because he dislikes the current leadership and has been the target of intense criticism for his outspoken conservativism. He believes that the finance department at Texas A&M would be a better fit. Id at ¶¶ 35–39.

Even so, he hasn't yet applied to Texas A&M and refuses to do so until his application will be considered on what he perceives to be an equal basis. Id at ¶ 41. And he alleges that his application wouldn't currently be considered on such basis because Texas A&M engages in unlawful hiring practices "by giving discriminatory preferences to females and non-Asian racial minorities at the expense of white and Asian men." Id at ¶¶ 19–20.

Seeking to put an end to these hiring practices, Lowery brings claims under Title VI, Title IX, Section 1981, and Section 1983. Id at ¶¶ 48–65. He sues Texas A&M University and a number of its officers or employees, including M. Katherine Banks (president), Alan Sams (interim provost and vice president for academic affairs), Annie S. McGowan (vice president and associate provost for diversity), and N.K. Anand (vice president for faculty affairs). Id at ¶¶ 4–8. These Defendants will be referred to together as *Texas A&M*.

In support of his claims against Texas A&M, Lowery alleges that Banks has continued to promote the unlawful hiring practices that she supported in her prior role as dean of the engineering college. Id at ¶¶ 13–14. The bulk of his complaint concerns one preferential-treatment program in particular—the ACES Plus program. According to a memorandum written by McGowan and Anand, this program allocates funds for the purpose of hiring "from underrepresented minority groups" and "moving the structural composition of

**276**  **696 FEDERAL SUPPLEMENT, 3d SERIES**

[the] faculty towards parity with that of the State of Texas." Dkt 19-1 at 1. Lowery alleges that Banks "was aware of and approved" ACES Plus "and its racially discriminatory set-asides." Dkt 19 at ¶ 16. He alleges elsewhere that the original ACES program—the predecessor of ACES Plus—didn't contain the discriminatory language contained in the ACES Plus memorandum, but that "the university would nonetheless reserve hiring spots for underrepresented-minority candidates" under that program. Id at ¶ 30.

Lowery's allegations extend beyond the ACES programs. He also alleges that Texas A&M is in the process of establishing faculty hiring lines reserved for underrepresented minorities. He gives an example concerning the finance department. The head of the recruiting committee for the department confirmed by email to another professor that a hiring line would be set aside for underrepresented minorities. He quotes the email from the committee head, which reads, "The under-represented line would potentially be a third position, so yes reserved, but not one of our 'regular' positions." Dkt 19 at ¶¶ 20–21.

Finally, Lowery describes a Texas A&M faculty senate meeting that resulted in the senate adopting a resolution supporting "the goals of programs, such as ACES and ACES Plus, that aim to diversify the ranks of faculty to better represent our state and our student body." Id at ¶ 23. It's alleged that one professor voiced strong opposition to these programs at the meeting, but which did little to persuade his fellow professors to vote against the resolution. The resolution instead passed in a lopsided vote. Id at ¶ 28.

As relief, Lowery seeks declaratory judgments against each Defendant for violations of Title VI, Title IX, 42 USC § 1981(a), and the Equal Protection Clause. He also seeks to permanently enjoin them from considering race or sex in the appointment, promotion, or compensation of Texas A&M faculty. He also asks that a "court monitor" be appointed to (i) "oversee all decisions relating to the appointment, promotion, and compensation of faculty" at Texas A&M, and (ii) "oversee the 'diversity office' . . . to ensure that it does not aid or abet violations of the nation's civil-rights laws." Dkt 19 at 14–15.

b. Subsequent legal developments

Pending is a motion to dismiss brought by all Defendants, seeking dismissal on jurisdictional grounds of standing, ripeness, and sovereign immunity, as well as for failure to state a claim. Dkt 22.

This motion was filed in February 2023. Four months later, the Supreme Court handed down its watershed decision in *Students for Fair Admissions Inc. v. President and Fellows of Harvard College*, holding the race-based admissions programs of two public universities to be unlawful. 600 U.S. 181, 143 S. Ct. 2141, 216 L.Ed.2d 857 (2023). And in June 2023, Texas Senate Bill No 17 was signed into law, to be codified at Section 51.3525 of the Texas Education Code and take effect on January 1, 2024. SB 17 seeks to dismantle diversity-and-inclusion initiatives at public universities, in part by prohibiting public universities from giving "preference on the basis of race, sex, color, ethnicity, or national origin to an applicant for employment, an employee, or a participant in any function of the institution." See Tex Edu Code § 51.3525(b)(1)(D).

These both present significant legal developments with respect to racial preferences of the sort that Texas A&M is alleged to have employed. The parties were thus requested to file supplemental briefing on the impact of SB 17 on the justiciability of this case. Dkt 32.

**LOWERY v. TEXAS A&M UNIVERSITY** 277
Cite as 696 F.Supp.3d 272 (S.D.Tex. 2023)

Texas A&M argues that SB 17 moots Lowery's case as pleaded, and that no set of facts are ripe to consider with respect to SB 17, which hasn't yet come into effect. Dkts 33 & 36. Lowery offers reasons to the contrary. Dkts 34 & 38. He also seeks leave to amend his complaint to address the justiciability concerns. Dkt 37.

2. Jurisdiction, Rule 12(b)(1)

**[1]** Subject-matter jurisdiction is inherently a threshold matter. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), quoting *Mansfield, Coldwater & Lake Michigan Railway Co. v. Swan*, 111 U.S. 379, 382, 4 S.Ct. 510, 28 L.Ed. 462 (1884). This is because federal courts are ones of limited jurisdiction. *Howery v. Allstate Insurance Co.*, 243 F.3d 912, 916 (5th Cir. 2001). A decision to hear a case that's beyond the subject-matter jurisdiction of a federal court isn't a "mere technical violation," but is instead "an unconstitutional usurpation" of power. Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 3522 (West 3d ed April 2022 update).

**[2–4]** Rule 12(b)(1) of the Federal Rules of Civil Procedure permits a defendant to seek dismissal of an action for lack of subject-matter jurisdiction. Dismissal is appropriate "when the court lacks the statutory or constitutional power to adjudicate the claim." *In re Federal Emergency Management Agency Trailer Formaldehyde Products Liability Litigation*, 668 F.3d 281, 286 (5th Cir. 2012), quoting *Home Builders Association Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (internal quotations omitted). The burden is on the party asserting jurisdiction to establish by a preponderance of the evidence that it is proper. *New Orleans & Gulf Coast Railway Co. v. Barrois*, 533 F.3d 321, 327 (5th Cir. 2008). Indeed, a presumption against subject-matter jurisdiction exists that "must be rebutted by the party bringing an action to federal court." *Coury v. Prot*, 85 F.3d 244, 248 (5th Cir. 1996).

a. Standing

**[5, 6]** The burden is squarely upon the party asserting a claim in federal court to establish Article III standing by showing that he's suffered an injury in fact, the injury is fairly traceable to the challenged conduct, and the injury is likely be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Spokeo Inc. v. Robins*, 578 U.S. 330, 338, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016). As to the requirement of *injury in fact*, "standing requires a claim of injury that is 'concrete, particularized, and actual or imminent.' That means a claimed injury must be real—'it must actually exist.' And it must not be 'too speculative for Article III purposes.'" *Earl v. Boeing Co.*, 53 F.4th 897, 901–02 (5th Cir. 2022) (citations omitted).

**[7–9]** The Fifth Circuit recognizes that a motion under Rule 12(b)(1) can present two different types of challenges to jurisdiction—one facial, the other factual. See *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981); *Lee v. Verizon Communications Inc.*, 837 F.3d 523, 533 (5th Cir. 2016). In a *facial* challenge, the defendant argues simply that the allegations in the complaint are insufficient to support jurisdiction. The court on such motion must then look only at the operative complaint, with all allegations presumed to be true. See *Paterson v. Weinberger*, 644 F.2d at 523. In a *factual* challenge, the defendant submits evidence together with the argument contesting jurisdiction. The court then isn't limited to the facts pleaded in the complaint, but instead has discretion to consider any evidence submitted by the

parties, such as affidavits, testimony, and documents. Ibid.; see also *Kasali v. FBI*, 2017 WL 6343654, *2 (S.D. Tex. 2017). Discretion would then also exist to weigh any competing evidence based on credibility assessments. *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981) (citation omitted).

Texas A&M contends that Lowery lacks standing even under facts pleaded that predate SB 17. In doing so, it attaches evidence not referenced in Lowery's complaint, thus bringing a factual challenge with its motion to dismiss. See Dkt 22-1. Such evidence will be considered where necessary on this inquiry into standing. See *Paterson*, 644 F.2d at 523.

Lowery presents himself as a finance professor seeking possible appointment in the finance department of the Mays Business School at Texas A&M. See Dkt 25-1 at 15 (Lowery affidavit). Texas A&M contends, "The lone injury alleged by Plaintiff is a lost opportunity to 'compete with other applicants' for professorships at TAMU 'on an equal basis.'" Dkt 22 at 15, quoting Dkt 19 at ¶ 45. It further argues that his complaint "falls squarely in the abstract-grievance camp," given that he's never applied and, in fact, "disavows any present intention to apply" to Texas A&M. Dkt 22 at 16, citing Dkt 19 at ¶ 41.

**[10]** This is correct. Lowery can't simply assume the conclusion—that ongoing discrimination exists and is injuring him—without substantially rewriting Article III standing for employment-discrimination claims. Otherwise, any putative plaintiff could sue a potential employer without ever applying, simply upon allegation the posited discriminatory practices deterred application. That's not enough. See *Carney v. Adams*, 592 U.S. 53, 141 S. Ct. 493, 498, 501, 208 L.Ed.2d 305 (2020) (standing insufficient where plaintiff had merely expressed interest in applying for available judgeships). To the extent the first-amended complaint cites cases purporting to show that it is enough, both instead include facts that the plaintiff had at least applied to the challenged program at some point in the past and intended to do so again. See Dkt 19 at ¶ 45, citing *Gratz v. Bollinger*, 539 U.S. 244, 261–62, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003); *Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993). For instance, in *Gratz*, the plaintiff had "applied to the University as a freshman applicant" and, after being denied admission, "demonstrated that he was 'able and ready' to apply as a transfer student should the University cease to use race in undergraduate admissions." 539 U.S. at 262, 123 S.Ct. 2411. And in *Northeastern Florida Chapter*, it was noted that the plaintiff made regular bids for the type of subject contracts. 508 U.S. at 668, 113 S.Ct. 2297.

Lowery attempts to make the injury appear more present, and thus justify his standing, with reference to three categories of allegations, being (i) the ACES Plus program, (ii) reserved faculty hiring lines, and (iii) a resolution from a faculty senate meeting. See Dkt 25 at 9–10, citing Dkt 19 at ¶¶ 34–44. Texas A&M argues that none are concrete enough to establish the requisite injury. See Dkt 22 at 17.

*As to the ACES Plus program*, the bulk of Lowery's complaint concerns this program and, to a lesser extent, the original ACES program. His alleged injury under these programs is putative inability to compete on an equal basis with non-white, non-Asian, and female applicants. But Texas A&M notes, with supporting evidence, that the Mays Business School participates in neither ACES Plus nor the original ACES Program. See Dkt 26 at 5; see also Dkts 22-4 & 26-1 at 2–3. In particular, the

original ACES program was the ACES Fellows Program, which applies only to "early career faculty" at select colleges at the university, but not including the Mays Business School. See Dkt 22-4. Texas A&M also reports in a reply brief that ACES Plus isn't administered at the Mays Business School. See Dkt 26-1 at 2–3 (Anand declaration). Lowery thus can't establish the actual or imminent injury of which he complains via these programs for the very reason that the Mays Business School doesn't participate in them.

*As to reserved faculty hiring lines*, Lowery separately complains that Texas A&M, at the time of his complaint, was in the process of establishing faculty hiring lines reserved for underrepresented minority groups. See Dkt 19-1. He gives an example concerning the finance department, citing an email from the head of the recruiting committee for the department confirming to another professor that a hiring line would be set aside for underrepresented minorities. Dkt 19-2. As alleged, the email from the committee head states, "The under-represented line *would potentially be* a third position, so yes reserved, but not one of our 'regular positions.' " Dkt 19 at ¶¶ 20–21 (emphasis added). This speaks of future possibilities, not of future certainties. And so, plainly missing is any allegation that such a hiring line is (or was) *currently* in place. As such, it doesn't speak of current practices or establish present injuries.

*As to a faculty senate resolution*, Lowery describes a Texas A&M faculty senate meeting that resulted in the senate adopting a resolution supporting "the goals of programs, such as ACES and ACES Plus, that aim to diversify the ranks of faculty to better represent our state and our student body." Id at ¶ 23; see also id at ¶ 28 (adoption of resolution in lopsided vote even with strong opposition voiced by one professor). Texas A&M submits evidence that the faculty senate serves in a purely "advisory capacity" to the president. See Dkt 22-3 (policy). It would perhaps improperly stretch inquiry into the merits to consider whether the faculty senate is, in fact, purely advisory and/or whether its resolutions have any impact in themselves. But that needn't be considered, because what's pleaded about them isn't indicative of any current actions even being pursued at the Mays Business School. It thus again fails to connect to any injury in fact.

Texas A&M raises a separate, but related, point about these three categories with respect to ripeness. It points out that the pleadings "depict programs that are both in nascent stages and contingent on various future actions." Dkt 22 at 18. This aspect of ripeness addresses facts in the past as pleaded in the first amended complaint. But it needn't be addressed beyond observation that, to the extent the assertions fail for standing as abstract or hypothetical, like reasoning counsels in favor of finding them unfit for judicial resolution at present. See *Lopez v. City of Houston*, 617 F.3d 336, 341 (5th Cir. 2010). Better instead to withhold consideration for further factual development. See *Choice Inc. of Texas v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012).

In sum, Lowery fails to show that, as a prospective applicant to Mays Business School, he would be impacted by any of the preferential-treatment programs that Texas A&M faculty and leadership have allegedly deemed important and elsewhere—prior to SB 17—attempted to advance. The action will thus be dismissed for lack of standing for failure to establish an injury in fact.

b. Mootness and ripeness

After briefing closed on its motion to dismiss, Texas A&M by notice of supplemental authority advised of the passage of

Senate Bill 17. Dkt 28. It contends that this case is moot because the enactment of SB 17 "outlaws" the conduct from which Lowery seeks relief. Id at 2. And by further supplement after hearing, it argues that this case is also unripe because SB 17 requires it to reform its hiring practices to any extent that they currently advance racial and other preferences. Dkt 33 at 3.

[11, 12] *Mootness* pertains to situations where a "set of circumstances ... eliminates actual controversy after the commencement of a lawsuit." *Center for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006). In this vein, mootness is often referred to as "the doctrine of standing in a time frame." *United States Parole Commission v. Geraghty*, 445 U.S. 388, 397, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980): "The requisite personal interest that must exist at the commencement of litigation (standing) must continue throughout its existence (mootness)." Where mootness is evident, the court must dismiss the suit. Id. at 404, 100 S.Ct. 1202.

[13–15] *Ripeness*, by comparison, pertains to situations where disputes may be "premature or speculative." *Shields v. Norton*, 289 F.3d 832, 835 (5th Cir. 2002). A case is ripe when it "would not benefit from any further factual development and when the court would be in no better position to adjudicate the issues in the future than it is now." *Pearson v. Holder*, 624 F.3d 682, 684 (5th Cir. 2010), quoting *Simmonds v. INS*, 326 F.3d 351, 359 (2d Cir. 2003). And where a controversy isn't ripe, the court must dismiss. *DM Arbor Court, Ltd. v. City of Houston*, 988 F.3d 215, 220 (5th Cir. 2021).

There has been a substantial change in applicable law. SB 17 prohibits exactly what Lowery alleges is taking place at Texas A&M, *viz*, preferential treatment in hiring "on the basis of race, sex, color, ethnicity, or national origin." Tex Edu Code Ann § 51.3525(b)(1)(D). To ensure compliance with this law, Texas A&M will have to alter any current hiring practices that give such unlawful preferences. It has submitted a memorandum from an ethics and compliance officer indicating that Texas A&M has already begun its efforts to comply with SB 17, with the goal of achieving full compliance by September 1, 2023, even though the fully effective date is the end of the year. Dkt 33-1. In the present context, then, the relief that Lowery seeks as to past practices is moot, and the relief that he seeks prospectively isn't ripe.

[16] *As to past conduct*, Lowery seeks a declaration that Texas A&M—based on the facts pleaded—"is violating" Title VI and Title IX by acts of discrimination favoring "women and non-Asian racial minorities." Dkt 19 at ¶ 66(b); see also id at ¶ 66(c). Its beyond reasonable argument that Texas A&M must review its hiring practices and revise them where necessary to bring them into accord with SB 17 and *Students for Fair Admissions*. Compare Dkt 28 at 2, with Dkt 29 at 2.

This means that the claims as originally presented have lost their practical significance because the facts generating the original controversy have altered so substantially. To that extent, this action is moot. And this isn't a context of voluntary cessation, as suggested by Lowery. Dkt 29 at 2–3. Recent precedent from the Fifth Circuit makes clear that change compelled by force of law isn't voluntary. See *Daves v. Dallas County, Texas*, 64 F.4th 616, 634–35 (5th Cir. 2023); see also *Does 1–7 v. Round Rock Independent School District*, 540 F. Supp. 2d 735, 745–46 (W.D. Tex. 2007).

*As to future conduct*, Lowery seeks to "permanently enjoin" Texas A&M from considering race or sex in faculty appointment, promotion, or compensation. Dkt 19

at ¶ 66(d). That, of course, is precisely what SB 17 now already bars Texas A&M from doing, thus again evincing mootness. But more concerning is ripeness.

**[17, 18]** Ripeness entails balancing "the fitness of the issues for judicial resolution" with "the potential hardship to the parties caused by declining court consideration." *Lopez v. City of Houston*, 617 F.3d 336, 341 (5th Cir. 2010). The Fifth Circuit holds, "A case is generally ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required." *New Orleans Public Service Inc. v. Council of City of New Orleans*, 833 F.2d 583, 587 (5th Cir. 1987). If the purported injury is "contingent [on] future events that may not occur as anticipated, or indeed may not occur at all," the claim isn't ripe for adjudication. *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 580–81, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985), quoting Edward H Cooper, 13B Federal Practice and Procedure § 3532 (Wright & Miller 3d ed 1984).

**[19, 20]** Lowery's purported future injury as a potential applicant depends entirely upon future events that may or may not occur. True, it remains to be seen whether Texas A&M will faithfully observe SB 17. But until then, Texas A&M is entitled to a presumption of good faith that it will comply with SB 17 and discontinue any conflicting practices. As noted by the Fifth Circuit in *Sossamon v. Lone Star State of Texas*, "government actors in their sovereign capacity and in the exercise of their official duties are accorded a presumption of good faith because they are public servants, not self-interested private parties." 560 F.3d 316, 325 (5th Cir 2009).

In light of substantial change in applicable law, further factual development is plainly required before the scope of injunctive relief—if any—would be fit for judicial review. A challenge to those practices will only be appropriate, if ever, after SB 17 actually takes effect. To that extent, this action is unripe.

Dismissal on the basis of mootness and lack of ripeness is thus warranted.

### c. Sovereign immunity

Texas A&M very briefly argues that sovereign immunity also bars Lowery's claims. Dkt 22 at 18–20.

**[21, 22]** A suit against Texas A&M, as an agency of the State of Texas, is construed as a suit against State officials. See *Sullivan v. Texas A&M University System*, 986 F.3d 593, 595 (5th Cir. 2021). But the doctrine of *Ex Parte Young* permits "an official-capacity equitable claim" to proceed against State officers so long as it "seeks injunctive relief for an ongoing violation of federal law" and the officer "bears a sufficiently close connection to the unlawful conduct" such that it can be redressed by injunction directed at the official. *Freedom From Religion Foundation, Inc. v. Mack*, 4 F.4th 306, 311–12 (5th Cir. 2021).

Lowery readily admits that he can't sue Texas A&M itself but contends that he can seek injunctive relief against the named officials. And he further contends that he has named the right officials to make that effective. Dkt 25 at 12–13.

The consideration of sovereign immunity serves only to confirm, in a rather roundabout way, the above observations as to standing and ripeness. On the one hand, to the extent that the parties evince a factual dispute as to the identity of the right officials for suit, Lowery's is the better point. For if the Court were inclined to proceed on this point, at worst, Texas A&M would be ordered to identify the correct officials. But to the extent the parties dispute whether the challenged prac-

tices are even ongoing, the analysis devolves to considerations of present injury and fitness for review in the first place.

Given the jurisdictional rulings above, the further question of sovereign immunity needn't be resolved.

3. Failure to state a claim, Rule 12(b)(6)

Texas A&M on reply notes that the Mays Business School has posted eight tenured or tenure-track faculty openings since July 2022. Six of those have been filled, with positions going to two white men, one Asian man, and three Asian women. Dkt 26 at 5–6, citing Dkt 26-1 at 3–4 (Anand declaration). It actually presents these alleged facts as further rejoinder on the standing inquiry. But statistics like that, if eventually substantiated, would cast consider-able doubt on Lowery's assertion that he, along with all other White and Asian men, are or would be at a disadvantage in the hiring pool.

Such statistics are obviously beyond comprehension at this juncture with respect to the merits, as they go well beyond the question whether the four corners of the first-amended complaint states viable claims. And in that respect, it is determined above that jurisdiction is lacking. Questions presented under Rule 12(b)(6) needn't, and shouldn't, be resolved. See *Hix v. US Army Corps of Engineers*, 155 F Appx 121, 127 (5th Cir. 2005).

4. Leave to amend

**[23]** Lowery recently moved to amend his complaint, seeking to add allegations as to justiciability following the enactment of SB 17 and the decision of the Supreme Court in *Students for Fair Admissions*. Dkt 37. He has also filed two additional notices that include online announcements made by the interim President about SB 17 compliance, further asserting that the announcements show that Texas A&M plans to continue with diversity commitments despite the mandate of SB 17. See Dkts 40 & 41; see also, Dkts 44 & 45.

**[24]** Whether to grant such leave is in the discretion of the court, and denial is appropriate when amendment would be futile. *Morgan v. Chapman*, 969 F.3d 238, 248 (5th Cir. 2020). And it would be futile here at this time. The proposed amendments simply reiterate much of what Lowery has included in supplemental briefing on the justiciability issues. They do nothing to overcome the above conclusions with respect to ripeness and standing. The same can be said as to the supplemental notices, for what's lacking is actual implementation and experience under the law as now proscribed.

The motion for leave to amend will be denied. There is certainly time and place enough for Lowery to bring further action if Texas A&M continues what he believes to be unconstitutional hiring practices. And nothing here should be construed to preclude later action on future facts.

5. Conclusion

The motion to dismiss by Defendants Texas A&M University, *et al*, is granted on ripeness, mootness, and standing grounds. Dkt 22.

The motion by Plaintiff Richard Lowery for leave to file a second amended complaint is denied. Dkt 37.

The complaint by Plaintiff Richard Lowery against Defendants Texas A&M University, *et al*, is DISMISSED WITHOUT PREJUDICE.

For the avoidance of doubt, this Order in no way precludes Lowery from bringing later action based on future practices of Texas A&M after implementation of new policy under SB 17.

A final judgment will issue by separate order.

So ORDERED.



**Rico MACIAS, Plaintiff,**

**v.**

**Halie WATKINS, Defendant.**

**Civil Action No. 6:22-CV-00043**

United States District Court, S.D. Texas, Victoria Division.

Signed September 30, 2023

Entered October 1, 2023

**Background:** Suspect brought § 1983 action against police officer for violating his Fourth Amendment rights, alleging that officer fired three rounds at him while investigating a possible burglary. Officer moved for summary judgment on grounds of qualified immunity.

**Holdings:** The District Court, Tipton, J., held that:

(1) suspect was "seized" within meaning of Fourth Amendment when police officer fired her gun at him;

(2) facts and circumstances taken together showed that seizure was supported by probable cause;

(3) first factor for evaluating whether use of force was excessive, severity of crime committed, weighed in favor of finding that use of deadly force was reasonable;

(4) second factor for evaluating whether use of force was excessive, whether there was immediate threat to safety, weighed in favor of finding that use of deadly force was reasonable; and

(5) officer's decision to use deadly force did not violate clearly established law.

Motion granted.

**1. Summary Judgment** ⚖︎77

If the party moving for summary judgment fails to meet its initial burden of informing the district court of the basis for its motion and identifying the record evidence which it believes demonstrates the absence of a genuine issue of material fact, the motion must be denied, regardless of the nonmovant's response. Fed. R. Civ. P. 56(a).

**2. Summary Judgment** ⚖︎77

The party opposing summary judgment must go beyond the pleadings and by the party's own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(c).

**3. Summary Judgment** ⚖︎89

If the evidence asserted by the party opposing summary judgment is merely colorable, or is not significantly probative, summary judgment is appropriate. Fed. R. Civ. P. 56(c).

**4. Summary Judgment** ⚖︎89, 95

On a motion for summary judgment, the nonmovant's burden to come forward with specific facts showing there is a genuine issue for trial will not be satisfied by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence. Fed. R. Civ. P. 56(c).

**5. Civil Rights** ⚖︎1376(2)

Qualified immunity protects government officials from civil liability to the